IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| DEWBERRY ENGINEERS, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Civil Action No. 1:20-cv-00610 |
| | ) | Hon. Liam O'Grady |
| DEWBERRY GROUP, INC., | ) | |
| | ) | **FILED UNDER SEAL** |
| *Defendant.* | ) | |
| | ) | |

## ORDER

This matter comes before the Court after a three-day bench trial held on October 12th – 14th, 2021, in the above-captioned action. The trial was limited to the sole issue of the appropriate quantum of damages to be awarded to Plaintiff Dewberry Engineers' Inc., *see* Dkt. 175 at 1, as the Court had previously granted Plaintiff's Motion for Summary Judgment, *see* Dkt. 174.

The parties subsequently submitted Proposed Findings of Fact and Conclusions of Law, Dkt. 238, Dkt. 239, and their respective Oppositions, Dkt. 245, Dkt. 246. Having taken all this under advisement, the Court holds the following.

## I. BACKGROUND

### A.   Procedural Background

On May 29, 2020, Plaintiff Dewberry Engineers, Inc. ("Plaintiff" or "Dewberry Engineers") sued Defendant Dewberry Group, Inc. ("Defendant" or "Dewberry Group") for trademark infringement and unfair competition under the Lanham Act and Virginia law. Dkt. 1. It also asserted breach of a 2007 Confidential Settlement Agreement ("CSA") that resolved

litigation between these same parties in 2006–07 (the "Prior Litigation"), when Plaintiff sued Defendant for infringing the same marks at issue now. The present claims relate to Defendant's rebranding from "Dewberry Capital" to "Dewberry Group," "Studio Dewberry," "Dewberry Office," and "Dewberry Living" (collectively, the "Infringing Marks").

In its Answer, Dewberry Group asserted counterclaims attacking Dewberry Engineers' federally registered service marks (the "Dewberry Marks") on the same grounds it raised in the Prior Litigation. Dkt. 19 at 3. The Court dismissed the counterclaims as plainly "barred by the [CSA]," which prohibited "the exact type of challenges [Defendant] is currently attempting to raise," finding that Defendant had also "misstate[d]" governing law and "ignor[ed] an entire paragraph of the CSA itself." *Id*. at 3-4.

The Court granted summary judgment in Dewberry Engineers' favor on all five counts of its Complaint, and denied Dewberry Group's cross-motion. Dkt. 174. On the contract claim, the Court found the CSA unambiguous. *Id*. at 4. Dewberry Group breached ¶B.6 by using "Dewberry" marks many times to promote and perform architectural-related services. *Id*. at 4–7. It repeatedly breached ¶B.3 by performing real estate development-related services using a "Dewberry" mark instead of "DCC" in Virginia. *Id*. at 8–10. It also breached ¶B.2 by rebranding to the Infringing Marks and using them in connection with promoting, offering, and performing real estate development services. *Id*. at 8–10, 15. Under ¶B.2, "Dewberry Capital" was the only "Dewberry" name that Defendant could use for such services—and only outside of Virginia, Maryland, or D.C.—thus giving Defendant a limited "safe harbor" from infringement. *Id*. Paragraph B.10 further narrowed that safe harbor to require use of the column/capital logo depicted in that paragraph together with "Dewberry Capital." *Id*. at 2, 7–10. Accordingly,

Defendant's repeated uses of "Dewberry" marks without the column/capital logo breached ¶B.10. *Id.*

The Court additionally found Dewberry Group liable for infringing the Dewberry Marks, holding that "no reasonable jury could, based on the evidence presented, find that no likelihood of confusion exists between the parties." *Id.* at 10–19. The Court also found that the infringement was intentional in view of the plain language of the CSA, *id.* at 15–16, 19, and harms Dewberry Engineers, which had invested substantially in its marks and developed positive associations for quality and expertise. *Id.* at 18–19. The confusion with Defendant "at best dilutes this investment," and "[m]ore concerning, Defendant's negative publicity damages [Dewberry's positive] reputational standing." *Id.* at 19. Having granted summary judgment to Dewberry Engineers on liability, the Court limited the scope of trial to "the appropriate quantum of damages to be awarded." Dkt. 175.

The Court denied Dewberry Group's motion for partial reconsideration. Dkt. 205. The Court also permanently enjoined Dewberry Group, and any others "in active concert or participation with" Defendant, from continuing the unlawful infringement. Dkt. 229 at 9. The Court stayed the injunction until final judgment. Dkt. 208.

The Court then heard a three-day bench trial on the sole issue of damages. Dkt. 175. The trial was held October 12th – 14th, 2021. At trial, Dewberry Engineers called damages expert Rodney Bosco, and relied on its admitted documentary evidence and deposition designations. Dewberry Group called Elizabeth Armstrong (its Director of Brand Development), David Groce (its former General Counsel), John Freeman (its Executive Vice President of Finance), John Dewberry (its Founder and CEO), and Lisa Miller (its damages expert).   At the close of

evidence, Defendant moved for Judgment on Partial Findings under Fed. R. Civ. P. 52(c), which Plaintiff opposed, and the Court denied. Day 3 A.M. Tr. 123:3–9.

## B.   Factual Background

The Court finds the following facts relevant to the profits disgorgement remedy owed to Plaintiff.

### 1.   Dewberry Group's infringement was intentional and ignored numerous red flags alerting it to the illegality of its conduct.

While proof of willful, intentional, or bad-faith infringement is not a prerequisite to profits disgorgement, the infringer's mental state is, nonetheless, "a highly important consideration" in awarding profits under the Lanham Act. *Romag Fasteners, Inc. v. Fossil Inc.*, 140 S. Ct. 1492, 1497 (2020). On summary judgment, the Court found Defendant's infringement to have been intentional. Dkt. 174 at 15-16, 19. The trial produced further evidence of Defendant's willfulness and bad faith. It showed that Dewberry Group encountered but ignored a succession of multiple "red flag" facts and circumstances alerting it to the illegality of its conduct, and had ample financial motivation for doing so.

The first red flag is Defendant's admissions before and during the pre-trial litigation that its use of "Dewberry" would cause confusion in the marketplace with Dewberry Engineers. Those historic admissions are still relevant because Defendant's development-related services have remained largely the same since 2004. John Dewberry Dep. Tr. [Dkt. 218-4] at 47:20–49:6.

In February 2006, Defendant, which then went by "Dewberry Capital," filed an application with the U.S. Patent and Trademark Office ("PTO") to register that name as a service mark for various real estate services. PX 73 at TSDR 901–02. The application was filed by Defendant's attorney Joseph V. "Jay" Myers, III of Seyfarth Shaw LLP. *Id.* at 903.

4

Two weeks later, Myers sent Dewberry Engineers a demand letter accusing it of trademark infringement, insisting that the *registered* Dewberry Marks were "extremely similar to" Defendant's *unregistered* "Dewberry Capital" mark "because of the common use of the predominant element 'Dewberry'" and because the companies' services "are legally related ... and travel in the same channels of commerce . . . ." PX 76 at 1–2. Thus, according to Defendant, "a likelihood of confusion or mistake exists between the parties' respective marks." *Id.* at 2.

At trial, John Dewberry tried to distance himself from this letter, testifying that "I don't believe" its contents. Day 2 P.M. Tr. 109:6-14. Yet John Dewberry did not dispute the letter's contents, he (not Hodgson) was copied on it, and he agreed that Defendant had retained Myers. PX 76 at 2; Day 2 P.M. Tr. 107:8-108:20.

Indeed, instead of backing off his position, John Dewberry offered to purchase Dewberry Engineers multiple times, which Dewberry Engineers rejected. PX 85 at 1; PX 89 at 1. John Dewberry admittedly made those offers. Day 2 P.M. Tr. 78:21–79:6. He tried to characterize them as a friendly gesture, *id.*, but his offers reveal a desire to obtain a connection with Dewberry Engineers and its marks, consistent with a motive to infringe.

The second red flag is that, in August 2006, the PTO rejected Defendant's "Dewberry Capital" application due to a likelihood of confusion with the Dewberry Marks. PX 73 at TSDR 0884–86. The PTO found the parties' marks to be virtually identical, sharing "the same dominant feature, namely DEWBERRY," and noted that "the parties' services are identical and highly related real estate services." *Id.* at 0885–86. These grounds for refusal are virtually identical to the PTO's grounds for refusing Defendant's subsequent unlawful "Dewberry" applications at issue in the present case.

The third red flag is the 2007 Confidential Settlement Agreement. The Court's summary judgment order found that Defendant repeatedly breached the CSA when it rebranded to the Infringing Marks, and cited those breaches as evidence of Defendant's intentional infringement. The Court explained that "Defendant was aware of Plaintiff's mark, entered into the CSA but breached the agreement as part of its 'rebranding' efforts, and then re-adopted the Plaintiff's 'Dewberry' mark." Dkt. 174 at 15–16, 19. Dewberry Group's defense, that the CSA gave it consent to use "'Dewberry' in general," was "meritless" because the unambiguous "CSA, in fact, says the opposite." *Id.* at 4, 15–16. This red flag is noteworthy given the pervasiveness of Defendant's unlawful uses of "Dewberry" marks discussed in the Summary Judgment Order, and reinforced by the evidence at trial.

Consistent with John Dewberry's pattern of claiming ignorance, when asked at trial whether he had read the CSA that he signed, his answer was, "probably not." Day 2 P.M. Tr. 82:23–84:12. Even if true, however, Dewberry Group remains bound by the CSA. When John Dewberry became aware of the CSA's restrictions, he said he "was not happy" to learn that it did not give both parties "equal rights" to use "Dewberry" for real estate development services because "that's what [he] wanted it to say." Day 2 P.M. Tr. 84:11-85:13. That admission reveals his awareness and dislike of the very CSA provisions that Defendant breached repeatedly, thus providing further evidence of willful and intentional infringement.

Despite the CSA's "Dewberry Capital" safe harbor and prohibition on using other "Dewberry" names, John Dewberry decided to jettison "Capital" in 2017 because he no longer liked its financial connotations. In a September 6, 2017 email, John Dewberry ordered his staff to rebrand to "Dewberry Group" and "Studiodewberry." PX 303; Day 2 P.M. Tr. 92:20–93:5.7 He also wanted to register a "Dewberry Group" mark with the PTO, but first asked his General

Counsel, David Groce, to "do a search" for that name, because Mr. Dewberry had been through "this thing before" (i.e., the Prior Litigation). PX 303; Day 2 P.M. Tr. 94:2–15. Yet John Dewberry never informed Groce about the prior litigation and the resulting CSA.

Two days later, Groce filed a "Dewberry Group" service mark application with the PTO for real estate development and related services. PX 302 at TSDR 0961–66; Day 2 A.M. Tr. 22:3–18. Groce emailed John Dewberry and others about this. PX 303. When Groce later learned of the Prior Litigation and CSA after receiving a cease-and-desist letter from Dewberry, he was "very, very surprised" and "embarrass[ed]," and apologetically agreed to abandon the application. PX 329; Day 2 A.M. Tr. 25:2–25:25, 59:14–61:4. The Court finds that John Dewberry's failure to inform Groce about the prior litigation and the CSA is further evidence of willfulness, as John Dewberry hoped that neither Groce nor Dewberry Engineers would raise objections that could hinder his desired rebranding.

The fourth red flag is that, when Groce nevertheless found Dewberry Engineers and the Dewberry Marks during his research and alerted John Dewberry and nine other colleagues, John Dewberry ignored it. John Dewberry testified that, "once I asked [David] Groce to do this [search], I kind of left it with him." Day 2 P.M. Tr. 98:10–18. When asked whether Groce performed the search as instructed, John Dewberry stated, "… I hope so. I was a little bit in the dark [on] what David [Groce] was doing, and I think he was keeping me that way on purpose." *Id.*, 124:22–25. That testimony is undercut by Groce's email which, despite heavy redaction, reveals that he did inform John Dewberry about finding Dewberry in the search. PX 301.

The fifth red flag is that, on December 19, 2017, a PTO examining attorney called Groce to explain her refusal of the "Dewberry Group" application, including its confusing similarity to the Dewberry Marks. PX 302 at TSDR 0938–39. The next day, the PTO informed Defendant of

the refusal in an Office Action sent to Groce. *Id*. The PTO found that "Dewberry Group" and the Dewberry Marks were confusingly similar because of the "dominant wording DEWBERRY" and similarity of the parties' services. *Id*. And this confusion could not be eliminated by using other descriptors, such as the "descriptive disclaimed wording GROUP," or by adding "a design element." *Id*. at TSDR 0939.

The Court finds that Groce's testimony throughout the trial was not credible. In particular, regarding the PTO's rejection, it strains credulity that Groce would clearly remember minor details, but have no recollection of the PTO's far more significant denial on confusion grounds with the Dewberry Marks. Similarly, the Court finds that John Dewberry's testimony throughout trial was not credible. John Dewberry testified that he "wasn't being kept abreast" of the PTO application or rejection, claiming that "I've never seen any of this stuff until you showed it to me today." Day 2 P.M. Tr. 99:22-100:6, 125:12-19. This professed ignorance is not credible. At best, his ignorance amounts to willful blindness.

The sixth red flag is that, a week after the PTO rejected "Dewberry Group," Plaintiff sent Defendant a cease-and-desist letter, demanding that it halt its efforts to register "Dewberry Group," which breached the CSA and reflected an intent to infringe. PX 321 at 1-3. Groce claimed this letter to be the first time he learned of the Prior Litigation and the CSA. Day 2 A.M. Tr. 24:2–25:8. John Dewberry once again pleaded ignorance and tried to blame his General Counsel: "David [Groce] may have, you know, been hiding [the letter] from me because he was afraid or something." Day 2 P.M. Tr. 98:19–99:3. This denial is no more credible than his many others, and Groce could not corroborate it given Defendant's election to invoke privilege. Day 2 A.M. Tr at 76:14–77:4. But even if it were true, it is more willful blindness.

The seventh red flag is that, in his January 11, 2018 apologetic response to Dewberry Engineer's cease-and-desist letter, Groce promised "to abandon our application" and "not to attempt to register the term DEWBERRY GROUP for real estate development services" or "to use the term in connection with any present or future real estate development or related services in Virginia, Maryland, or the District of Columbia" in violation of the CSA or Dewberry Marks. PX 329; *Id*. at 26:9–30:2, 90:20–92:24.

Despite all of these red flags, Defendant forged ahead with its rebranding. For example, in the same month as Groce's apologetic letter, Defendant promoted its architectural services for "Studio Dewberry" (a violation of the CSA). In February 2018, Defendant sent "Dewberry Group" marketing materials to prospective tenants, PX 343. In March 2018, Defendant used "Dewberry Capital" and "Studio Dewberry" in negotiations to purchase land from the owner of property in Charlottesville, Virginia. PX 348. Day 2 A.M. Tr. 94:20-97:11. Also in March 2018, Dewberry Group sent to its third-party brokers a branding guide directing them to use the Infringing Marks in "existing and future marketing materials." PX 350; Day 1 P.M. Tr. 91:15–92:12. The same month, Defendant used "Dewberry Group" in leasing materials sent to multiple prospective tenants in Charleston and Atlanta. PX 347; PX 349; PX 354. A month later, John Dewberry approved the decision to "continue with the Dewberry Group logo on all new leasing materials." PX 366; Day 1 P.M. Tr. 109:19–110:7.

Elizabeth Armstrong confirmed the high business and economic value Dewberry Group placed on rebranding to the Infringing Marks. *Id*.; Day 1 P.M. Tr. 112:19–114:19, 132:11–133:19; Armstrong Dep. Tr. [Dkt. 218-1] 305:4–306:14. She explained that the Infringing Marks, as a brand, were far superior to the abandoned "Dewberry Capital" mark and logo, and "really bring[] all of the properties and hotel together." *Id*., 133:1–19. Indeed, Dewberry Group

considered promotion of its services under the infringing "Studio Dewberry" mark to be a "top priority" as a "huge differentiator" from competing firms, to be highlighted "on any item we design." PX 338 at 05_DG-0247065; PX 344 at 05_DG-0246956. Defendant's perceived value of the rebranding was thus a strong motive to continue moving forward despite the ever-increasing red flags.

In April 2018, Dewberry Group applied to register the full suite of Infringing Marks with the PTO. PX 359 at TSDR 1315–17; PX 360 at TSDR 1726–31; PX 361 at TSDR 1897–02; PX 362 at TSDR 2209–11; Day 2 A.M. Tr. 35:21–38:3, 40:12–41:13. It did so without any notice to Dewberry Engineers. PX 329; Day 2 A.M. Tr. 111:2–10. Abandoning the column logo in breach of CSA ¶B.10, Defendant added a "D"-in-a-circle design element to three of those marks. *Id*. In addition to breaching the CSA, given the PTO's prior warning that adding a design element to "Dewberry Group" would not eliminate confusion with the Dewberry Marks, PX 302 at TSDR 0939, Defendant had to know its latest applications were likewise confusingly similar. Its General Counsel even conceded that "Dewberry"—Plaintiff's registered mark—is the "common denominator" of all the Infringing Marks. Day 2 A.M. Tr. 101:4-22.

Groce did not perform any risk evaluations prior to Defendant's filing to register the Infringing Marks. Groce Dep. Tr. [Dkt. 218-6] at 52:3–21. In fact, after Dewberry Engineers' December 2017 cease-and-desist letter to Defendant and Groce's apologetic reply, he was essentially stripped of responsibility for the "direction and management of the dispute" with Dewberry Engineers and prosecution of the Infringing Marks, as such matters were turned over to outside counsel. Day 2 A.M. Tr. 38:5–17. Groce similarly claims to have been uninvolved with Defendant's rebranding, testifying that "I was not personally involved" or "personally

familiar" with the "rebranding effort" or what "anybody else was doing" for it. *Id.*, 35:10–20. Like his other pleas of ignorance, Groce's purported lack of awareness here is troubling.

The eighth red flag is that, Dewberry Engineers sent another cease-and-desist letter in June 2018, PX 373, but Dewberry Group still refused to abandon the Infringing Marks. PX 374. In July 2018, Dewberry Engineers sent another letter, reiterating its objections to the Infringing Marks, informing Dewberry Group of actual confusion between the parties occurring "in both the Charlottesville area and the Northern Virginia area," and requesting a response within 21 days. PX 376; Day 2 A.M. Tr. 112:19–115:14. Defendant ignored the letter and continued with its rebranding and use of the Infringing Marks. E.g., PX 377, PX 379.

The ninth and final red flag is that, less than two weeks after Dewberry Group's third cease-and-desist letter, the PTO rejected Defendant's "Studio Dewberry" application as confusingly similar to the Dewberry Marks, finding the marks to be "similar in sound, appearance and commercial impression as a result of the term 'DEWBERRY'"; that the parties' services were related; and that the term "Studio" was merely descriptive and had to be disclaimed. PX 361 at TSDR 1859–63; Day 2 A.M. Tr. 107:11–109:16. Such confusion findings echo those in the PTO's refusals of "Dewberry Group" six months earlier and of "Dewberry Capital" in 2006. *Compare* PX 361 at TSDR 1859–63, *with* PX 302 at TSDR 0938–42, and PX 73 at TSDR 0884–86.

Having received no response to its July 13 letter, Dewberry Engineers submitted Letters of Protest to the PTO providing evidence as to why the three remaining Infringing Marks should also be refused on confusion grounds. PX 359 at TSDR 1169; PX 360 at TSDR 1648; PX 362 at TSDR 2103. In the ensuing months, the PTO refused those marks on substantially the same

confusion grounds as it rejected "Studio Dewberry," as Groce acknowledged. PX 359 at TSDR 1132–68; PX 360 at TSDR 1611–47; PX 362 at TSDR 2066–02; Day 2 A.M. Tr. 111:11–18.

Dewberry Group challenged the refusals, but the PTO rejected them as "unpersuasive," along with Defendant's multiple requests for reconsideration. PX 359 at TSDR 0980–82, 1033–53; PX 360 at TSDR 1460–62, 1512–32; PX 362 at TSDR 1915–17, 1967–87. The PTO's refusals of the Infringing Marks for confusion with the Dewberry Marks—just like the 2017 and 2006 refusals—were more obvious red flags. Again professing ignorance, John Dewberry said he "wasn't being kept abreast" of the applications for the Infringing Marks or the PTO's responses: "I've never seen any of this stuff until you showed it to me today." Day 2 P.M. Tr. 99:22–100:6; 125:12–19. This testimony, like his other denials, is not credible. But even if true, it would be yet another example of willful blindness.

### 2. Despite these numerous red flags, Dewberry Group forged ahead with its continued use of the Infringing Marks.

Despite these additional red flags throughout 2018 and 2019, Dewberry Group pressed forward. In May 2019, Defendant officially changed its name from "Dewberry Capital Corporation" to "Dewberry Group, Inc." with Georgia's Secretary of State. PX 472; Day 2 A.M. Tr. 7:23–25. It also distributed numerous leasing packages to prospective tenants and their brokers and loan request packages to lenders. *See, e.g.*, PXs 379, 385-87, 389-91. These leasing and loan packages all feature the Infringing Marks and promote Dewberry Group's portfolio of properties. Dewberry Group used the Infringing Marks with current tenants, too, such as in letters to its Oyster Park tenants soliciting advertisements on its new "large [Dewberry Living] Monument sign." PX 403. By January 2019, Dewberry Group had launched its new website plus its new "Dewberry Group" letterhead and email signature blocks with the Infringing Marks, *see*

*e.g.*, PX 433, PX 438. Also in 2019, Dewberry Group updated signage at multiple properties to feature the Infringing Marks, *see e.g.*, PX 639, PX 646, PX 645. And, Dewberry Group continued using "Dewberry Capital" and the Infringing Marks in Virginia for development in additional ways the Court has previously deemed unlawful.

In sum, this evidence shows that Defendant pervasively engaged in the very types of acts and services the Court determined to be clear breaches of the CSA and infringement of the Dewberry Marks. That Defendant did so in the face of the numerous red flags demonstrates that its infringement was intentional, willful, and in bad faith. Further, for the numerous reasons previously stated, the Court finds that the testimony of David Groce and John Dewberry throughout trial was not credible. At best, their feigned ignorance amounts to willful blindness on behalf of Dewberry Group.

## II. LEGAL STANDARD

Plaintiff Dewberry Engineers brings its case for profits disgorgement under the Lanham Act. The purposes of the Lanham Act include to "regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce… [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks…" 15 U.S.C. § 1127

15 U.S.C. § 1117(a) – Recovery for violation of rights under the Lanham Act – provides:

> … The Court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above

circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

The purpose of this provision allowing plaintiff to recover the infringing defendant's profits is to take all the economic incentive out of trademark infringement. *See American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 340 (5th Cir. 2008).

The Fourth Circuit outlines six equitable factors for a district court to consider in connection with the disgorgement-of-profits remedy for infringement under 15 U.S.C. § 117(a). These factors are: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Synergistic International, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006). *See also Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 176 (3d Cir. 2005); *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002) (identifying these same six factors). These factors are not exhaustive, and the Court may consider additional factors. *See Synergistic*, 470 F.3d at 176. Further, a plaintiff need not establish all factors to be awarded profits. *See Variety Stores, Inc. v. Walmart Inc.*, 852 Fed. Appx. 711, 721 (2021).

### III. DISCUSSION

In determining the proper amount of the disgorgement remedy to award to Dewberry Engineers, the Court considers numerous issues raised at trial and in the post-trial filings. These issues include: whether the *Synergistic* factors weigh in favor of disgorgement; whether Dewberry Group and the "Ownership Entities" are to be considered a single corporate entity; whether Bosco's revenue calculations are overinclusive; and whether Defendant carried its burden to prove costs or deductions claimed. The Court addresses each of these in turn.

A.     The *Synergistic* factors favor a disgorgement of profits remedy.

In considering the "*Synergistic* factors" outlined by the Fourth Circuit, the Court finds

that five of the six factors are applicable, and that a profit disgorgement remedy is appropriate in

this case.

The first *Synergistic* factor, whether the defendant had the intent to confuse or deceive,

"addresses whether there has been a willful infringement on the trademark rights of the plaintiff,

or whether the defendant has acted in bad faith." *Synergistic Intern.*, 470 F.3d at 175. In

awarding summary judgment to Dewberry Engineers, the Court held that the intent factor in the

likelihood-of-confusion analysis weighs in Dewberry Engineers' favor. Dkt. 174 at 15–16, 19.

As discussed above, the evidence at trial further demonstrated that Defendant's infringement was

not only intentional, but also willful and in bad faith. Ignoring just a few infringement red

flags—let alone a long succession of them as Defendant did—has been held to establish willful

and bad faith infringement. *See Variety Stores*, 852 F. App'x at 723. Indeed, where, as here, one

of the red flags includes "obligations under [a] Settlement Agreement . . . to refrain from using

[a] mark," it represents "not merely a case of knowing and deliberate infringement," but "a total

disregard of a specific promise" that amounts to "bad faith." *Am. Farm Bureau Fed'n v. Ala.*

*Farmers Fed'n*, 935 F. Supp. 1533, 1553 (M.D. Ala. 1996).

The second *Synergistic* factor, whether sales have been diverted, evaluates "whether the

plaintiff lost sales as a result of the defendant's trademark infringement activities, and the extent

to which the plaintiff had entered the market area where the infringement occurred." 470 F.3d at

175. In its summary judgment order, the Court already established that "the parties operate in

overlapping markets" and "market to the same kinds of parties," Dkt. 174 at 14–15, 19; thus, the

second *Synergistic* factor also favors disgorgement. Although Dewberry Engineers has not

provided direct evidence of lost sales, this is not required under the Lanham Act. *See, e.g.,*
*Exclaim Mktg., LLC v. DirecTV, LLC*, 674 F. App'x 250, 257 (4th Cir. 2016) (rejecting
infringer's argument that disgorgement was improper in the absence of evidence of actual
diverted sales).

The third *Synergistic* factor, the adequacy of other remedies, also favors Dewberry
Engineers. This factor considers "whether another remedy, such as an injunction, might more
appropriately correct any injury the plaintiff suffered from the defendant's infringement
activities," in lieu of disgorgement. 470 F.3d at 176. The injunction entered in this case will only
address future harm to Dewberry Engineers, not past injuries. *See Mazelmints, Inc. v. It's A*
*Wrap, LLC*, No. 1:10-CV-1117, 2011 WL 2960873, at *5 (E.D. Va. July 20, 2011) ("[P]ast harm
cannot be cured via an injunction."). The Court's summary judgment and injunction rulings
found that the confusion created by the infringement has injured Dewberry Engineers' positive
reputation and diluted its significant investment in its brand. Only disgorgement of Dewberry
Group's profits can redress Dewberry Engineers' unquantifiable but real reputational damage.
Additionally, Dewberry Group's use of the Infringing Mark in the face of myriad red flags
discussed above and attempts to justify such infringement through contorted readings of the CSA
indicate that an injunction alone is likely insufficient to deter all future infringement.

The fourth *Synergistic* factor, any unreasonable delay by the plaintiff in asserting its
rights, "addresses the temporal issue of whether the plaintiff waited too long, after the
infringement activities began, before seeking court relief." 470 F.3d at 176. Dewberry Group's
summary judgment motion asserted an unreasonable delay based on the two years between
Dewberry's filing suit and Defendant's applications for the Infringing Marks, Dkt. 71 at 32. But
the Court denied Defendant's motion, and the argument fares no better now.

Dewberry Engineers did not sit on its hands after Dewberry Group filed applications for the Infringing Marks. As discussed above, Dewberry Engineers promptly sent cease-and-desist letters, and when Dewberry Group ignored them, Dewberry Engineers filed Letters of Protest opposing the applications which the PTO acted on. Courts have found that pursuing an opposition in the USPTO can excuse a delay in filing suit on a Lanham Act claim. *See e.g., Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, No. 5:14-CV-217, 2016 WL 6906704, at *3 (E.D.N.C. Nov. 22, 2016), *vacated and remanded on other grounds*, 888 F.3d 651 (4th Cir. 2018) (2.5 year delay in suit not unreasonable delay given plaintiff's PTO opposition to infringing applications); *Exclaim Mktg., LLC v. DirecTV, LLC*, 674 F. App'x 250, 257–58 (4th Cir. 2016) (affirming enhanced profits award despite four-year delay in filing suit). *See also Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 2d 152, 159 (D.D.C. 2007) ("Numerous courts have recognized that pursuing an opposition in the USPTO excuses delay in filing suit on a Lanham Act claim.")

The fifth *Synergistic* factor, the public interest in making the misconduct unprofitable, "addresses the balance that a court should strike between a plaintiff's right to be compensated for the defendant's trademark infringement activities, and the statutory right of the defendant to not be assessed a penalty." 470 F.3d at 176. Infringing "behavior . . . interferes with the consumer's ability to make informed purchasing decisions." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 176 (3d Cir. 2005). The Court has already found that Dewberry Group's infringement caused actual consumer confusion, Dkt. 174 at 16-19. Furthermore, Dewberry Group generated millions while using the Infringing Marks between 2018 and 2020. The Court acknowledges that there is a public interest in making such conduct unprofitable. *See American Rice*, 518 F.3d at 340

("[T]he purpose of section 1117 is to take all the economic incentive out of trademark infringement.") (internal citation omitted).

The sixth and final *Synergistic* factor, whether it is a case of palming off, "involves the issue of whether the defendant used its infringement of the plaintiff's mark to sell its products, misrepresenting to the public that the defendant's products were really those of the plaintiff." 470 F.3d at 176. Both Plaintiff and Defendant agree that this is not a case of palming off, and the Court agrees. But a plaintiff need not establish all factors to be awarded profits. *See Variety Stores, Inc.,* 852 Fed. Appx. at 721.

In sum, the Court finds that five of the six *Synergistic* factors outlined by the Fourth Circuit favor Plaintiff Dewberry Engineers in this case. Therefore, the Court finds that a profit disgorgement remedy is appropriate here.

## B.   Dewberry Group and the "Ownership Entities" are considered a single corporate entity.

The parties disagree on whether the Court should consider, as Defendant urges, only the revenues and profits reported on the tax returns of the single corporate entity Dewberry Group, Inc., or as Plaintiff argues, the revenues and profits that were generated and collected by the Dewberry Group real estate business, through the services and managerial efforts of Dewberry Group and its employees and ultimately distributed to affiliated, single-purpose entities owning properties managed and serviced by Dewberry Group (collectively, the "Ownership Entities"). It is undisputed that John Dewberry owns outright and/or controls Dewberry Group and the Ownership Entities.

As a preliminary matter, Dewberry Group states that the Court already held that the Ownership Entities are "third parties, separated by the corporate veil." Dkt. 174 at 6. While the

Court did use this phrase, evidence further developed at trial has proven it to be inaccurate. This phrase did not control the Court's holding in the summary judgment order and does not govern the Court's analysis here.

Defendant's expert witness, Lisa Miller, looked at corporate formalities and tax reporting to conclude that all of the revenue shown on the books of the Ownership Entities should be excluded. Day 3 A.M. Tr. 32:13–33:17. She further opined that Defendant generated zero profits because the Dewberry Group, Inc. tax entity showed losses on its tax returns. *Id.*, 35:5–18; DX 511. Dewberry Group argues that it is responsible for the accounting and cash management for each separate Ownership Entity, which includes logging debits and credits for each separate entity and maintaining each separate entity's bank account; however, Dewberry Group argues that it is not the "economic engine that creates the revenue that flows to these Ownership Entities." Tr. [Doc. 233] at 12:1-8.

In contrast to Defendant's reliance on corporate formalities and tax reporting, Plaintiff's expert witness, Rodney Bosco, looked at the economic reality of how the Defendant's business actually operates. In Bosco's opinion, when the evidence of Dewberry Group's business and financial operations is considered from an economic perspective, it supports consideration of the total revenues and profits of the combined Dewberry Group real estate business. Bosco explained that Dewberry Group's real estate business is structured so that it and its employees promoted, managed, and operated all of the properties owned by the Ownership Entities, and did so using the Infringing Marks. *Id.* Dewberry Group's Executive Vice President of Finance, John Freeman, provided testimony consistent with Bosco's conclusions. Day 2 P.M. Tr. 6:7–10:21; Freeman Dep. Tr. [Dkt. 218-5] at 68:12–70:9, 81:8–82:22, 91:14–92:8, 97:4–99:6, 103:13–105:17, 135:1-13. And, even though the Ownership Entities do not and cannot perform the work and services

necessary to generate revenues (but for limited exceptions at the hotel), all revenues generated through Dewberry Group, Inc.'s services show up exclusively on the Ownership Entities' books. Day 1 P.M. Tr. 9:9–10:17 (Bosco).

Furthermore, John Dewberry has contributed at least $23 million to cover Dewberry Group, Inc.'s massive losses over the past 30 years. PX 690, ¶42; PX 710, ¶73; Day 2 P.M. Tr. 16:1–9 (Freeman). Because no real estate or other business could continue as a going concern after decades of losses like these, Bosco rationally concluded that Dewberry Group, Inc.'s tax returns, standing alone, do not tell the whole economic story. PX 690, ¶¶12–17; 40–51; PX 710, ¶¶40–43; Day 1 A.M. Tr. 69:4–70:13.

Bosco's analysis is supported by ample evidence, and the Court concurs with his analysis. The Court acknowledges the economic reality that, but-for the revenue generated by the Ownership Entities, Dewberry Group as a single tax entity would not exist.

The Court further finds that *American Rice* is instructive. In that case, the Fifth Circuit held that profits earned by a cooperative are "profits" for the purposes of the Lanham Act, regardless of how they may be passed on to members or how they are taxed. *American Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 339 (5th Cir. 2008). On appeal, defendant argued that the district court erred in considering profits as a recoverable Lanham Act damage item because, due to the nature of its business, defendant retained no profits; rather, they flowed through to the member farmers. The plaintiff argued that defendant's business structure is irrelevant to its obligations as infringers, and the Fifth Circuit agreed. *Id.* The Fifth Circuit found that defendant clearly earned a profit on its sales, and that it passed the profits on to its patrons. "The 'flow-through' of the profits to the farms is certainly relevant to how [defendant] is treated for tax purposes; however, [defendant] cites no authority for the proposition that tax treatment is

relevant to the Lanham Act remedies." *Id.* The Fifth Circuit therefore held that "profits earned by [defendant] are [defendant's] profits for purposes of the Lanham Act, regardless of how such profits are passed on or how they are taxed." *Id.* at 340. *See also Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.,* 778 F.3d 1059, 1076 (9th Cir. 2015) (upholding district court's refusal to reduce an infringer's profit disgorgement based on royalty fees paid to another entity where "the royalty fee arrangement was not an arms' length transaction"); *Aladdin Manufacturing Co. v. Mantle Lamp Co.,* 116 F.2d 708, 713 (7th Cir. 1941) (holding that an infringer cannot reduce the profits it must pay for infringement by distributing those profits to partners or shareholders); 5 McCarthy on Trademarks and Unfair Competition § 30:69 ("[P]rofits earned by… a cooperative are 'profits' for purposes of the Lanham Act, regardless of how they may be passed on to members or how they are taxed.").

The Court therefore holds that Dewberry Group, Inc. and its Ownership Entities will be treated as a single corporate entity when calculating the revenues and profits generated by Defendant's use of the Infringing Marks. Again, the equitable purpose underlying the Lanham Act's disgorgement remedy is to prevent unjust enrichment and "take all the economic incentive out of trademark infringement." *Am. Rice,* 518 F.3d at 340. Consistent with the legal authority cited above, this Court will not allow the non-arms' length corporate dealings and tax treatment of Dewberry Group's business enterprise to trump the economic reality of its profit infringement. To hold otherwise would not only ignore the economic reality of how Defendant's business operates, but also undermine the equitable purposes of the Lanham Act's disgorgement remedy by enabling the entire Dewberry Group enterprise to evade the financial consequences of its willful, bad faith infringement. That Plaintiff did not name the Ownership Entities as defendants or allege contributory infringement or alter-ego liability is of no moment. The courts in

*American Rice, Aladdin*, and *Fifty-Six Hope Road Music* and others did not impose such requirements.

### C.   Bosco's revenue calculations are overinclusive.

Plaintiff's expert witness, Rodney Bosco, calculated the total profits attributable to Dewberry Group's use of the Infringing Marks during the infringement period to be $53,719,657. PX 710, ¶61 & Fig. 3 (Revised); Day 1 A.M. Tr. 50:4–22.

By contrast, Defendant's expert witness Lisa Miller claimed that little or none of the Dewberry Group's revenues at issue were attributable to the use of the Infringing Marks. In particular, she noted that all of Dewberry Group's revenues and profits should be excluded based on her finding that leases with *some* tenants were signed before the infringement began, or that communications with some other tenants occurred before the infringement began. Day 3 A.M. Tr. 28:13–30:11. From this, Miller concluded that *none* of the revenues or profits from any property rentals could be related to infringement. *Id.*, 28:13–30:11. Miller further argued that numerous other market factors weigh on a prospective commercial tenant's decision to lease a commercial property.

As for the Dewberry Hotel revenues, Miller opined that they should be completely excluded because, in her view, the hotel does not use the Infringing Marks. Id., 41:9–11. And as for parking revenues, Miller opined that they should be completely excluded because those revenues are either: (i) related to tenant leases; or (2) paid by transient parkers who, in her view, would not consider names, marks, signs, or reputations in considering where to park. *Id.*, 95:22–96:1.

The Court addresses each of these arguments in turn. As a preliminary matter, the Court acknowledges that profits disgorgement under the Lanham Act is a remedy sounding in equity,

allowing courts to adjust an award up or down as circumstances demand. 15 U.S.C. § 1117. "[A] trial court, in assessing the issue of damages under 15 U.S.C. § 1117(a), should weigh the equities of the dispute and exercise its discretion on whether an award is appropriate and, if so, the amount thereof." *Synergistic Intern.,* 470 F.3d at 176. The Court acknowledges that it does not provide a precise mathematical calculation of the profits earned by Dewberry Group, but rather weighs the equities in determining the appropriate disgorgement remedy.

The Court further acknowledges that Bosco conservatively evaluated the infringement period. Bosco determined a starting date for the infringement at each of the Dewberry Group properties relying on Defendant's loan and leasing materials (among other materials) bearing the Infringing Marks, and identifying each starting date in his report. PX 690, ¶¶27–31, Fig. 1, 2 & App. A (PX 692); Day 1 P.M. Tr. 6:9–8:9. Bosco did not start the infringement period for any Dewberry Group property until the month after the first documented use of the Infringing Marks that he observed at each property. Day 1 A.M. Tr. 52:19–54:6, 55:18–56:6. Bosco could not use start dates prior to January 2018 because Dewberry Group did not produce profit-and-loss statements for any periods before January 2018. Day 1 A.M. Tr. 5:21–6:3. Bosco observed evidence showing first uses of the Infringing Marks for properties that were earlier than the dates reflected in his reports (e.g., PX 343 for Peachtree Pointe; PX 347 for Dorchester Square; PX 379 for Ortega Park). Day 1 P.M. Tr. 16:9–19:1. What's more, the December 31, 2020 end date for Bosco's calculation of Dewberry Group's revenues and profits is also conservative, as the infringement has continued through today. Dewberry Group did not produce any profit-and-loss statements for 2021. Day 1 P.M. Tr. 4:23–5:2, 19:2–6.

Recognizing this, the Court turns to the specific issues with Bosco's calculations as raised by Defendant Dewberry Group.

First, the Court reviews profits earned by the Dewberry Group Properties other than the Dewberry Hotel. Bosco's Revised Supplemental Expert Report indicates that total profits earned from these properties while using the Infringing Marks from 2018 – 2020 is $47,427,117. PX 710, ¶61 & Fig. 3 (Revised). However, the Court acknowledges that some leases within these properties were indeed signed before the period of infringement began. The Court agrees that the relevant Ownership Entities and their lessees therefore had preexisting performance obligations as a result of these pre-existing leases. These resulting streams of revenue were already in place and were therefore unlikely to be the direct result of Dewberry Group's use of the Infringing Marks. At the same time, the Court acknowledges that, once the Infringing Marks were put into place, Dewberry Group had an ongoing and active relationship with its lessees. These Infringing Marks allowed the Ownership Entities to maintain the existing contractual relationship with, and the revenue received from, a tenant – although the relationship and revenue had been previously established.

The Court finds the fact that some these leases were in place prior to the period of infringement should decrease the total disgorgement award due to Dewberry Engineers. However, because of the large number of leases signed in total throughout all of the Dewberry Group Properties, and because of the many variances in the rental cost and timeline of each lease, it is not possible for the Court to be exact in its determination of the financial impact of the Infringing Marks. Because the revenues earned from these pre-existing leases cannot be fully attributed to the Infringing Marks, the disgorgement award will be reduced accordingly under the principles of equity.

Second, the Court addresses the profits earned from the Dewberry Hotel. Bosco's Revised Supplemental Expert Report indicates that profits earned from The Dewberry

Charleston Hotel while using the Infringing Marks from 2018 – 2020 total $6,292,540. PX 710 Revisions Figure 3. Defendant notes that Plaintiff does not allege that the use of THE DEWBERRY® for hospitality services is an infringement. Moreover, Defendant argues, the Infringing Marks are not used in connection with hospitality services associated with the hotel. *See* Dkt. 238 at 29. Plaintiff argues, by contrast, that Bosco included its revenues because Dewberry Group used Infringing Marks in connection with financing and promoting the hotel (e.g., negotiations and communications with investors, PX 292, 497; loan solicitations, PXs 414– 16, 434, 473, 590; in Architectural Record magazine), and in loan packages for other properties featuring the hotel. PX 389 at 27; PX 532 at 29; see also Day 1 P.M. Tr. 11:22–14:7. Dewberry Group's Director of Brand Development, Elizabeth Armstrong, further testified that the Infringing Marks "really bring[] all of the properties and hotel together" as part of "one unified brand," and that the hotel is advertised on Dewberry Group's website. Day 1 P.M. Tr. 79:7-9; 133:1-19. The Court acknowledges that Plaintiff Dewberry Engineers did not allege that the use of THE DEWBERRY® for hospitality services is an infringement. Further, an average patron of the hotel would not know it to be in any way associated with the Infringing Marks. Therefore, the Court finds that the full profit from the hotel of $6,292,540 from 2018 – 2020 as calculated by Bosco should not be disgorged in its entirety. The Court will reduce the award in light of this.

Third and finally, the Court addresses Miller's argument that the parking revenues should be excluded completely because those revenues are either: (i) related to tenant leases; or (2) paid by transient parkers who would not consider names, marks, signs, or reputations in considering where to park. The Court agrees with Plaintiff that Miller's basing this assertion solely on her own personal parking experiences in Atlanta is insufficient. Day 3 A.M. Tr. 94:23–96:1. Her position is also undermined by evidence that Dewberry Group promotes and performs its parking

services under its Infringing Marks. *E.g.*, PX 341; PX 483; PX 484; *see also* PX 710, ¶¶80–83. The Court therefore finds that Dewberry Group's efforts to exclude parking revenues are unavailing.

In summary, under the principles of equity set forth under the Lanham Act, the Court will award a portion of the revenues generated during the infringement period as calculated by Bosco. This reduction to Plaintiff's requested award acknowledges the fact that some leases pre-dated the use of the Infringing Marks, and that attributing the full revenue from these leases is therefore inappropriate. Similarly, Plaintiff did not allege that the use of THE DEWBERRY® for hospitality services is an infringement, an average patron of the hotel would not know it to be in any way associated with the Infringing Marks. Given all this, the Court will reduce the total award to Plaintiff by twenty percent.

### D.    The burden was upon Dewberry Group to prove costs or deductions claimed.

Finally, the Court notes that, after Dewberry Engineers established Dewberry Group's revenues during the infringement period, the burden shifted to Dewberry Group to prove (1) any costs or deductions from those revenues, 15 U.S.C. § 1117(a) and (2) any revenues that had "no relation" to the infringement. The language of the Lanham Act could not be clearer: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). *See also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him."); *American Rice*, 518 F.3d at 337 ("[T]he Act allows the plaintiff to recover the defendant's profits based on proof of the defendant's sales. Once the plaintiff establishes the defendant's sales, then it is the defendant's burden to prove all elements of cost or deduction claimed.").

Dewberry Group failed to carry its twin burdens of proof on deductions (such as reasonable expenses) and non-infringement revenues. Defendant's expert, Miller, did no analysis of Defendant's expenses. Instead, she argued only that "no revenues left that apply to the alleged use of the marks." DX 168 at 21. Based on that unsupported position, Miller did no analysis of Defendant's expenses and no calculation of Defendant's actual profits; Miller conceded she "did no actual calculations" regarding expense items used to ratchet profit down to zero, and "did not do a profits analysis," simply because she had already (wrongly) concluded there were zero infringement-related revenues. Day 3 A.M. Tr. 46:25–47:16; 59:15–18.

That Defendant declined to do this analysis puts both the Defendant and the Court at a disadvantage. Rather than rely on specific calculations of appropriate deductions set forth by the Defendant, the Court must instead rely on more general notions of equity, as discussed above, and determine its disgorgement award accordingly.

### E.      This is an exceptional case warranting attorneys' fees.

Finally, the Court finds that this is an "exceptional case" under the Lanham Act, thus warranting attorneys' fee-shifting. In *Verisign, Inc. v. XYZ.COM LLC*, 891 F.3d 481 (4th Cir. 2018), the Fourth Circuit explained that: (1) the requisite standard of proof is only a "preponderance of the evidence;" and (2) an "exceptional" case is one "presenting either subjective bad faith or exceptionally meritless claims" that "while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at 485, 487 (internal citations omitted). Thus, while proof of willful or bad faith infringement is no longer necessary, such conduct clearly remains the hallmark of an "exceptional" case. This Court has observed that proof of "an intent to infringe or deliberate disregard for the rights of the mark holder" is sufficient to make a case "exceptional." *Mazelmints*, 2011 WL 2960873, at *5.

The record here demonstrates beyond a preponderance of the evidence that Dewberry Group engaged in bad faith, intentional misconduct. Dewberry Group pervasively breached the CSA over Dewberry Engineers' objection, in contravention of its General Counsel's false assurances, and in the face of multiple red flags, which were cited by the Court on summary judgment, Dkt. 174 at 14–15, and bolstered at trial. Courts have held that where a defendant infringes a mark in disregard of clear obligations under a settlement agreement like the CSA, that the case is "exceptional." *E.g., Mya Saray, LLC v. Al-Amir*, 831 F. Supp. 2d 922, 937 (E.D. Va. 2011) ("[T]he defendants' . . . intentional breach of the Settlement Agreement [restricting defendants from using plaintiff's trademarks] make this case exceptional" under the Lanham Act).

## IV. CONCLUSION

Dewberry Group continuously disregarded Dewberry Engineers' trademark and contractual rights. Rather than abide by the outcome of the Prior Litigation and CSA, Defendant jettisoned the only "Dewberry" mark and logo allowed by the CSA, and then brazenly rolled out and used four separate infringing marks and sought federal trademarks for them. Ignoring red flags including the Prior Litigation, Defendant's own acknowledgements of confusion risks, the CSA, concerns raised by its employees, cease-and-desist letters from Dewberry, and multiple PTO refusals, Dewberry Group barreled ahead with its unlawful, all-encompassing rebranding. The Court finds that, in addition to enforcing the already-entered permanent injunction, ordering disgorgement of profits and attorneys' fee shifting is necessary to deter Dewberry Group from continuing its wrongdoing, and ensure that it doesn't unjustly benefit from four years' use of the Infringing Marks.

The purpose of the provision of the Lanham Act allowing plaintiff to recover the infringing defendant's profits is to take all the economic incentive out of trademark infringement. *See American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 340 (5th Cir. 2008). "[A] trial court, in assessing the issue of damages under 15 U.S.C. § 1117(a), should weigh the equities of the dispute and exercise its discretion on whether an award is appropriate and, if so, the amount thereof." *Synergistic Intern.,* 470 F.3d at 176.

The Court applies these principles here, to find that an award of $42,975,725.60 to Plaintiff Dewberry Engineers is appropriate. This is a twenty percent reduction from Plaintiff's requested award of $53,719,657. This reduction accounts for the fact that some leases in the Dewberry Group Properties pre-dated the use of the Infringing Marks, and that Plaintiff did not allege that the use of THE DEWBERRY® for hospitality services is an infringement. Again, the Court notes that Defendant failed to calculate its own expenses and non-infringement related revenues. Because Defendant failed to carry its burden, and because the Court cannot be exact in its determination of the financial impact of the Infringing Marks for the reasons previously discussed, it must instead rely on more general notions of equity and determine its disgorgement award accordingly.

In conclusion, the Court **AWARDS Plaintiff Dewberry Engineers $42,975,725.60 in damages**.

As discussed above, the Court also finds that this is an exceptional case warranting attorneys' fees. Plaintiff is directed to file a separate motion indicating the attorneys' hours worked with particularity, the billing rates of the attorneys involved, and an affidavit of reasonableness from a Northern Virginia practitioner.

Finally, this Order is filed under seal. The Court intends to unseal this Order in 10 days. If the parties would like any part of the Order to remain under seal, they should promptly file a motion.

It is **SO ORDERED.**

March 2, 2022                                   Liam O'Grady
Alexandria, Virginia                            United States District Judge