**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| DEWBERRY ENGINEERS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-610-LO-IDD |
| | ) | |
| DEWBERRY GROUP, INC. F/K/A | ) | |
| DEWBERRY CAPITAL CORPORATION. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF ARTHUR E. SCHMALZ IN SUPPORT OF PLAINTIFF
DEWBERRY'S PETITION FOR ATTORNEYS' FEES AND BILL OF COSTS**

I, Arthur E. Schmalz, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over 18 years of age and otherwise competent to make this declaration.

2.      I have personal knowledge of all matters alleged herein.

3.      I am a partner at the law firm Hunton Andrews Kurth LLP ("Hunton") on the

litigation team engaged in an active civil litigation practice for nearly three decades, and am the

attorney of record and lead counsel for the Plaintiff Dewberry Engineers Inc. ("Dewberry"), in

this action.  I have been admitted to practice in all courts in the Commonwealth of Virginia and

in this Court since 1993, and subsequently admitted to the United States District Court for the

Western District of Virginia, the United States Court of Appeals for the Fourth Circuit, the Court

of Appeals of the District of Columbia, the Court of Appeals of Maryland, and the United States

Supreme Court.

**A. Overview of the litigation prior to Hunton's entry into the case.**

4.      In May 2020, Dewberry filed this trademark infringement and breach of contract

lawsuit against Defendant, Dewberry Group, Inc. ("Dewberry Group").  The Complaint was

prepared and filed on Dewberry's behalf by attorneys with the Fairfax, Virginia-based law firm

McCandlish Lillard, P.C. ("McCandlish").   In addition to the Complaint, McCandlish attorneys

later prepared and filed a motion to dismiss counterclaims asserted by Dewberry Group, which

motion the Court granted on September 4, 2020 [Dkt. 19].

5.      On October 15, 2020, the Court issued the initial Rule 16(b) Scheduling Order

[Dkt. 24] which, among other things, set a November 4, 2020 deadline for submission of the

parties' opening expert witness reports, and reiterated the February 12, 2021 deadline for

completion of all discovery set forth in the Court's September 23, 2020 initial pretrial conference

order.

**B. Hunton's engagement five months into the case with looming expert witness and discovery deadlines.**

6.      On Friday, October 23, 2020, Dewberry asked me to serve as its lead counsel in

the pending litigation for the remainder of the case.  At that time, the parties' settlement

discussions over the prior several months had been unsuccessful.  It had also become apparent

that the case would require additional litigation resources beyond the capabilities of McCandlish,

a comparatively small law firm, especially under the short expert witness and discovery

deadlines set by the initial Scheduling Order.  Among other things, within approximately the

next 30 days, Dewberry had to locate, retain and work with multiple expert witnesses to ensure

timely and adequate preparation of expert reports, complete initial disclosures, collect, review

and begin producing tens of thousands of pages of emails and other electronically stored

information ("ESI") in response to the Defendant's 52 requests for production, and answer 260

requests for admissions and 25 interrogatories (not counting subparts) served two weeks earlier, on October 8, 2020.

7.      After considering the matter over the weekend, I agreed to accept the engagement and entered by appearance in the case on November 2, 2020 (Dkt. 25).  I quickly assembled a multi-disciplinary team consisting of attorneys at Hunton whom I knew had the specific skill sets, expertise and availability to handle all facets of the case and meet the tight deadlines we were facing at the time.  In addition to myself, a senior litigation partner, the initial Hunton team consisted of my partner, Stephen Demm, a trademark specialist in our firm's Richmond office, Julie Peters, a senior litigation associate in Hunton's Washington, D.C. office, and Meghan Podolny, a counsel in our Richmond office who specializes in ESI and e-discovery-related matters.

8.      A detailed summary of these and other relevant professionals' backgrounds and roles in the case appears in Section C, *infra*, but in summary, I selected the above-named professionals to head up our initial Hunton team for very specific reasons.  Mr. Demm not only has extensive trademark litigation experience, including in this Court, but also had been heavily involved in the prior, 2006–07 trademark dispute between Dewberry and Dewberry Group (then known as Dewberry Capital).  He was also involved with the pre-lawsuit cease and desist letters to the Defendant and USPTO protest proceedings involving the Defendant's infringing marks.  Mr. Demm's experience and skill sets would prove very useful and important in addressing numerous trademark-specific issues throughout the case, among other things.

9.      Ms. Peters is a very experienced and talented civil litigation associate who had handled a number of complex civil litigation matters for Dewberry in recent years.  Her attention to detail and writing is superb, and I knew that I could rely on her to interface with the client and

its witnesses to gather and marshal the key facts on which our case would depend (facts which in some cases stretched back a half-century or more), answer the Defendants' discovery requests, research and draft motions and briefs, and prepare witnesses and take depositions, among other things. Ms. Peters carried out those tasks excellently until she suffered some health problems in early 2021 that forced her to withdraw from the case by mid-March 2021. As discussed further below, in mid-February 2021, I brought in senior litigation associate, Brian Wright, to replace Ms. Peters on the team. Mr. Wright is an experienced litigator whom I knew ultimately could adequately take over Ms. Peters's role. But due to the depth and breadth of the factual information involved, it would, quite understandably, require considerable time for him to learn the relevant facts and documents sufficiently to replace her.[1]

10.     I brought in Ms. Podolny, a very accomplished and experienced ESI/e-discovery specialist, to handle those aspects of the case, a role that she carried out superbly. Within just the first few days of the case, Ms. Podolny developed, and began executing a plan to tackle all of the many complex and labor-intensive ESI collection and review tasks that Dewberry faced at the outset of the case. Her efforts would continue throughout most of the pre-trial period, as she discusses in her accompanying Declaration. To collect and process the large quantities of ESI from Dewberry under the extremely short time frame presented, Ms. Podolny used a small team of Hunton lawyers to help her carry out that function. That team included, principally Melissa Romanzo, a senior litigation associate with whom Ms. Podolny had worked previously in similar situations. Ms. Romanzo supervised capable attorneys and professionals with significantly lower

---

[1] For that reason, as discussed further below, I wrote off the first 40 hours of Mr. Wright's time in February 2021 ($28,000 of associated fees), as well as another $29,000 of his time in March 2021 assisting with witness deposition preparation and participation in depositions. *See* **Exhibit B** to Dewberry's Motion for Attorneys' Fees (authenticated below in ¶ 11).

billing rates who conducted the necessary relevance, responsiveness and privilege review of Dewberry's materials.  The primary attorneys who handled those tasks were junior litigation associate, Colin Stanton, staff litigation attorney, Natalie Harris, and law clerk/paralegal Nicholas Thomason, with support as needed from firm paralegals.

11.     Our initial engagement terms with Dewberry provided for hourly representation at our firm's regular standard rates, as adjusted from time to time for market conditions and seniority.  The initial professionals assigned to the case, and their then-current rates, were as follows, with Hunton having the ability to add additional professionals at their current standard hourly rates as the need may arise:

| | |
|---|---|
| Stephen P. Demm, Partner (Richmond) | $985[2] |
| Arthur E. Schmalz, Partner (DC) | $985 |
| Julie Peters, Sr. Associate (DC) | $750 |
| Megan Podolny, Counsel (Richmond) | $675 |
| Melissa Romanzo, Sr. Associate (Charlotte) | $720 |

Approximately two months later, however, when it became apparent that the intensity of the litigation was going to be even greater than originally anticipated, the firm agreed to provide a 16% discount on all invoices (including our initial invoices), as well as additional discounts as deemed appropriate by myself and my firm to keep the fees within the range of the client's expectations, as well as fair and reasonable.  In addition to pre-billing discretionary write-offs of time (totaling over $163,000), the firm also provided additional percentage discounts on several invoices beyond the baseline 16% discount, including three invoices with a 25% total discount (Oct.-Dec. 2020); another with a 30% total discount (Feb. 2021); and another with a 32% total discount (Mar. 2021).  The firm also had over 40 hours of useful research and other legal work

---

[2] Mr. Demm's then-current standard rate was $1035/hr.  The firm, in its discretion, however, elected to charge the client only $985/hr, which was the same as my then-current standard rate for 2020.

performed in May through July 2021 by talented summer associates which was either written off pre-bill, or reflected as no charge on the invoices.. The combined discretionary write-offs and percentage discounts applied to each of the invoices at issue since the inception of Hunton's engagement in October 2020 through the present total more than $1.76 million in fees at our firm's rates agreed to by Dewberry. A true and accurate copy of Hunton's invoices that relate to its attorneys' fee claim in this case, with the exception of certain redactions discussed below,[3] are attached as **Exhibit A** to Dewberry's Brief in Support of Motion for Attorneys' Fees. A true and accurate summary of those invoices, along with pre- and post-invoice write-offs and discounts is attached as **Exhibit B** to Dewberry's Brief in Support of Motion for Attorneys' Fees. Dewberry has paid all final invoices timely and completely as of this writing, except for the March 2022 invoice which was only just submitted to the client earlier this month.

12.     Handling the collection, review and production of Dewberry's large volume of ESI and documents was a huge undertaking that required intense focus and effort by Ms. Podolny and the attorneys working with her on that task, making it necessary to have additional associate resources to review and analyze Dewberry Group's ESI/documents and discovery responses, and to propound follow-up written discovery as necessary, among other things. Originally, those tasks were to be handled by Mark Abrajano, the McCandlish associate who had been involved with the case from the outset. In mid-November 2020, however, Mr. Abrajano, informed the team that he was leaving his firm by the end of the month. McCandlish had no available associates who could replace him. As a result, in late November 2020, I brought in Jon Caulder, a talented and experienced mid-level litigation associate in Hunton's Richmond office, to fill Mr. Abrajano's role by taking primary day-to-day responsibility for handling most matters

---

[3] *See infra* ¶¶ 62, 66.

involving Dewberry Group's document production and discovery responses.  After Ms. Peters's departure from the team, Mr. Caulder's role also expanded as discussed further below.

13.     With great focus and effort, our team was able to timely and successfully complete all of the many looming discovery and other litigation obligations that Dewberry faced at the time our firm was hired.  Within approximately one month of our initial appearance in early November 2020, our team interviewed over 20 witnesses; collected, reviewed and produced over 22,000 pages worth of Dewberry's ESI responsive to the Defendant's document requests; began privilege log preparations; located and engaged three outside expert witnesses (real estate development, damages and confusion); served initial disclosures; answered all of the above-described written discovery; and propounded a second set of interrogatories, a second and third request for production of documents and a Rule 30(b)(6) deposition notice to Dewberry Group, among other things.

### C.  The Hunton Attorneys and Professionals Who Worked On This Case

14.     Hunton has over 900 lawyers and other professionals in the United States, Asia, Europe, and the Middle East, serving clients across a broad range of complex transactional, litigation, and regulatory matters.  Hunton was founded in Virginia in 1901, and has been nationally recognized for its skill and success in complex commercial litigation, particularly in the federal and state courts of Virginia, having been named the top litigation law firm in Virginia by Benchmark Litigation for the last three years in a row.[4]

---

[4] *See* https://www.huntonak.com/en/news/benchmark-litigation-names-hunton-as-va-firm-of-the-year-for-3rd-consecutive-year.html (Hunton website); https://benchmarklitigation.com/NewsAndAnalysis/Benchmark-Litigation-East-Coast-Award-Winners-Announced/Index/8155 (Benchmark Litigation website).

15.     Dewberry selected Hunton to take over lead counsel responsibilities in this case not only because of its reputation and litigation capabilities, but also because of its longstanding working relationship with the company.  In particular, Hunton represented Dewberry in the 2006–07 litigation between it and Dewberry Group (then known as Dewberry Capital).  A member of the current Hunton team, Mr. Demm was an integral part of the team of Hunton lawyers who handled the prior case.  That prior experience would enable Hunton to leverage its working knowledge and experience from the previous litigation into the present case, helping to achieve efficiencies that would have been unavailable from another comparable large law firm.

16.     The attorneys who performed the lion's share of the work in the case have been previously identified, along with a summary of their specifically defined roles in the case that provided the depth and breadth of skills and ability necessary to handle the case without unnecessary overlap or duplication of effort.  The following is a more in-depth discussion of each professional's credentials and experience, as well as their involvement in the litigation.

<u>Arthur E. Schmalz</u>

17.     I received my J.D. from George Mason University Antonin Scalia Law School with distinction, graduating first in my class in May 1993, and my B.A. from The College of William & Mary in May 1988 with a double major in English and Economics.  I am an active member of the bars of the Commonwealth of Virginia, the State of Maryland, and the District of Columbia, and admitted to practice in this Court and the others mentioned previously in paragraph 3, above.

18.     I have been with Hunton my entire legal career.  I was first employed by the firm in 1992 as a summer associate, and then served as a full time litigation associate in the firm's Fairfax and Tysons Corner offices from September 1993 to April 2002.  I became a partner in

April 2002 and have served in that capacity ever since.  For the bulk of my career, my practice

has focused on a wide range of complex commercial and business disputes, most of which have

been litigated in Virginia federal and state courts and arbitration proceedings, including many

cases in which I have represented the plaintiff.  Notable representative examples include:

- As lead counsel in a June 2020 arbitration trial, I won a $54 million award for a Virginia-based telecommunications company in a breach of contract action against a large, public telecommunications company;

- As co-lead counsel in a two-week arbitration trial in 2016, I successfully defended the principal defendant in a complex corporate governance lawsuit brought by a shareholder seeking $50 million in damages; the rulings were confirmed by the Circuit Court for the City of Alexandria, and affirmed on appeal by the Supreme Court of Virginia.  *Meuse v. Henry*, 296 Va. 164 (2018);

- As co-lead trial counsel for a Richmond, Va.-based sports marketing agent, I won a $4.5 million breach of contract arbitration award in 2008 against a former NFL Pro-Bowl quarterback, which award was later increased to $6 million during bankruptcy proceedings, and ultimately paid in full in accordance with an approved Chapter 11 reorganization plan.  *In re: Michael D. Vick*, No. 08-50775-FJS, U.S. Bankruptcy Court for the Eastern District of Virginia.

19.    I was first admitted to practice in the Eastern District of Virginia and Fourth

Circuit nearly 30 years ago, and have handled numerous complex commercial cases in those

courts over the years.  Examples of such cases include:  *Weidman v. Exxon Mobil Corp.*, 717

Fed. Appx. 214 (4th Cir. 2018); *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214 (4th Cir. 2014);

*Doe v. Arlington Cnty Sch. Bd.*, 2000 U.S. App. LEXIS 4287 (4th Cir. 2000), *cert. denied*, 531

U.S. 824 (2000); *Springer v. Fairfax Cnty Sch. Bd.*, 134 F.3d 659 (4th Cir. 1998) *Wolf v.*

*Fauquier County Water and Sanitation Auth.*, 1996 U.S. App. LEXIS 21385 (4th Cir. Aug. 20,

1996); *Transcontinental Gas Pipe Line Co., LLC v. Permanent Easement Totaling 2.322 Acres*,

2014 U.S. Dist. LEXIS 165697 (E.D. Va. Nov. 25, 2014);  *Transcontinental Gas Pipe Line Co.,*

*LLC v. A Permanent Easement Totaling 0.889 Acres*, 2014 U.S. Dist. LEXIS 164848 (E.D. Va.

Nov. 25, 2014); *Transcontinental Gas Pipe Line Co., LLC v. A Permanent Easement Totaling*

*0.799 Acres*, 2014 U.S. Dist. LEXIS 164869 (E.D. Va. Nov. 25, 2014) *Transcontinental Gas*

*Pipe Line Co., LLC v. Temp. Easement Totaling 0.049 Acres*, 2014 U.S. Dist. LEXIS 164872
(E.D. Va. Nov. 25, 2014); *Transcontinental Gas Pipe Line Co., LLC v. Permanent Easement
Totaling 2.322 Acres*, 2014 U.S. Dist. LEXIS 122588 (E.D. Va. Sept. 2, 2014); *Transcontinental
Gas Pipe Line Co., LLC v. Temp. Easement Totaling 0.119 Acres*, 2014 U.S. Dist. LEXIS
122615 (E.D. Va., Sept. 2, 2014); *A.W. v. Fairfax Cnty Sch. Bd.*, 548 F. Supp. 2d 219 (E.D. Va.
2008); *Goldstein v. Dale*, 2007 U.S. Dist. LEXIS 9732 (E.D. Va. Nov. 8, 2007); *Schrembs v.
Chick-Fil-A, Inc*., 2001 U.S. Dist. LEXIS 26224 (E.D. Va. 2001); *Doe v. Arlington Cnty Sch.
Bd.*, 41 F. Supp.2d 599 (E.D. Va. 1999), *aff'd*, 2000 U.S. App. LEXIS 4287 (4th Cir. 2000);
*Springer v. Fairfax County Cnty Sch. Bd.*, 960 F. Supp. 89 (E.D. Va. 1997), *aff'd*,134 F.3d 659
(4th Cir. 1998).  I am also a principal member of our firm's "Rocket Docket" practice group that
focuses in particular on litigation in this Court.[5]

     20.    In the present case, I served as lead counsel for Dewberry, with primary
leadership and management responsibilities for all aspects of the litigation.  I led the day-to-day
management of the team and communications with the client and opposing counsel, as well as
ongoing assessment of legal and factual issues, evaluation of evidence and potential witnesses,
development of litigation strategy, assisting in drafting key legal briefs, and handling significant
court appearances.  In addition to overseeing the lawyers working on the case, my client
expected me to have a hands-on, substantive role in the litigation, which required me to be
closely involved in the factual and legal investigation of the case, selecting, retaining and
working with Dewberry's expert and fact witnesses, as well as discovery issues, briefing and
motions practice, and trial, among other things.  While this level of involvement required

---

[5] *See* https://www.huntonak.com/en/practices/litigation/rocket-docket-practice-us-district-court-for-the-eastern-district-of-virginia.html

considerably more time than if I had served only as a high-level manager, I believe that it materially helped our helped our team function more effectively throughout the course of the litigation.  In particular, I was able to apply my nearly three decades of experience in litigating commercial disputes to all significant aspects of the case, and also better ensure that the work of each member of our team was fully consistent with the overall litigation plan and strategy approved by Dewberry that I had developed with my partner, Mr. Demm.  This hands-on approach also allowed me to keep my client informed continuously about all aspects of the litigation, which was an important part of my role in the case.

21.    Specific examples of my work throughout the case apart from my managerial, supervisory and client interface roles include the following:

a.    **Dewberry fact witnesses and factual development**—With assistance from Ms. Peters, I was the attorney primarily responsible for interviewing and evaluating Dewberry's fact witnesses, and in identifying the key Dewberry witnesses and factual evidence necessary to prove and prosecute the Plaintiff's case.  This was a time-consuming, but very important task for several reasons.  One of Dewberry Group's primary defenses involved efforts to claim its services were not similar to those of Dewberry.  Also, because Dewberry Group refused to drop its prior-use/senior user affirmative defense, despite having raised, dismissed and settled that very same defense in the prior 2006–07 litigation between the parties, Dewberry was forced to investigate and explore its uses of "Dewberry" in connection with real estate development-related services extending back many

decades, and long before the 2003 date of Dewberry's service mark applications.[6] Thus, determining the fact witnesses and documentary evidence most useful to address these issues was extremely important to the case.  It required considerable effort, however, as Dewberry has been in business for 65 years, and has more than 2,000 employees in multiple offices across the U.S.  As noted below, I prepared and/or defended many of Dewberry's witnesses for their depositions, and worked with them in preparing their factually detailed and well-documented declarations used in support of Dewberry's motion for summary judgment (11 in all, totaling nearly 100 pages in length).

b. **Expert witnesses**—I was the attorney primarily responsible for selecting and retaining Dewberry's outside and in-house expert witnesses (five in total), and opposing Dewberry Group's four experts.  I worked extensively with Dewberry's experts to assist them with obtaining factual information and documents, and to ensure timely completion of their reports.  I also and prepared several of them for, and defended them in, their depositions.  In particular, I worked most closely with Dewberry's two in-house architectural services experts and our outside real estate development services expert, Carolyn Leah Grimsley, Ph.D., who prepared an opening expert report that comprehensively analyzed the real estate development services performed by Dewberry and Dewberry Group, as well as an extensive rebuttal report in response to the report of Dewberry Group's real estate development expert.  I also had a considerable supporting role with our financial

---

[6] This is addressed in a previous declaration I submitted in the case, Dkt.59-2, ¶¶5-6, as well as in Dewberry's proposed brief in support of a motion for partial summary judgment (to strike Defendant's prior-use affirmative defense. *See* Dkt. 054, ¶¶1-21.

damages expert, Rodney J. Bosco, and his work.  As to Dewberry Group's experts, I had primary responsibility for analyzing the work product of, and deposing, its architectural and real estate development experts, and working with our corresponding experts on their reports in rebuttal to those experts' opinions.

c. **Communications with opposing counsel**—I was responsible for interfacing with opposing counsel on all important matters throughout the entirety of the case after our appearance in the fall of 2020.  These included various communications and discussions of settlement proposals and counterproposals, the most significant of which occurred in January of 2021 (relating to a written settlement proposal that Dewberry made to Dewberry Group), September 2021 (when Dewberry evaluated a settlement proposal from Dewberry Group and responded with a counterproposal outlined in a detailed term sheet), October of 2021 (when opposing counsel and I had additional settlement discussions) and in January of 2022 (in connection with a settlement proposal from Dewberry Group).  I also led the principal discussions and negotiations of the most significant discovery issues and disputes among other things.

d. **Depositions**—Of the 28 total depositions taken in this case—which began on March 18, 2021 with the deposition of Dewberry's Phillip Thiel—I took or defended 12 of the most important ones.  Those include, for Defendant, two of Dewberry Group's four experts, its president and owner, John Dewberry, its "in-house architect," Lockie Brown, and its Director of Brand Development, Elizabeth Armstrong.  I note that thirteen of Dewberry Group's deponents, including all nine of its fact deponents (John Dewberry, Jaimie Brown Dewberry,

Doug Dewberry, Kim Lavigne, George Howard, Elizabeth Armstrong, Lockie Brown, David Groce, and John Freeman) and four of its expert witnesses lived in Georgia, South Carolina, or Massachusetts—outside of this Court's subpoena power to compel attendance at trial.  For Dewberry, I prepared and defended its General Counsel and several other high-level officials and employees of its affiliates, including Dewberry's then 93-year old founder and Chairman Emeritus, Sidney Dewberry.   The depositions were also taken over a compressed time frame, particularly 18 of the fact witness depositions, which all occurred over a less than a four-week period in March and April of 2021.

e.   **Motions/briefing**—I had a substantial role in drafting and/or reviewing and editing all major legal briefs filed in the case on Dewberry's behalf after Hunton's appearance (e.g., opposition to motion for protective order [Dkt. 037], motion for summary judgment [Dkt. Nos. 085 & 163], opposition to Defendants' motion for summary judgment [Dkt. 153], oppositions to Defendants' three motions to exclude expert witnesses, which Dewberry Group filed just two days after filing its cross-motion for summary judgment [Dkt. Nos. 140, 142, & 145], motion for entry of permanent injunction [Dkt. Nos. 188 & 205], opposition to Dewberry Group's motion for partial reconsideration of summary judgment rulings [Dkt. 197], post-trial briefing [Dkt. Nos. 239, 246], and opposition to Defendant's motion to seal the damages award [Dkt. 262]).  The summary judgment briefing was particularly demanding, especially given the amount of factual material and details necessary to sufficiently establish all elements of our claims, including all of the confusion factors, with nearly a dozen detailed fact witness declarations

14

and 184 documentary exhibits.  While other members of the Hunton team had significant roles in the briefing of a number of these motions, most of their input and involvement went beyond simply "reviewing" for editorial or non-substantive stylistic issues.  Where possible, I had initial drafts of briefs prepared by significantly lower billing associates, principally Mr. Caulder or Mr. Wright.  But due to their limited roles in the case (Mr. Caulder being focused primarily on Defendant's documents and operations, and Mr. Wright having entered the case much later, in mid-February to replace Ms. Peters after her departure), it was often necessary for me, or others on the team more familiar with different aspects of the case, to expand upon or add additional substantive content.  My review and editing was also important to ensure consistency with our overall factual and legal strategy and litigation plan.  Likewise, consistent with his role focusing on Lanham Act-specific issues and matters, Mr. Demm would review and edit briefs primarily to ensure that they fully and properly addressed those particular issues.

f.  **Pretrial arguments** – Consistent with the client's expectations, I prepared for and argued the two pretrial motions on which oral argument was heard (opposition to Defendant's motion for protective order [Dkt. 042][7] and summary judgment [Dkt. 174]).

---

[7] This was a significant discovery motion.  Dewberry Group sought to quash all five of Dewberry's third-party document subpoenas it had issued in late January 2021, at a time when Dewberry had received only a relatively small portion of the documents that it had requested from Defendant.  Among other things, Dewberry Group claimed the documents were irrelevant and could be obtained from it, instead of the third parties.  After an hour-long argument on February 5, 2021, instead of issuing a protective order to prevent such discovery, Judge Davis ordered Dewberry Group to produce all such documents in five days.  *See* Dkt. 42 (ordering Dewberry Group to "produce information that is within its possession and control that Plaintiff seeks with the third-party subpoenas at issue by close of business on February 10, 2021").  Thus,

g. **Trial** – I assisted with all material aspects of the trial preparation process, including determining the final set of documents that would be included in Dewberry's trial exhibits and exhibit list, determining who would testify at trial on behalf of Plaintiff and the key issues, developing factual points and themes that our case would focus upon, as well as overall trial strategy.  I also reviewed and edited Dewberry's deposition designations to be used at trial to ensure consistency with our overall factual and legal strategy; and prepared for, and served as lead counsel, during the trial on damages in October 2021, directing the overall presentation of the case and cross-examining two of Defendant's main fact witnesses:  its president, John Dewberry and former general counsel, David Groce.  I also assisted Mr. Demm with preparing Dewberry's damages expert, Mr. Bosco, for his trial testimony.

h. **Post-trial briefing**.  And as previously noted, I had a considerable involvement in drafting and editing Dewberry's post-trial briefs.  Preparation and drafting of this briefing was very complex and laborious.  For example, Dewberry's 49-page opening proposed findings of fact and conclusions of law, filed on December 15, 2021 [Dkt 239 (public); Dkt. 242 (under seal)] required a thorough marshaling and analysis of voluminous documentary evidence, as well as trial testimony of Defendant's witnesses, to lay bare the succession of "red flag" facts and circumstances that Dewberry Group ignored, and that the Court ultimately relied upon to support its substantial disgorgement of profits award and "exceptional

---

Dewberry's successful opposition to Defendant's motion for protective order resulted in the equivalent of an expedited order compelling *Defendant* to produce documents that it had, up to then, failed to turn over.

case" determination.  It also required very thorough legal research, analysis and written advocacy to address complex issues relating to the disgorgement of profits award, such as the extent to which the award could be based upon profits on the books of Defendant's affiliated entities that had been generated by Dewberry Group's use of the infringing marks at issue.  Dewberry's opposition to Defendant's proposed findings and conclusions was also a very labor-intensive effort.  Under the agreed briefing parameters, we had only 25 pages to analyze, address and undermine the dozens of factual and legal issues and arguments that Dewberry Group's raised in its 50-page submission.  Doing that effectively, and within the page limitations, required considerable focus, attention and time.

22.     Additionally, as alluded to elsewhere in this Declaration, when senior associate Julie Peters had to leave the case for health reasons in March 2021, it became necessary for me to assume a considerable portion of the responsibilities that she was planned to handle, including preparing and defending depositions of several Dewberry witnesses, responding to Defendant's interrogatories and requests for supplementation of prior interrogatory responses, and drafting and editing summary judgment declarations and briefs.  In part because of that, and the time that Mr. Wright would need to spend to get up to speed as her replacement in the case, the firm reduced its fees for February and March 2021 by nearly $600,000 through significant pre-bill write offs of Mr. Wright's and Ms. Peters's time together with large (30% and 32% discounts). *See* Ex. B to Dewberry's Motion for Attorneys' fees.  Those adjustments also include over $50,000 of time written off pre-bill in March 2021 to adjust for any duplication of efforts by Mr. Caulder and Mr. Wright in assisting with the preparation and taking of the 18 fact witness depositions taken in the last two weeks of that month and the first two weeks of April.  *Id.*

<u>Stephen P. Demm</u>

23.     Stephen P. Demm is a partner in Hunton's intellectual property practice group. He received his J.D. from Harvard Law School in 1989, and his B.A. from the University of Virginia in 1985.  Mr. Demm is an active member of the Virginia bar.  He has practiced in federal courts throughout the country and is admitted to practice before the United States Supreme Court, the Fourth Circuit and the U.S. District Courts for the Eastern and Western Districts of Virginia.  He was a judicial clerk for the Honorable James R. Spencer, United States District Court for the Eastern District of Virginia from 1989–90.

24.     Mr. Demm's practice focuses on intellectual property litigation, counseling, and prosecution, with emphasis on trademark, trade dress, copyright, domain name and technology litigation and dispute resolution.  In addition to his significant involvement in the prior litigation in this Court between the parties, Mr. Demm has extensive other litigation experience in Lanham Act and trademark-related litigation in this Court and the Fourth Circuit.  *E.g.*, *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 781 F.3d 710 (4th Cir. 2015); *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 710 F.3d 527 (4th Cir. 2013); *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441 (4th Cir. 2010); *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285 (4th Cir. 2009); *PBM Prods. Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417 (E.D. Va. 2002).  His practice also includes intellectual property audits and policies; clearance, registration and management of intellectual property assets; intellectual property and technology licenses, transfers, and agreements; and counseling on advertising and promotions, including consumer sweepstakes.

25.     Mr. Demm's primary responsibility in the litigation was to address the trademark-law specific aspects of this case, including analyzing Lanham Act/trademark-related legal issues

and providing strategy recommendations.  He also worked with me in locating, retaining and

working with expert witnesses, in particular, Dewberry's confusion survey expert, James T.

Berger and damages expert, Rodney J. Bosco.

26.     Mr. Demm's role also included drafting and editing motions and briefs and

portions thereof, especially with regard to trademark-specific issues and arguments.  In

particular, he had considerable input into Dewberry's summary judgment briefing, oppositions to

Defendant's *Daubert* motions to exclude Dewberry's confusion survey and damages experts, and

post-trial briefing.  He also assisted with the preparation of several fact and expert witnesses for

their depositions, and took and defended a significant number of depositions (8 of the 28 total

depositions taken in the case).

27.     At trial, Mr. Demm conducted the direct examination of Dewberry's damages

expert, Mr. Bosco, and cross-examined Defendant's damages expert, Ms. Miller, as well as its

Executive Vice-President of Finance, John Freeman.

<u>Meghan A. Podolny</u>

28.     Meghan A. Podolny is a counsel on Hunton's litigation team, and head of the

firm's Information Governance & eDiscovery Group.  She received her J.D. from The College of

William & Mary in 2007, and her B.A. from the University of Notre Dame in 2004.  She is an

active member of the bars of Virginia and the District of Columbia.

29.     Ms. Podolny's practice focuses on providing state-of-the-art data management

and eDiscovery advice and services to corporate clients across multiple industries. Her

experience includes developing and implementing best practice guidelines on enterprise-level

information governance and approaching her clients' eDiscovery challenges with innovative and

cost-effective technology solutions that promote efficient handling of complex data management

projects.  She is recognized within Hunton as the firm's go-to expert on all matters relating to

ESI and eDiscovery.  Ms. Podolny is also recognized nationally for her expertise in such matters.

For example, in April 2021, she served as a panelist at the midyear meeting of the Sedona

Conference workgroup tasked with studying electronic document retention and production

issues.[8]

30.     Ms. Podolny's principal duties in the case consisted of managing the collection of

ESI and other documents and materials from Dewberry, in particular, the review, evaluation and

production of documents responsive to the defendant's voluminous discovery requests.  To

accomplish those tasks under the tight deadlines faced at the time of Hunton's appearance in the

case, she brought in senior litigation associate Melissa Romanzo to lead the initial relevance,

responsiveness, key issue coding, and privilege review and logging of the huge volume of ESI

and other documents collected from Dewberry, and production of the responsive documents

(over 55,000 pages in all) to Defendant.  Ms. Podolny also participated in interviews of

Dewberry witnesses to determine which of them were appropriate document custodians, as well

as the arrangements with our outside eDiscovery vendor (Driven) necessary to accomplish the

collection and formatting of the ESI in accordance with the Consent Discovery Order [Dkt. 023].

31.     Of particular importance in this case was Ms. Podolny's outstanding work in

successfully completing the monumental ESI and discovery burdens under tight deadline

pressures that Dewberry faced when Hunton first entered the case, and in quickly and efficiently

handling the nearly 290,000 page ESI dump Dewberry Group suddenly made 10 days before the

---

[8] The Sedona Conference is a non-profit study institute that is particularly influential in developing ESI and eDiscovery protocols and best practices, whose studies are widely cited by state and federal courts, including the Fourth Circuit in the leading case on recovery of ESI-related costs under 28 U.S.C. § 1920(4).  *The Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc*., 718 F.3d 249, 252 n.2 & n.3, 253 n.5 & n.6 (4th Cir. 2013).

then-expert witness report deadline in February 2021, and barely a month before depositions were to begin. Further details relating to this "document dump" and other unique ESI-related discovery burdens presented by this case are addressed in greater detail in Ms. Podolny's Declaration that accompanies Dewberry's attorneys' fee application.

32.     Ms. Podolny also handled all significant ESI/eDiscovery-related issues that arose in the case and related discussions and negotiations with opposing counsel, such as matters regarding ESI production formatting, deficiencies in the Defendant's ESI-related discovery responses and productions, including inadequacies in its search terms and methodologies, and responding to Defendant's questions or issues regarding Dewberry's ESI productions. Ms. Podolny provided further assistance responding to alleged deficiencies in Dewberry's ESI/document production, including conducting and/or supervising searches for specific types of documents sought by opposing counsel in their deficiency letters.

33.     In addition, Ms. Podolny assisted the team in searching for and supplying documents in the case on particular issues that had arisen, something which helped considerably in focusing the factual development of our case. That work also proved to be valuable in enabling Ms. Podolny to provide much needed assistance to me in the coordination and preparation of the many factually detailed fact witness declarations used to support Dewberry's June 2020 motion for summary judgment. Further, it aided Ms. Podolny with her work in constructing and populating a database of key documents in the case, arranged and organized by specific issues. That effort was of critical importance in enabling the team members responsible for taking and defending depositions to identify the exhibits they would need for each witness—particularly in light of the huge ESI dump that Defendant had made shortly before depositions were to start. It also was extremely helpful for identifying exhibits needed for summary

judgment and at trial, among other things.  And because of her familiarity with many of the

relevant documents in the case, Ms. Podolny, with assistance from Ms. Harris and paralegals,

assembled the first draft of our proposed trial exhibits and exhibit list, among other things.

Julie M. Peters

34.     Julie M. Peters is a senior associate on Hunton's litigation team.  She received her

J.D. from the University of Pennsylvania Law School in 2001, and her B.A. from Georgetown

University in 1995.  She is an active member of the bars of District of Columbia, and Virginia.

Ms. Peters joined Hunton in 2004, initially as a member of a team specializing in international

arbitration and litigation.  Shortly thereafter, she transitioned to Hunton's litigation practice in its

Tysons Corner office, where she became known for her excellent factual and legal analysis and

brief writing, and attention to detail.  Her wide-ranging litigation practice regularly takes her

before international arbitral bodies, as well as Federal and Virginia State courts, including this

Court and the Fourth Circuit.  *E.g.*, *Jones Lang LaSalle Ams., Inc. v. Hoffman Family, LLC*, 606

Fed. Appx. 706 (4th Cir. 2015); *UCB, Inc. v. Yeda Research & Dev. Co*., 117 F. Supp. 3d 755

(E.D. Va. 2015); *Roberts v. Fairfax County Pub. Sch*., 858 F. Supp. 2d 605 (E.D. Va. 2012).

Examples of the types of litigation matters she has handled over the years include representing

governmental and corporate clients in disputes involving bilateral investment treaties, complex

commercial transactions, major public construction projects, patent matters, employment

discrimination, business torts and constitutional law, among other things.

35.     Ms. Peters's work has included representation of Dewberry in a number of

matters for several years.  Because of this, as well as her litigation skills and ability, I brought

her into the case at the outset as the principal associate responsible for helping me develop the

facts of the case based on Dewberry's witnesses and documents, as well as answer discovery and

22

assist with other substantive aspects of the case as it progressed.  Among other things, her

diligent work in October and November of 2020 was instrumental in responding to the

Defendant's factually detailed and complex 260 requests for admissions and 52 interrogatories

within barely three weeks. To help accomplish those tasks and develop the necessary factual

support for our case, she and I interviewed nearly all of Dewberry's fact witnesses.

36.     In particular, Ms. Peters provided extremely helpful assistance with her in-depth

investigation and analysis of historical evidence to prove that Dewberry had, indeed, used the

"Dewberry" mark in connection with real estate development and related services decades before

Defendant claimed to have done so.  This time consuming work was made necessary in part

because, as discussed earlier, Dewberry Group refused to drop its baseless prior use defense that

it has previously raised, dismissed and settled in the prior 2006-07 litigation.

37.     Further, until March 2021, when she had to leave the case due to health issues,

Ms. Peters provided extensive assistance with expert discovery matters, in particular with regard

to Dewberry's real estate development expert, Dr. Grimsley, such as locating and providing

necessary supporting documents and materials concerning Dewberry's various real estate

development work and services over the entirety of its operations, dating back to the 1960s.  And

until leaving the case, she also assisted with the preparation of various Dewberry fact witnesses

for their depositions.

<u>Brian A. Wright</u>

38.     Brian A. Wright is a senior associate on Hunton's litigation team.  He received his

J.D. from the University of Virginia School of Law in 2011, and his B.A. from The Pennsylvania

State University (with honors and with distinction) in 2004.  He is an active member of the

Virginia bar.  Mr. Wright is admitted to practice before the United States District Court for the

Eastern District of Virginia, the United States District Court for the Western District of Virginia,

the United States Court of Appeals for the Fourth Circuit, and Virginia state courts.  Prior to

joining Hunton, Mr. Wright served as a law clerk for the Honorable Norman K. Moon of the

United States District Court for the Western District of Virginia.

39.     Mr. Wright and I had worked together with tremendous success previously.  Mr.

Wright was my lead associate in the June 2020 arbitration referenced in the first bullet in

paragraph 18, *supra*, where we together secured a $54 million award for our client.  Mr. Wright

had a major role in that hearing, as he and I roughly divided the witnesses equally between us.

On the basis of Mr. Wright's excellent performance in that matter, I was confident that he would

be a valuable addition to the litigation team when it became necessary to replace Ms. Peters.

40.     Mr. Wright joined the Hunton team on this case in mid-February 2021.  Among

other things, Mr. Wright was responsible for assisting with the development of evidence for trial

from Dewberry witnesses, documents and other evidence.  He was also responsible for preparing

Dewberry's comprehensive second request for admissions which contained 169 detailed requests

directed at issues relevant to forthcoming summary judgment proceedings, including

authentication of 91 separate documentary exhibits, many of which would be used during

summary judgment or trial.  Additionally, he assumed Ms. Peter's role in answering remaining

interrogatory requests and the Defendant's demands for further supplementation of Dewberry's

already detailed answers, and provided extensive assistance with preparing multiple witnesses

for deposition, as well as taking or defending two depositions in the case.  As previously noted, I

made considerable discretionary reductions to our firm's fees to mitigate the impact of Mr.

Wright having to spend time to get up to speed on the case to assume the responsibilities that Ms.

Peters had been handling.  Those include writing off the first 40 hours of Mr. Wright's time on

the case in February 2021 (equating to $28,000 of fees), as well as an additional $29,225 of his time spent in assisting with the preparation or taking of various depositions. *See* Ex. B to Dewberry's Brief in Support of Motion for Attorneys' Fees. The invoices for February and March 2021 also included an additional 30% and 32% discount, respectively, on the total fees for those months. *Id*.

41. Additionally, Mr. Wright provided much needed assistance with drafting and editing substantive briefing, in particular, portions of Dewberry's summary judgment motion, as well as some of the oppositions to Defendant's Daubert motions to exclude four of Dewberry's expert witnesses. Because those motions were filed only days after Defendant's motion for summary judgment brief, it was necessary for our team to divide up primary responsibilities for drafting all of those briefs. Later, he assisted with the permanent injunction briefing, and prepared the initial draft of Dewberry's deposition designations for use at trial. Additionally, Mr. Wright took on a significant trial role in the case, delivering Dewberry's opening statement and closing argument (in opposition to Dewberry Group's Rule 52(c) motion for judgment on partial findings), and cross-examined Dewberry Group's Director of Brand Development, Elizabeth Armstrong. After the trial, Mr. Wright assisted with the drafting, reviewing, and editing of Dewberry's post-trial briefing and was the primary drafter of Dewberry's applications and supporting briefs for its attorneys' fee claim and bill of costs.

Jonathan L. Caulder

42. Jonathan L. Caulder ("Mr. Caulder") was a mid-level associate on Hunton's litigation team who recently left the firm for another opportunity. He received his J.D. from Washington and Lee University School of Law in 2015, and his B.A. from University of Virginia (with high distinction) in 2010. He is an active member of the Virginia bar. Mr. Caulder is

admitted to practice before the United States Court of Appeals for the Fourth Circuit; the Eleventh Circuit, and in Virginia state courts.  During law school, Mr. Caulder served as an extern for the Honorable Michael F. Urbanski of the United States District Court for the Western District of Virginia.  He also interned in the office of Chief Staff Attorney for the Supreme Court of Virginia. His practice involves a wide variety of commercial and business litigation disputes, including post-M&A disputes, products liability issues, environmental challenges, and appellate litigation.

43.     As previously noted, after Mr. Abrajano announced his impending departure from McCandlish, Mr. Caulder was brought into the case in November 2020, to assume primary responsibility for analyzing the sufficiency of the defendant's discovery responses and document production, and taking actions (such as deficiency letters, meet and confer sessions and motions to compel) to police and address such deficiencies.  He also worked to identify and select key Defendant's documents for use in depositions, motions, and at trial.  He often took the lead in corresponding with and negotiating discovery disputes with opposing counsel, and preparing and responding to discovery-related motions and correspondence.

44.     Additionally, Mr. Caulder served an important role during the fact and expert witness depositions.  He provided extensive assistance, in particular, with preparation for the depositions of Dewberry's damages, confusion survey and architectural services experts, and also took or defended three depositions in the case, including defending the depositions of Dewberry's two architectural experts.

45.     Mr. Caulder was also responsible for providing initial drafts of significant briefs, or major portions of them, such as those in opposition to Defendant's motion for protective order, in support of Dewberry's motion for summary judgment, and in opposition to Dewberry's

cross-motion for summary judgment, as well Dewberry's post-trial briefing.  He also provided considerable editorial assistance with two of Plaintiff's oppositions to Defendant's *Daubert* motions.

46.     As to trial, Mr. Caulder had principal responsibility for culling the initial, much larger set of proposed trial exhibits identified by Ms. Podolny into a much smaller set from which I ultimately selected our final trial exhibits.  Additionally, he prepared a very detailed analysis and chart of the exhibits organized into discrete categories of documents that facilitated the Defendant's stipulation to the admissibility of the majority of Dewberry's documentary exhibits, which he presented on Plaintiff's behalf on the morning of the first day of trial.  That work also enabled him to lay the necessary foundations for admitting most of the remaining exhibits during his initial presentation on the first day of trial.  Given Mr. Caulder's familiarity with the exhibits, in particular those produced by Dewberry Group, he was present during the trial to provide helpful assistance on locating specific documents or factual information needed by Dewberry's trial team during their examination and cross-examination of witnesses.  Mr. Caulder also prepared the initial draft of Dewberry's proposed findings of fact, and portions of Dewberry's opposition to Defendant's post-trial brief.

<u>Melissa A. Romanzo</u>

47.     Melissa A. Romanzo is a senior associate on Hunton's litigation team.  She received her J.D. from the University of Notre Dame Law School in 2008, and her B.A. from Davidson College in 2005.   She is an active member of the North Carolina bar.  Ms. Romanzo is admitted to practice before the United States Court of Appeals for the Fourth Circuit; the United States District Courts for the Western, Eastern and Middle Districts of North Carolina; and all state courts in North Carolina.

48.     Ms. Romanzo represents clients in a broad range of complex commercial disputes in state and federal courts across the country.  Of particular relevance here is Ms. Romanzo's extensive experience guiding clients through complex discovery disputes during litigation, including matters involving ESI and eDiscovery.  In that regard, she has frequently worked with Ms. Podolny over the years, which was a principal reason why she was selected as a member of the team in this case.

49.     Ms. Romanzo's primary responsibility in the case was directly supervising associates Colin Stanton and Natalie Harris in their review of the ESI and documents collected from Dewberry for relevance and responsiveness to Defendant's discovery requests, including ensuring quality control with regard to identification of responsive and relevant documents, as well as identification of privileged documents and documents to be designated confidential/AEO under the protective order.  She also assisted with the preparation of Dewberry's privilege log in this case.

<u>Natalie Harris</u>

50.     Natalie Harris is a staff attorney on the Hunton litigation team.  She received her J.D. from the University of Virginia School of Law in 1994, and her B.A. from Hampton University in 1991.  She is an active member of the Virginia bar.

51.     In addition to merits-based litigation experience, Ms. Harris has more than a decade's work of experience in e-discovery and discovery management, including client engagement and business development, project management, supervising large-scale document reviews, participating in document collections in the United States and abroad and preparation of privilege logs.

52.     Ms. Harris' primary role at the outset of the case was to assist with the previously-mentioned review of ESI collected from Dewberry, as well as a significant number of hard copy documents obtained from Dewberry (some 30 banker's boxes in total), and also with preparation of Dewberry's privilege log.  Additionally, Ms. Harris had a significant role in preparing declarations and other materials in support of Dewberry's Attorneys' Fee Petition and Bill of Costs.

<u>Colin Stanton</u>

53.     Colin Stanton was a junior associate on Hunton's litigation team.  He joined Hunton in 2018 after receiving his J.D. from American University Washington College of Law in 2016 and a B.A. from the College of William and Mary in 2012.  He clerked for the Honorable Senior Judges, United States Court of Appeals, District of Columbia, and the Honorable Rebecca B. Smith, United States District Court, Eastern District of Virginia.

54.     I brought Mr. Stanton into the case in November 2020 to assist with the review and analysis of the large volume of ESI and documents collected from Dewberry.  The previous year, he had assisted me and Mr. Wright in a similar capacity in a fast-track commercial arbitration proceeding referenced in ¶18 and involving a large volume of emails and ESI concerning a factually complex dispute between two telecommunications companies.  He did an excellent job analyzing these materials on an expedited basis, and distilling them into a useful factual timeline for use in the hearing.  It was for that reason that I selected him, in light of the extremely tight deadlines Dewberry faced to review, analyze and produce tens of thousands of documents within the first month of our appearance in the case.  After successfully completing those tasks in connection with Dewberry's primary document productions between November

2020 and January 2021, Mr. Stanton transitioned off the team.  Since that time, he left Hunton and is practicing with another law firm.

Paralegals and Other Professionals

55.     Several paralegals were involved from time to time throughout the case to assist with tasks that could be accomplished more inexpensively and efficiently, such as organizing and preparing exhibits for depositions, motions and use at trial, cite checking briefs, and assisting with title searches and securing title search reports, among other things.  Given the extremely large volume of ESI and documents, as well as the terms of the Protective Order, this was often extremely painstaking and laborious work that required careful review and redaction of documents filed with motions.  Dewberry's June 2020 summary judgment motion is a prime example.  It had 184 supporting exhibits, over half of which had to redacted or filed under seal to comply with the terms of the Protective Order.  The vast majority such substantive paralegal work was conducted by Stephanie Meharg, a very experienced senior paralegal in Hunton's Richmond office, and Meredith Malcolm, a talented junior paralegal in our Washington, D.C. office who has since left the firm for another opportunity.  Additionally, Nicholas Thomason (referred to as a "case clerk" in the invoices) was a paralegal who assisted Ms. Harris with the review and analysis of the substantial collection of Dewberry's hard copy documents previously mentioned.   The majority of that work was completed in January and February of 2021.

56.     Other timekeepers were involved in discrete and limited roles from time to time for necessary or specialized support, including librarians obtaining certain research materials, such as trademark-law treatises, and on-line records and materials, among other things.  That work was necessary and helpful, and the invoices reflect a small number of hours worked by

these non-attorney timekeepers.  I also exercised billing judgment by writing off many other of their time entries prior to billing the final invoices.

57.     Hunton also worked with co-counsel on this matter, partners Alan B. Croft and Ralph M. Tener of McCandlish Lillard, as well as their associate, Mark Abrajano, until his departure from the firm at the end of November 2020.   Please see the accompanying Declaration of Alan B. Croft regarding his firm's invoices and an overview of their practice, rates and billing practice.  Mr. Croft, an experienced civil litigator and trial lawyer who helped prepare Dewberry's Complaint, had primary responsibility for this litigation until Hunton's appearance in the lawsuit in early November 2020.  After that, Mr. Croft served in a supporting role on a number of discrete tasks, such as providing assistance early in the case with Dewberry's real estate development expert, providing comments and insights on legal strategy and arguments raised in briefs, settlement discussions with opposing counsel, and assisting with depositions of fact witnesses.  Specifically, he took the deposition of John Dewberry's brother, Doug, a former senior Dewberry Group executive, and defended the depositions of Dewberry's Chief Financial Officer and two other senior-level employees.  He was also present at trial, as his firm remained co-counsel of record in the case.

58.     Mr. Tener, is a veteran trademark specialist with McCandlish, who handled the service mark applications and maintenance filings for Dewberry's service marks at issue, and was also involved with cease and desist letters to Dewberry Group in 2017 and 2018, and papers filed with the USPTO protesting Dewberry Group's applications for its infringing marks at issue. Mr. Tener was also involved in the early stages of this case prior to Hunton's appearance as lead counsel.  After Hunton's appearance in the case, Mr. Tener would occasionally provide

insightful trademark-specific advice and input to our team, such as with regard to arguments in substantive briefs, as well as settlement negotiations.

**C.      Hunton rates and billing practices, generally.**

59.      Like most comparable firms, Hunton typically charges for legal services based on set hourly rates, and did so in this case.  Rates are set at the beginning of each calendar year for every lawyer, paralegal, and other timekeeper based on his or her level of experience, reputation, and practice area, as well as specific market conditions.  Hunton's rates, and its periodic adjustments to them (such as for seniority, experience, and elevation within the firm), are based on the firm's market research, such as peer firm industry reports, in an effort to keep them competitive with those of other comparable firms, as well as fair and reasonable.  Our firm's rates are premised upon prompt payment and therefore do not include any compensation for delay.  In addition, the firm will occasionally provide certain discounts to its rates or total fees on invoices based on a number of factors unique to the engagement, including its complexity, likely difficulty of opposing counsel, legal market conditions of the forum court, among other things. Hunton did so in this case, as previously noted, and discussed further below.

60.      Hunton requires that all attorneys and other timekeepers to contemporaneously record the time they spend on each client matter and have that time entered into our computerized billing system.  The normal practice for billing professionals is to record all activities on a client matter in one daily entry with the total time for the day recorded.  This method of time recordation is acceptable to the firm's regular clients.

61.      Our accounting staff prints from our computer system billing summaries for each matter that include all the time for timekeepers and expenses charged to that matter.  Using these computer-generated summaries, the billing and/or responsible partner reviews the time spent, the

services performed, and the expenses incurred on the matter.  In addition to noting corrections of typographical or other errors in the summaries, the billing and/or responsible partner also exercises discretion to delete, or "write-off" certain time or expenses that he or she considers to have been inefficient, ineffective or otherwise not consistent with the client's expectations. Those "write-offs," as in the present case, are typically not reflected or otherwise indicated on the invoice.  In addition, the billing and/or responsible partner may provide additional discounts, which are often, as in this case, indicated on the invoice.

**D.  Hunton's rates and fees charged for services in this case.**

62.    Hunton's rates for services charged to Dewberry in this litigation are reflected on the invoices attached as **Exhibit A** to Dewberry's Brief in Support of Motion for Attorneys' Fees, which, except for a relatively small number of redactions of information that would reveal attorney mental impressions or litigation strategies (including also strategies for certain post-trial matters), are accurate and complete copies of the invoices billed to, and paid in full by, Dewberry  The rates of the initial five Hunton attorneys assigned to the were previously identified above, in paragraph 11, along with a summary of the material terms of Hunton's engagement in the fall of 2020.  Although Hunton had the right under the engagement terms to adjust the rates of each attorney at the beginning of each calendar year in the typical manner described above, the firm did not do so for calendar year 2021, as I elected to freeze the rates for each of the attorneys who had already begun work on the case at their 2020 rates.[9]  Also, for 2022, I have elected to keep those same 2020 rates frozen for all timekeepers except for Mr.

---

[9] Hunton's January 2021 invoice inadvertently included the typical annual rate increase for Mr. Demm.  That error was found after the invoice had been billed.  As a result, Hunton, with approval of Dewberry, provided a credit for those amounts (totaling $18,273.75) that appears on the face of the firm's invoice for March 2021 charges.  *See* Ex. B to Dewberry's Brief in Support of Attorneys' Fee Motion.

Demm, whose rate was increased from $985 to $1035 per hour at the beginning of this year,

starting after the January 2022 invoice.  I did that because Mr. Demm's initial $985 rate when

Hunton entered the case was below his actual 2020 standard rate of $1035.  Accordingly, by

increasing his rate to $1035 per hour as of February 2022, he like myself and the other

timekeepers, are now billing at our firm's calendar year 2020 standard rates.   Given the market

increases that have occurred over the last few years, and because Mr. Demm's original rate in

this case was already below his then current standard firm rate when we stepped in as lead

counsel, I believe this adjustment was fair, reasonable and warranted (and only affects the last

two months of fees at issue in this application, March and April 2022).

63.     I believe our firm's rates in this case are fair, reasonable and consistent with the

prevailing market rates within this District for firms comparable to Hunton in terms of size and

capabilities, and particularly given the experience and skill sets of the attorneys involved and the

nature, complexity and intensity of this litigation.  That conclusion is supported by Dewberry's

attorneys' fee expert, Craig C. Reilly, Esq., in his accompanying Declaration in support of

Plaintiff's fee application.  Among other things, this case was legally and factually complex, and

required myself and the core members of the Hunton team to be "all in" from the outset in order

to satisfy the very substantial discovery-related obligations that Dewberry faced in the first few

weeks of our appearance, as well as master the facts and law sufficiently to prosecute the case

effectively over the next several months.  And the extraordinary pace and volume of work the

case required continued unabated, as Dewberry Group mounted a particularly vigorous defense

throughout the duration of the case.

64.     Hunton's time for its services rendered in this case, as reflected in the invoices

attached as Ex. A to Brief in Support of Dewberry's Motion for Fees, was recorded in

accordance with our firm's normal practices described above.[10]  Additionally, those time entries and descriptions were extensively reviewed and edited, principally by myself, but also by Mr. Demm, for accuracy and appropriateness.  As noted previously, we also exercised substantial discretion to write-off significant amounts of time prior to billing, after which we applied substantial discounts to the amounts billed that we deemed appropriate under the circumstances.  Those discounts were applied to every one of our firm's monthly invoices from October 2020 to the present—write offs and discounts totaling more than $1.7 million.  *See supra*, ¶ 11; see also Ex. B to Brief in Support of Motion for Attorneys' Fees.  Additionally, I exercised billing judgment by writing off more than $28,000 in total on-line research expenses on the invoices billed to Dewberry.

65.     From its first appearance in the fall of 2020, to the present, the Hunton team faced extremely difficult and challenging circumstances, many of which were caused in substantial part by Dewberry Group.  In addition to Defendant's ill-fated and costly efforts in early 2021 to quash Dewberry's third-party subpoenas, and its huge, belated ESI dump and refusal to drop its unfounded prior-use defense, other examples of Dewberry Group's fervent opposition efforts include its multiple, unsuccessful *Daubert* motions to exclude Dewberry's expert witnesses, taking several factual and legal positions that the Court correctly found to be baseless, and filing an unfounded motion for partial reconsideration of the Court's summary judgment ruling.  This

---

[10] The only arguable exceptions I am aware of relate to approximately one week of my time at the end of February 2021 that, in the midst of various pressing matters in this case, such as Dewberry Group's large ESI dump, and preparing for upcoming depositions among other things, missed the cut-off for inclusion in that month's invoice and, therefore, appeared in the following invoice for our firm's services through March 31, 2021.  In addition, due to the previously-noted error by our firm's accounting staff, Mr. Demm's rate was incorrectly raised at the beginning of January 2021, but thereafter corrected by providing a full credit on Hunton's subsequent invoice for services in March 2021.  *See supra*, ¶ 62, n. 9.

continued at trial, with Dewberry Group offering at least two fact witnesses whom the Court found to have repeatedly offered testimony that was not credible and riddled with inconsistencies.  And most recently, following the Court's issuance of its damages ruling on March 2, Dewberry Group filed a motion asking for the unprecedented relief of permanently sealing the amount of the Court's damages award along with other key aspects of its rulings.  As a result, our team was forced to spend a considerable amount of time researching and preparing a thorough and complete opposition to Defendant's unfounded motion.  Such efforts were justifiable, particularly given the substantial difficulty that Dewberry would likely face in attempting to enforce the nearly $43 million damages award if the amount of the award itself along with other key factual findings supporting it, were permanently sealed, as Defendant had urged.[11]  Accordingly, based upon my professional experience and first-hand knowledge of the facts and circumstances of this case, I believe that all of the amounts charged to Dewberry in our invoices were and are appropriate, as well as fair and reasonable.  Nonetheless, I understand and accept the assessment of Dewberry's fee expert, Mr. Reilly, that what may be fair and reasonable under the circumstances of the case and expectations of the client, does not always mean that all of those fees are appropriately awarded in accordance with the hypothetical lodestar analysis used in this Court.  As a result, I and my client accept Mr. Reilly's analysis and opinions, and have reduced the amount of our fee claim in accordance with his Declaration.

66.     Additionally, some invoices are redacted to prevent disclosure of mental impressions or work product or involve tasks not directly related to the litigation of dispute adjudicated by the Court on summary judgment and at trial (such as potential post-trial matters),

---

[11] For example, Dewberry would have to move to file the award under seal in every court where it might seek to domesticate the award for enforcement purposes.

The vast majority of such redactions are in our firm's invoices for January and March of 2022.   I concur with Mr. Reilly that all of those redacted entries should be excluded from our attorneys' fee application.  The approximate hours and fees associated with these two redacted entries total respectively, about 10 hours and $9,941.00 in fees for  January 2022 and 79 hours and $64,310 in fees for March 2022.  Thus, applying those adjustments, together with the 16% discounts reflected on each of the two invoices, for purposes of our fee claim here, the $140,016.65 in fees billed for January 2022 reduces to $131,666.21 (a reduction of $8,350), and the $127,862.70 in fees reflected on our March 2022 invoice reduces to $73,842.30 (a reduction of $54,020.40).

67.    Note also that even though Hunton (in particular, Mr. Demm) was involved with the pre-litigation cease and desist letters and submissions to the USPTO relating to Defendant's infringing marks between late 2017 through 2019, Dewberry has elected to exclude those amounts from its fee claim here.  Those amounts total nearly $43,000.  Thus, Dewberry's fee claim only seeks reimbursement of Hunton's fees from and after it was retained in late October 2020 to assume lead counsel responsibility in this case.  Thus, after elimination of the more than $62,000 in fees associated with the redacted January and March 2022 time entries discussed above, the total Hunton fees submitted for this fee claim amount to $5,990,335.00.  *See* Ex. B to Dewberry's Brief in Support of Motion for Attorneys' Fees, n.*****.

68.    The last monthly invoice that Hunton has billed to Dewberry was for legal services performed during March 2022; since the month of April has not concluded, our firm, in accordance with its normal practices, has neither generated nor issued an invoice for April 2022. It was during March and April that our firm has spent the vast majority of its time and effort concerning the attorneys' fee application in this case and bill of costs.  Based on my review of our firm's time entry records, and taking into account any appropriate discretionary discounts I

would likely apply to the final bill, in connection with the preparation of this attorneys' fee application and supporting materials through submission on April 29, 2022, I estimate that our team will spend in excess of 85 hours, equating to fees of more than $55,000. I accept Mr. Reilly's determination, however, that under the lodestar analysis, **$39,000.00** represents an appropriate adjusted fee for that submission. *See* Reilly Decl., ¶¶ 110, 142.

69. In summary, although Hunton's actual fees associated with the merits aspects of this litigation exceeded the lodestar amounts reflected in Mr. Reilly's declaration, and for the reasons explained above in my declaration were reasonable and justified under the circumstances of this case, I and Dewberry concur with Mr. Reilly's lodestar determination of **$5,329,425.00** for Hunton's fees. *See* Reilly Decl., ¶ 120. I understand that this figure does not include Mr. Reilly's separate lodestar calculation of **$39,000.00** as the reasonable amount of an award for preparation of Dewberry's attorneys' fee application. *Id*., ¶¶ 110, 142. Dewberry and I also concur with Mr. Reilly's adjustments to McCandlish's fees to arrive at a lodestar figure of **$258,962.00** for the purposes of Dewberry's attorneys' fee application. Accordingly, the lodestar for the total Dewberry fees (both Hunton's and McCandlish's) sought in its attorneys' fee application is **$5,588,387.00**, in accordance with Mr. Reilly's analysis, together with an additional award of **$39,000.00** for fees associated with the preparation of Dewberry's fee application, for a total award of **$5,627,387.00**.

### D. TAXABLE COSTS

70. I have reviewed records reflecting the expenses incurred by Hunton in this case. Contemporaneous with this Attorneys' Fee Application, Hunton is filing a Bill of Costs and seeking taxation of $153,592.42 in taxable costs. The categories of costs sought are described below, and itemized on the chart attached to Plaintiff's contemporaneously filed Bill of

Costs, which contains references to the Exhibits authenticated below and in the declarations of Alan Croft and Meghan Podolny.

71.     Dewberry seeks reimbursement for costs of filing the Complaint in the amount of $400.00.  Dewberry's counsel at McCandlish incurred that cost prior to counsel at HuntonAK's being retained.  *See* Croft Decl. ¶ 7 (authenticating Bill of Costs Exhibit 1 ("**BOC Ex. 1**"),  a Cost Report from McCandlish containing the $400 filing fee).

72.     Dewberry seeks reimbursement for a $195.00 fee from the Clerk of the Fairfax Circuit Court to obtain certified land records for certain of its properties.  **BOC Ex. 2** is a true and correct copy of HuntonAK's Invoice ID 0500-2654-7457 memorializing that cost. Although Dewberry's victory at summary judgment obviated the need to use the certified land records at trial, they were necessarily obtained before trial in response to Dewberry Group's contention that the two parties were in different industries—and specifically that Dewberry is not a "developer" like Dewberry Group is.  The land records helped negate Dewberry Group's contention by showing, for example, that Dewberry's affiliated entities acquired, improved, held, and, in a number of instances, sold, numerous  commercial properties.

73.     Dewberry seeks reimbursement of $1,724.65 in court reporter fees for transcripts necessarily obtained for use in the case.  Transcript costs in this case include $1,354.50 in fees for three days of trial transcripts last October and $381.15 for the hearing on the parties' cross-motions for summary judgment held on July 30, 2021 (which includes an additional $11.35 PayPal transaction charge that Dewberry does not seek to recover).  True and correct copies of the court reporters' invoices are found at **BOC Exs. 3 and 4**.  All associated invoices were necessarily obtained for use in the case.

74.     Dewberry seeks $207.69 in taxable witness fees.  Dewberry called one witness at trial: its expert witness, Rodney J. Bosco, who necessarily attended all three days of trial in case Dewberry determined that it was necessary to put on rebuttal evidence.  Mr. Bosco's daily witness fee is $40, or $120 for three days.  28 U.S.C. § 1821.  Taxable costs also include vehicle mileage, *id.*, which for Mr. Bosco was 26.1 miles each way at from his office at 11710 Plaza America Drive, Suite 800, Reston, VA 20190 to the U.S. District Court at 401 Courthouse Square, Alexandria, VA 22314, for a total of 156.6 miles.  **BOC Ex. 5** is a true and correct copy of the mileage calculation of that route from Google Maps.  The milage rate effective in 2021 was $0.56 per mile.  See U.S. General Services Administration, Archived Mileage Rates, *available at* https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates (last visited April 6, 2022).  Multiplying 156.6 miles by $0.56 per mile is $87.69.

75.     Dewberry seeks $42,673.93 for exemplification and copying costs.  These costs include costs relating to its trial exhibits, its presentation of electronic exhibits, and certain taxable ESI costs necessarily incurred in the case.

76.     ***First*,** Dewberry incurred costs of $5,039.60 to prepare copies of its trial exhibits, including one set for its counsel and three sets required by Local Civil Rule 79(A) (two sets delivered to the Clerk and another set for opposing counsel).  A true and correct copy of HuntonAK's November 2021 invoice to Dewberry is among those referenced previously and contains a $5,128 line item for copying costs.  **BOC Ex. 6** is a true and correct copy of HuntonAK's detailed copying costs, which summarizes the two copying requests made by paralegal Stephanie Meharg on October 7, 2021, just five days before the bench trial began.  Dewberry utilized its exhibits extensively both at trial and in its post-judgment briefing.  Copies

of those exhibits were therefore "necessarily obtained for use in the case" and are taxable against Dewberry Group.

77.     **Second,** Dewberry's exemplification costs also include $16,912.50 in trial-technology support costs from Dewberry's technology vendor, Trial Technology & Presentation Services, which led to the efficient and effective exemplification of Dewberry's documentary trial evidence to the Court (and to witnesses) at the October trial.  **BOC Ex. 7** is a true and correct copy of all of the final invoices Dewberry received from its trial technology consultant (the vendor's account information and contact information has been redacted).   Highlighted line items in the exhibit include those pertaining solely to the preparation of the electronic exhibit database and setting up the courtroom for the effective and efficient display of those exhibits.  In other words, if a line item describes (1) setting up the courtroom and (2) setting up the attorneys' war room in the hotel without ascribing specific hours to each task, Dewberry—taking a conservative approach toward cost recovery—omitted the line item entirely from its cost request. Highlighted line items relating solely to the preparation of the electronic exhibit database and setting up the courtroom for the effective and efficient display of those exhibits total $16,912.50. The table below summarizes the costs that Dewberry seeks to recover as taxable:

| Date | Description | Amount |
|------|-------------|--------|
| 20-Sep | Downloaded PX/DX exhibits; Began development of Trial Director presentation database. | $2,062.50 |
| 22-Sep | Created Courtroom equipment list and submitted request for Courtroom Technology Orientation/set up to Courthouse. | $550.00 |
| 23-Sep | OCR and Q/C (quality check) Plaintiff and Defense exhibits; Trial Director DB development to include creation of Windows Explorer document repository; creating and importing documents into Trial Director. | $2,062.50 |
| 10-Oct | Continued development of Trial Director presentation database and prep for team review. | $4,950.00 |

| 12-Oct | Provided courtroom technical and presentation support to include Set of Witness/Print room. | $2,475.00 |
| 13-Oct | Provided courtroom technical and presentation support. | $2,612.50 |
| 14-Oct | Provided courtroom technical and presentation support. Completed Strike of Courtroom and equipment. | $2,200.00 |
| | | |
| | **TOTAL** | **$16,912.50** |

78.     ***Third***, Dewberry incurred $20,721.83 in taxable electronic discovery costs because this case required production of ESI-unique information such as metadata.  Specifically, the Consent Discovery Order in place in this litigation requires that responsive ESI "will be produced in the form set forth in Appendix A, (I)," which in turn describes the production format for such documents in detail.  *See* Dkt. No. 23, Appendix A, (I).  The Consent Discovery Order further describes a broad array of 35 metadata fields that "database load files for all productions shall contain . . . ."  *Id.* at Appendix A, (III) (emphasis added).  Accordingly, **BOC Ex. 8** contains true and correct copies of the invoices of Dewberry's ESI vendor, Driven.  *See* Podolny Decl. ¶ 30.  In those invoices, Ms. Podolny has highlighted the specific line-items that are taxable as related to copying ESI and related labor costs to perform those taxable tasks.  Non-highlighted, excluded costs include, for example, those incurred to process data and generate OCR.  **BOC Ex. 8A** is a chart prepared by counsel summarizing Dewberry's taxable costs from those invoices, for a total sum of $20,721.83.  *See* Podolny Decl. ¶ 31.

79.     Dewberry seeks $40 of taxable costs pursuant to 28 U.S.C. § 1923, which provides for a $20 docket fee for trial or final hearing and $2.50 for each deposition admitted into evidence.  The Court held a bench trial on October 12–14, 2021, and admitted into evidence the depositions of eight witnesses: John Dewberry, Lockie Brown, Elizabeth Armstrong, George "Trey" Howard; Douglas Dewberry; John Freeman; David Groce; and Kim Lavigne.  *See* Dkt.

No. 225 (overruling objections to admission of deposition designations), a true and correct copy of which is found at **BOC Ex. 9**.

80.     Finally, Dewberry seeks reimbursement for $108,340.15 in costs incurred in taking and defending 28 depositions in this case.  These costs include transcript costs and costs relating to video services, which were necessary due to the extraordinary effects of the Covid-19 pandemic on litigation—including that in-person depositions were not feasible during the timeframe during which the depositions occurred because, due to the ongoing Covid-19 pandemic, it was neither safe nor feasible to gather counsel, witnesses, and court reporters in close-quartered conference rooms over and over again for half- or full-day depositions last spring—particularly when many of the depositions would require counsel for at least one party to take a commercial flight and stay in a hotel to attend.

81.     Accordingly, the parties jointly agreed to use an experienced video-deposition vendor, Veritext, to conduct all depositions remotely.  Veritext's virtual deposition platform includes video features necessary for counsel and witnesses to see and react to one another, view the same exhibits, and so forth.  **BOC Ex. 10** contains true and correct copies of all of the Veritext invoices sent to Dewberry (Veritext's Taxpayer ID Number is redacted)  As explained in the accompanying brief in support of Dewberry's Bill of Costs, courts have recognized the extraordinary effects that the Covid-19 pandemic had on litigation and allowed prevailing parties like Dewberry to tax as costs in the form of both transcription and videographic services.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Arthur E. Schmalz

Dated: April 29, 2022