**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| DEWBERRY ENGINEERS INC., | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | No. 1:20-CV-610-LO-IDD |
| | ) | |
| DEWBERRY GROUP, INC., | ) | |
| | ) | |
| *Defendant.* | ) | |

**DECLARATION OF CRAIG C. REILLY**

CRAIG C. REILLY, as his declaration, states as follows:

1.      I am over 21 years of age and otherwise competent to make this declaration.  I have personal knowledge of the statements contained herein.  The statements herein are true and correct to the best of my knowledge, information, and belief.

2.      I have been asked by Plaintiff to submit this expert declaration in support of its application for an award of reasonable attorneys' fees.[1]

3.      I am being compensated for the time I have spent preparing this declaration.  My compensation is $400.00 per hour.  My compensation is not contingent in any way upon the Court's decision.

**QUALIFICATIONS**

4.      My qualifications to offer opinions on the reasonableness of attorneys' fees for civil litigation in Northern Virginia are based primarily upon my experiences as an attorney at law.  I have been a member in good standing of the Virginia State Bar since 1981 (VSB

---

[1]  Expert evidence may be received in support of a fee application.  *See McAfee v. Boczar*, 738 F.3d 81, 91 (4th Cir. 2013); *see also* AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION, at 115 (Fed. Jud. Cntr. 2005) (expert analysis may be useful).

# 20942).   I have been admitted to practice before this Court since 1982.   My resume is submitted herewith as **Attachment A**, outlining my legal training and experience.

5.      The vast majority of my legal work over the last forty years has been civil litigation, most of that being in the United States District Court for the Eastern District of Virginia, Alexandria Division.  I also have appeared as counsel of record in Virginia state courts. During my practice, I have appeared in a wide variety of intellectual property cases including numerous trademark cases.   Based on this experience, I am well-aware of the hourly rates charged by attorneys in Northern Virginia for similar civil litigation as well as the nature and extent of work that is reasonably necessary to successfully litigate a trademark action.

6.      Moreover, I often have worked with co-counsel from national, regional, and local firms in civil litigation matters before this Court and the other courts in Northern Virginia.  In the course of my work, therefore, I have become familiar with the prevailing hourly rates charged by other law firms for intellectual property civil litigation in Northern Virginia.

7.      Furthermore, in my litigation practice, I have applied for, or opposed, numerous fee applications under fee-shifting statutes, rules, and contractual provisions.  Through that fee litigation, I also have become familiar with the hourly rates charged for civil litigation in Northern Virginia and with the factors to be applied in determining the reasonableness of attorneys' fees.

8.      In addition to my experience as a practitioner, I have analyzed the local legal market as an expert witness.  In support of my expert declaration in another case, I conducted a survey of attorneys' fees charged in the Northern Virginia market for complex civil litigation. *Vienna Metro LLC v. Pulte Home Corp*., No. 1:10cv502 (GBL) (E.D. Va. June 6, 2011) (Doc. 210) (declaration describing fee survey and setting forth hourly rate matrix).  My survey results

were adopted by the Court as the basis for the award of fees in that action.  *Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10cv502 (GBL) (E.D. Va. Aug. 24, 2011) (Doc. 263) (fee award). That rate matrix ("*Vienna Metro* Matrix") has been applied in several other cases, including other cases in this Division.  *E.g.*, *Tech Systems, Inc. v. Pyles*, No. 1:12cv374 (GBL/JFA), 2013 U.S. Dist. LEXIS 110636, *19-20 & n.4 (E.D. Va. Aug. 6, 2013); *Taylor v. Republic Services, Inc.*, No. 1:12cv523 (GBL/IDD), 2014 U.S. Dist. LEXIS 11086, *14-15 (E.D. Va. Jan. 29, 2014); *Zoroastrian Cntr. and Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Fndn.*, No. 1:13cv980 (LO/TRJ), 2017 U.S. Dist. LEXIS 43754, *32-33 (E.D. Va. Mar. 24, 2017); *BMG Rights Management (US) v. Cox Communications*, 234 F. Supp. 3d 760, 770-73 (E.D. Va. 2017) (O'Grady, J.) (in copyright infringement action that was "complex" and "hard-fought," and which required "sophisticated counsel," "the Court finds that the *Vienna Metro* Matrix for complex civil litigation supplies an appropriate range of fees").  Numerous other decisions in this Division also have used the *Vienna Metro* Matrix as a benchmark in complex civil litigation.

9.      The *Vienna Metro* Matrix also has been accepted and applied in two state court cases in which I gave testimony as an expert witness on reasonable attorneys' fees.  *See, e.g., Mantech Int'l Corp. v. Analex Corp.*, No. 2008-5845 (Fairfax Cir. June 10, 2011) (order); *Tureson v. Open Sys. Sciences of Va., Inc.*, No. CL-2012-323 (Fairfax Cir. May 31, 2013) (letter opinion).  Other state courts also have relied on the *Vienna Metro* Matrix in complex civil litigation.

10.      I have been found qualified to testify (or to present written opinions) as an expert on hourly rates and reasonable attorneys' fees in the Northern Virginia market in the *Vienna Metro*, *Taylor*, *Mantech*, and *Tureson* cases, as well as several others.

11.     I have presented evidence by declaration as an expert witness on attorneys' fees in numerous other cases, including recent cases in this Court, which are identified in **Attachment B**.

12.     Finally, since preparing the *Vienna Metro* Matrix data for 2010-2011, I have continued to monitor hourly rates generally, and in Northern Virginia particularly, to keep myself informed of current information.  My analysis takes into account, and applies, ***current*** prevailing market rates, which have risen since the *Vienna Metro* decision (*see* ¶¶ 23-34, *infra*).

**BACKGROUND**

13.     In preparing this declaration, I considered materials and information from several sources.  First, I reviewed the pleadings and docket sheet to determine the level of skill and experience required to successfully perform the work, as well as the nature of the litigation services, for the purpose of (i) comparing this to other cases and (ii) analyzing the reasonableness of the work and fees.  Second, I reviewed the declarations of Plaintiff's lead lawyers from Hunton Andrews Kurth LLP ("Hunton") and McCandlish Lillard in support of the fee application.  In particular, the *Declaration of Arthur E. Schmalz*, submitted herewith, provides a detailed and comprehensive review of the litigation, which justifies the enormous amount of work needed to successfully litigate this matter.  Third, I reviewed the credentials of the principal lawyers for Plaintiff, which are available online.  Fourth, I reviewed the Court's rulings on the merits, the injunction, and damages to determine the degree of success achieved by Plaintiff.

***The Litigation***

14.     On May 29, 2020, Plaintiff, Dewberry Engineers Inc. ("Plaintiff"), brought this five-count action against Defendant, Dewberry Group, Inc. ("DGI"), asserting federal trademark and unfair competition claims (Counts I & II), Virginia common law trademark and unfair

4

competition claims (Counts III & IV), and a Virginia common law claim for breach of the parties' 2007 Confidential Settlement Agreement ("CSA") that had resolved prior trademark litigation between them (Count V).  Dkt. 1.

15.     After vigorous litigation, on August 11, 2021, the Court granted Plaintiff's motion for summary judgment of liability on all five counts and denied DGI's motion for summary judgment.  Dkt. 174.  I am relying on the Court's findings and conclusions in formulating my opinions regarding the nature of the claims and defenses and extent of damages involved in the litigation, as well as to measure the degree of success.  After a bench trial on damages, the Court awarded $43 million in profit-disgorgement damages to Plaintiff.  Dkt. 256, *Order* at 29.  The Court also awarded a permanent injunction.  Dkt. 208 & 229.

### *Award of "Reasonable Attorney Fees" under § 1117(a)*

16.     In addition to awarding damages, the Court found that this was an "exceptional case" warranting an award of attorneys' fees to Plaintiff pursuant to 15 U.S.C. § 1117(a).  Dkt. 256, *Order* at 29.

17.     The pertinent statute provides for an award of "reasonable attorney fees."[2] Whenever a "reasonable" attorney's fee may be awarded under federal fee-shifting statutes, that term will be interpreted "uniformly."[3]  And that generally means the "lodestar" analysis.[4]  While "not perfect," the lodestar amount roughly approximates the hourly fee an attorney would receive

---

[2] 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

[3]  *See Burlington v. Dague*, 505 U.S. 557, 561-62 (1992) ("our case law construing what is a 'reasonable' fee applies uniformly to all [fee-shifting statutes]").

[4]  *See Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (lodestar is dominant analysis); *Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002) (lodestar analysis is "guiding light" in fee award litigation).

under a privately negotiated engagement agreement with a paying client, is "readily administrable," and is "objective."[5]  Thus, I apply the federal lodestar analysis herein.

18.     The principal determinants in the federal lodestar analysis are the time reasonably expended and the appropriate hourly rate, which are multiplied to calculate the lodestar amount.[6]

19.     I also understand that the Court will apply the Fourth Circuit's three-step formula:

> First, the court must "determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate."  To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  Next, the court must "subtract fees for hours spent on unsuccessful claims unrelated to successful ones."  Finally, the court should award "some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff."[7]

20.     The twelve *Johnson* factors are familiar:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.[8]

21.     Generally, *Johnson* factors 1 (time) and 5 (customary fee) are applied to calculate the lodestar amount in Step One.  The other *Johnson* factors also may be used in the lodestar calculation.  For example, *Johnson* factors 2 (novelty and difficulty) and 8 (amount in

---

[5]  *Perdue*, 559 U.S. at 551-52.

[6]  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

[7]  *See McAfee*, 738 F.3d at 88; *BMG*, 234 F. Supp. 3d at 766.

[8]  *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  These twelve factors have long been applied in the Fourth Circuit.  *See Barber v. Kimbrell's*, 577 F.2d 216, 226 (4th Cir. 1978) (citing *Johnson*).

controversy) could justify a larger number of hours, or the higher hourly rates of a legal specialist, or both, and could justify a greater award than in a garden-variety case. Similarly, *Johnson* factors 3 (skill required) and 9 (attorney's reputation and experience) could justify higher hourly rates for the applicant's counsel than would be used for other local lawyers. Furthermore, Johnson factor 8 (results obtained) would be applied in Step Three to adjust the lodestar. Importantly, the *Johnson* factors need not be considered and analyzed individually, nor are all factors relevant in every case, because "such considerations are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."[9] Essentially, there is no strict formula regarding which factors are analyzed in the lodestar calculation, or how those are to be considered.[10] Ultimately, "the district court has discretion in determining the amount of a fee award" in light of its "superior understanding of the litigation."[11]

## I.   STEP ONE:  CALCULATING THE LODESTAR

22.   It is well-settled that "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."[12] Each component (hours and rates), as well as the nature and extent of the proof required for each component, are analyzed separately below.

### A.   Calculating the Reasonable Hourly Rates

23.   The fee applicant bears the burden of establishing the reasonableness of the hourly rates.[13] A fee applicant must show that the requested hourly rates are consistent with "the

---

[9]  *Hensley*, 461 U.S. at 434 n.9.

[10]  *See McAfee*, 738 F.3d at 89-90.

[11]  *Hensley*, 461 U.S. at 437.

[12]  *Id.*

[13]  *See Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990).

prevailing market rates in the relevant community for the type of work for which [s]he seeks an award."[14]  The evidence may include "affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community."[15]  Expert evidence also may be received in support of hourly rates sought in a fee application.[16]

24.     I also understand that when determining the "reasonable hourly rates" to use in the lodestar analysis, the Court would apply "the prevailing market rates in the relevant community" for the type of work involved.[17]  The Supreme Court has recognized that determining a "prevailing market rate" is "inherently difficult" and in any event is an artificial construct because lawyers are not "commodities," and hourly rates are not determined by "supply and demand" for fungible products and services.[18]  Instead, hourly rates "vary widely," based on "experience, skill, and reputation" of the lawyer.[19]  As the Supreme Court explained, the proper method for determining the "prevailing market rate" is as follows:

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.  A rate determined in this way is normally deemed to be reasonable, and is referred to — for convenience — as the prevailing market rate.[20]

---

[14]  *Id.*

[15]  *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009).

[16]  *See McAfee*, 738 F.3d at 91 (expert affidavits were "sufficient evidence" to support hourly rate calculation).

[17]  *See Blum v. Stenson*, 465 U.S. 886, 895 (1984).

[18]  *Id.* at 895 n.11.

[19]  *Id.*

[20]  *Id.*

Accordingly, I understand that when determining the reasonable hourly rates to be applied, the Court would not merely adopt the privately negotiated hourly rates as charged by the fee applicant's counsel; rather, the Court would receive evidence and analyze whether the applicant's rates are consistent with the "prevailing market rates" in that locale for the sort of legal work.[21]

25.     Determining the reasonableness of proposed hourly rates is fact-intensive, and involves comparison of comparable rates for similar services, the experience and skillsets of each attorney, rates used in similar cases, and other reference points (such as rate surveys, published tables of rates, or tables of rates used in other cases).  The reasonable hourly rate also must be current[22] and should reflect only local rates.[23]

26.     While every case is different and comparisons sometimes are difficult,[24] this is not a routine case, for which rock-bottom hourly rates might be appropriate.  Rather, the subject matter (trademark infringement), the amount in controversy (tens of millions of dollars in disgorged profits), and the significant non-monetary value of obtaining an injunction (to protect Plaintiff's trademark rights and the commercial value of Plaintiff's brand identity from irreparable injury) justified the retention of highly skilled litigators familiar with the Court's practices and procedures.  As the Court has recognized, litigators who are capable of handling complex civil litigation and intellectual property litigation in this Court charge higher rates.[25]

---

[21]  *See McAfee*, 738 F.3d at 91.

[22]  *See Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 228 (4th Cir. 2009) (abuse of discretion to use an outdated hourly rate).

[23]  *See id.* at 227 (Court must use "the market rate for services in the geographic jurisdiction of the litigation").

[24]  *See Hair Club for Men, LLC v. Ehson*, No. 1:16-cv-236-LO, 2017 U.S. Dist. LEXIS 51370, *14-22 (E.D. Va. Apr. 3, 2017) (comparing numerous cases to determine reasonable rates).

[25]  *See BMG*, 234 F. Supp. 3d at 773.

Moreover, this case was vigorously disputed and presented complexities and challenges that required skillful lawyering, careful research, thorough factual investigation, and thoughtful briefing and argument—which also warrants higher than run-of-the-mill rates.[26]

27.     In my opinion, therefore, the most appropriate comparable would be the *BMG* case, which, in turn, used the *Vienna Metro* Matrix rates as the standard.[27]  Thus, I would use the *Vienna Metro* Matrix rates as the primary comparable in this case, but I also would use an upward adjustment on certain rates because local hourly rates have increased since 2011 when the *Vienna Metro* Matrix rate table was compiled.[28]  To be sure, for several years after 2011, local hourly rates were stagnant—standard rates may have gone up annually, but firms then gave discounts and experienced lower realization rates, effectively keeping rates at 2011 levels.  Since 2015, however, hourly rates have steadily increased, and realization rates have leveled off.[29] These national trends are reflected in the local legal market as well.

28.     Based on my litigation experience in this locale, and my analysis of the local legal market, the hourly rates proposed for Plaintiff's principal attorneys, Hunton are reasonable. (**Attachment C** (Hunton attorney rate table.))[30]  Based on my review of their years of experience

---

[26]  *Id.* at 772 (case was "complex" and "hard fought" justifying higher rates).

[27]  *Id.* at 770-73.

[28]  *See* note 22, *supra*, about using current comparable rates.

[29]  2021 *Report on the State of the Legal Market* at 6 (Georgetown/Thom. Reuters 2021).  The nationwide trends shown in this report have held true in the local legal market as well.

[30]  In that rate table, I note the "status" of each attorney-timekeeper (*e.g.*, Partner), but generally I would disregard the "status" and focus on years of experience.  Rather than using the traditional categories of partner and associate attorneys, many firms now have numerous categories of attorneys—*e.g.*, senior counsel, partner, non-equity partner, counsel, senior associate, associate, and staff attorney.  Firms do not use the same criteria when categorizing their attorneys, which makes apples-to-apples comparisons based on the firm-conferred status impossible.  Thus, I have used experience—years since graduation from law school—to categorize the attorney-timekeepers for comparing hourly rates to the *Vienna Metro* Matrix.

and credentials, it is readily apparent that these lawyers are preeminently qualified and would command the highest rates in the legal market.

29.     It first should be noted that most of the Hunton attorney hourly rates for this matter are within or below the *Vienna Metro* Rates.  As their online biographies show, each of these attorneys has top-drawer credentials and appropriate, often specialized, litigation experience to justify their rates.  This is confirmed in the lawyers' declarations.  Two partners (Demm and Schmalz, both at $985) have rates higher than the *Vienna Metro* rate for their years of experience; but based on my experience and analysis, their rates are consistent with ***current*** market rates for similarly skilled attorneys with similar skills and experience.  I regularly see rates exceeding $1000/hour for highly skilled attorneys like these.  Therefore, in my opinion, the Hunton attorneys' hourly rates are reasonable within the Northern Virginia legal market should be used in the lodestar analysis.

30.     In addition, I understand that fees for nonlawyer timekeepers—such as paralegals and law clerks—may be compensable under federal fee-shifting statutes.[31]   Plaintiff's fee application includes several types of Hunton nonlawyer timekeepers, whose hourly rates I have analyzed.  (**Attachment D** (Hunton other timekeepers rate table).)

31.     As pertinent to this fee application, I would categorize the "Summer Associates" as "law clerks."  To be sure, there is no uniform practice or professional qualification for "law clerk" in private practice in this locale.  It can refer to someone who has graduated from law school but has not been licensed to practice yet, or a law student still in school.  It usually refers to someone with some law school training, however, as opposed to a paralegal.  Therefore, the "Summer Associates," who I understand are law students temporarily working for the firm, fit

---

[31]  *Missouri v. Jenkins*, 491 U.S. 274, 284-89 (1989) (fees for paralegals and law clerks are compensable); *Priestley v. Astrue*, 651 F.3d 410, 416 (4th Cir. 2011) (same).

into the category of "law clerk."  The local market rate for "law clerks" is hard to gauge.  There does not appear to be reliable market data on hourly rates charged for contract attorneys or "law clerks;" however, two cases from 2010 and 2011 included hourly rates of $105 for "law clerks,"[32] which I would use as a comparable.  Even updating those approved rates to 2022, I submit that $150 per hour is a reasonable rate for a "law clerk" or Summer Associate in this locale.  (But I address whether work by "law clerks" should be included in the lodestar in ¶ 115 below.)

33.     I would categorize the Hunton timekeepers identified as "Paralegal," "Professional Assistant," and "Librarian" under the *Vienna Metro* category for "paralegal."  The "Staff Timekeeper" is a highly trained and experienced investigator, formerly of the FBI, but also seems to "fit" best in the *Vienna Metro* paralegal category.

33.     The proposed hourly rates for Hunton paralegals, $185 to $375, are comparable to hourly rates routinely charged in this locale for litigation paralegals and investigators.  True, some rates exceed the *Vienna Metro* range for paralegals, but hourly rates for paralegals, as for lawyers, have increased locally since 2011.  These days, paralegals do a lot of work that would otherwise have to be done by lawyers at much higher rates, so an hourly rate of $350 for a paralegal now is routine (whereas in 2011, that rate was at the top of the local legal market).  The Hunton paralegals had to handle and process many of the documents produced by both sides, including making redactions of those produced subject to the protective order, which otherwise may have required attorneys to handle.  Therefore, in my opinion, the Hunton hourly rates for

---

[32] *Porter v. Elk Remodeling Inc.*, No. 1:09-cv-446, 2010 U.S. Dist. LEXIS 89037, *25 (E.D. Va. Aug. 27, 2010) (O'Grady, J.) (allowing $105 hourly rate for "law clerk"); *Khair v. Countrywide Home Loans, Inc.*, No. 1:10cv410, 2011 U.S. Dist. LEXIS 35503, *15 (E.D. Va. Apr. 1, 2011) (Cacheris, J.) (same).  Those rates from 2010 and 2011 are outdated but, in my opinion, the market has not reached the proposed rates charged by Hunton for a law clerk.

these "paralegal" timekeepers are reasonable.  (But I address whether work by all these non-lawyer timekeepers should be included in the lodestar, or should be excluded as "clerical work," in ¶ 114 below.)

34.     I also have analyzed the hourly rates of the McCandlish Lillard attorney and para-professional timekeepers.  (**Attachment E**.)  Based on my review of their years of experience and credentials, it is readily apparent that these lawyers are highly qualified and the rates they charge are commensurate with their qualifications.  Their rates also are well within the corresponding *Vienna Metro* rate ranges.  Therefore, in my opinion, the McCandlish Lillard hourly rates are reasonable within the Northern Virginia legal market.

### B.     *Calculating the Reasonable Number of Hours*

35.     The fee applicant bears the burden of proof on the reasonable number of hours and must "submit evidence supporting the hours worked."[33]  Furthermore, "[t]he applicant … should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims" for which fee-shifting might not be awarded.[34]  The billing records also should "describe specifically" the work performed so the reviewing court can "exclude hours that were not reasonably expended."[35]  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly."[36]

36.     Keeping in mind that the fee application should not become a "second major litigation,"[37] and because the fee application, commensurate with the nature of the dispute and

---

[33]  *Hensley*, 461 U.S. at 434.

[34]  *Id.* at 437.

[35]   *S. Boston Energy LLC v. Hartford Stm. Boiler Spclty. Ins. Co.*, No. 1:18-cv-596-LO, 2019 U.S. Dist. LEXIS 138847, *14; 2019 WL 3843062 (E.D. Va. Aug. 15, 2019).

[36]  *Hensley*, 461 U.S. at 434.

[37]  *Id.* at 437

amount in controversy, is both voluminous and complex, I have not attempted a line-item justification of the fee application.  To be sure, I have read and considered every time entry on every invoice, but I submit that justifying (or requiring the fee-opponent to dispute) every line-item is unwarranted.  Instead, as in other complex cases, I submit that the analysis should entail an overall assessment of the matter and the use of percentage reductions when calculating the lodestar.[38]  Likewise, the Court is not required to make a line-item analysis, either; instead, the Court need only "provide a concise but clear explanation of its reasons for the fee award."[39]  As the Supreme Court has noted, "Trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."[40]

37.     Determining the reasonable number of hours involves both quantitative and qualitative analyses.  Quantitatively, not every hour worked counts towards the total—some are excessive.  Even some hours that are compensable as between the prevailing party and its lawyer, will not be compensable as between the prevailing party and its opponent because they were not "reasonably and necessarily" incurred in the action.  Qualitatively, not every hour that has been worked will be recovered—some hours may have been spent on an unsuccessful claim that was unrelated to the fee-shifting claim.  Thus, determining the reasonable number of hours is not merely a math problem of adding up the time on the prevailing party's legal invoices.

38.     For the purposes of this analysis, I have divided the litigation into two phases: (1) prefiling investigation and (2) active litigation (including pleading, motions, discovery, summary adjudication, and the damages trial).  On **Attachment F** (McCandlish Lillard) and

---

[38] *E.g.*, *BMG*, 234 F. Supp. 3d at 773-75.

[39] *Hensley*, 461 U.S. at 437.

[40] *Fox v. Vice*, 563 U.S. 826, 838 (2011).

**Attachment G** (Hunton), I have summarized the firms' work and fees as well as my summary analyses and conclusions on these charts.

### 1.      Prefiling Investigation

39.      Under the federal lodestar formula, time spent by litigation counsel in investigating claims, conducting preliminary legal research, developing a theory of the case, and preparing the initial complaint may be compensable in the award of reasonable attorneys' fees.[41] The Court has summarized the standard for determining the reasonableness of such work as follows:

> A party may recover attorney's fees for pre-suit actions if the time spent before the complaint was filed was reasonably expended on the litigation.  It is difficult to treat time spent years before the complaint was filed as having been expended on the litigation.  Legitimate pre-suit actions include attorney-client interviews, investigation of the facts of the case, research on the viability of potential legal claims, drafting of the complaint and accompanying documents, and preparation for dealing with expected preliminary motions and discovery requests.  These actions are legitimate because careful pre-filing investigation of the facts and law is required by the ethical rules of profession and the Federal Rules of Civil Procedure, and the realities of [civil litigation].[42]

Thus, even though the fee-shifting clock may start prior to filing, it will be limited to work to reasonably necessary to prepare and file the action.

40.      This case had a long prefiling period.  In a sense, this dispute started simmering even before the prior litigation was settled in February 2007, when the CSA was executed.  *See* Dkt. 256, *Order* at 4-7 (characterizing certain actions and inactions by DGI as early as 2004 as "Red Flags").  However, "[i]n 2016 … Defendant rebranded from 'Dewberry Capital' to 'Dewberry Group,'" which caused the then-simmering dispute to boil over.  Dkt. 174, *Order*

---

[41]   *See Ray Haluch Gravel Co. v. Central Pension Fund of Op. Engrs.*, 577 U.S. 177, 189-90 (2014).

[42]   *Harwood v. Am. Airlines, Inc.*, No. 1:17-cv-484-LO, 2019 U.S. Dist. LEXIS 138844, *9; 2019 WL 3244200 (E.D. Va. May 16, 2019) (citations and quotations omitted).

at 2.  Thereafter, several of DGI's actions and inactions from the 2017 to 2019 period have been cited by the Court as additional "Red Flags" in its rulings.  Dkt. 256, *Order* at 7-11.  Following that rebranding, the McCandlish Lillard attorneys (who are Plaintiff's regular counsel for most trademark work) closely monitored DGI's trademark uses and applications from September 2017 through October 2019.  Although it is arguable, in my opinion, and applying the Court's analysis in *Harwood*, the work done in this period by McCandlish Lillard should be excluded from the lodestar because it appears to have been directed to trademark applications, administrative protests, and cease and desist letters—which were efforts to achieve a non-judicial resolution, rather than direct preparations for filing a lawsuit.  (Although I reviewed these invoices, I understand that only invoices that are included in the lodestar will be submitted.)  In October 2019, however, the McCandlish Lillard attorneys began to analyze the dispute as a potential lawsuit.  In my opinion, the work performed by McCandlish Lillard between October 2019 and May 29, 2020, when the suit was filed should be included in the lodestar as reasonable prefiling investigation.  I summarize these conclusions (and my other analyses) on **Attachment F**.

41.     Similarly, prior to late October 2020, the Hunton attorneys were monitoring the case rather than actively participating in the litigation.  (Although I reviewed these invoices, I understand that only invoices that are included in the lodestar will be submitted.)  In my opinion, and applying the Court's reasoning in *Harwood*, their work through April 2020, when the suit was filed should not be included in the lodestar because it is too remote in time or is not directed at prefiling investigation.  Their time from May through September 2020, while the action was underway, likewise may be excluded as duplicative of the work done by McCandlish Lillard.  I summarize these conclusions (and my other analyses) on **Attachment G**.

### 2. *Active Litigation*

42.     I have closely analyzed the work descriptions on both firms' invoices during the active litigation phase to determine whether the work was reasonable and necessary.  In my forty years at the bar, I have worked together with a lot of "big firms" on a lot of "big cases" (*i.e.*, multi-million-dollar litigation) in the Alexandria Division.[43]  Further, I have litigated multi-million-dollar legal fee applications in this Division (*e.g.*, *BMG*), and served as an expert analyzing multi-million-dollar legal fee applications in this Division (*e.g.*, *Vienna Metro*).  These experiences inform my opinions in this matter—particularly regarding so-called "big firm" practices, the use of multiple attorneys, aggressive opponents, billing judgment, and elimination of "clerical" work.

43.     *"Big Firm" Litigation Practices:*  The Court has expressed some concern about "big firm" litigation practices:

> Large law firms often task far more attorneys than is necessary in a lawsuit like this.  Indeed, in this case, a litigation team of sixteen individuals worked on behalf of one group of defendants. With such a large litigation team, the number of hours billed grows rapidly.  If multiple lawyers assigned to the case all read a memorandum or meet to confer about the status of the case, each lawyer bills time and there is a risk of duplicative effort.  Put another way, this case could have been fully and fairly litigated with each party devoting no more than two experienced, competent lawyers to the case.  In other words, large law firms are often hired to cinch every belt, tighten every suspender, and scrutinize every Bluebook citation.  But while this may be expected in the context of large law firms, it is not necessarily "reasonable" in the legal sense, and oftentimes a more focused expenditure of hours from fewer attorneys could have achieved the same task with the same results.[44]

---

[43]  *E.g.*, *TecSec, Inc. v. IBM et al.*, No. 1:10cv115 (E.D. Va. filed Feb. 5, 2010) (serving as local counsel for defendants IBM, Oracle, and Cisco in patent infringement litigation).

[44]  *BMG*, 234 F. Supp. 3d at 773 (citation and formatting omitted).

In my experience, this criticism may go too far generally, and would go too far if strictly applied to this case particularly. In my experience, this criticism overlooks another important causative factor: litigating a "big case" at the speed of the Rocket Docket.

44.     In this Division, regardless of whether a case is "big" or "small," essentially the same four-month discovery period is allowed. That leads to recurring staffing pressures in "big cases," which I have experienced time and again. Essentially, all agree that most "big cases" require a team-approach: a senior litigator leading a team of appropriately skilled attorneys. The idealized team of "no more than two" or just a few attorneys may work for some cases, but in a "big case," a team of ten or more often is required, including attorneys to handle discrete tasks like ESI discovery, document review and analysis, or more generalized tasks like legal research, motions practice on the Court's unique one-week schedule, expert disclosures, fact investigation and witness preparation, and fact and expert depositions, and so on.

45.     In a "big case," the ideal of a small team that works in a highly efficient manner may fit in a district that allows *four years* for pretrial litigation. In such a district, a small litigation team can still accomplish all the work in a timely manner. Within that team, moreover, each lawyer's learning curve will be shorter because their knowledge base will grow as the case progresses, allowing for more efficient litigation in later phases. By contrast, in the Alexandria Division, where only *four months* are allowed for pretrial litigation, that idealized small team of just a few lawyers would be overwhelmed with work, and the team typically needs to expand on an *ad hoc* basis, when and as needed to accomplish each task on the brisk schedule set by the Court. Each new lawyer, often added for a single, specific time-sensitive task, will face a steeper learning curve, require more supervisory coordination, and may take longer to accomplish a task than if it were done by a member of the original cadre. So, in my experience, litigation of a "big

case" has some inefficiencies baked in—not by "big firm" billing practices, but the practical necessity of litigation on the Rocket Docket schedule. Although several extensions were granted for good cause, the pretrial period was compressed in this action, creating this time-pressure.

46.    Furthermore, certain "big cases" require "big firms" to handle them—*i.e.*, firms that have the "legal horsepower" in terms of specialist litigators, sufficient experienced and skilled lawyers to handle all tasks in a timely manner, and the capacity to handle a "big case" without sacrificing the ability to timely handle the work ethically required by the firm's other cases.   Indeed, both sides in this matter used "big firms":   Hunton, for Plaintiff, is an international law firm with 900 lawyers around the world, 400 of which are litigators.   Arnall Golden Gregory LLP, for DGI, touts itself as an "Am Law 200 law firm"—*i.e.*, it is one of the top 200 law firms in the United States—that has nearly 200 lawyers in two offices, of which about 50 are litigators.

47.    When both sides have used "big firms" to handle a "big case," reasonableness must be viewed through that lens.   It would be unfair to the prevailing party to measure reasonableness for fee-shifting as if only the prevailing party had used a "big firm."   Therefore, I submit that concerns about "big firm" litigation practices must not drive the analysis in this action.   Each side in this case used a "big firm" to handle a "big case," and each expected to engage in "big firm" litigation—and that is what they got.   The losing party cannot now ask the Court to reduce the fee award as if this were routine commercial litigation.

48.    *Multiple Attorneys:*   In the Alexandria Division, time spent by more than one lawyer on a task is not necessarily duplicative or excessive.   In a legally and factually complicated case, like this one, the use of multiple lawyers may be necessary, and so long as the

attorneys work effectively in a coordinated fashion, no deduction for duplication need be made.[45] Similarly, if multiple lawyers are working on the case, some supervisory time must reasonably and necessarily be spent to ensure that all work gets done in a timely and coordinated fashion.[46] Thus, time for multiple lawyers may be allowed, even if overlapping to some extent, so long as multiple lawyers are necessary for effective representation.  In the Alexandria Division, using a lot of lawyers often is the relief-valve on the docket pressure experienced when litigating a "big case" on a tight schedule—it is a necessary practice, not an abusive one.

49.    *Aggressive or Vigorous Opponent:*  The time-pressure on staffing a "big case" in the Alexandria Division's Rocket Docket schedule may then be compounded by an aggressive or vigorous opponent.  If one's opponent fights vigorously for every square inch of contested territory in the case, the inherent docket pressure on staffing a "big case" becomes extraordinary, as numerous contested motions are added to the mix of work to do.

50.    In my experience, staffing up to meet these extraordinary time-demands on the Court's Rocket Docket schedule is not "over-litigating" or "overstaffing"—often, it is a necessity.  The lodestar analysis, therefore, must accommodate the fee applicant who has had to overcome a vigorous defense:  A defendant who has "pull[ed] out all the stops … may not complain to the Court about the hours the plaintiff naturally expended in response" to

---

[45]  *See The Colonial Williamsburg Fndn. v. The Kittinger Co.*, 38 F.3d 133, 139 (4th Cir. 1994) ("staffing of four partners does not alone constitute poor billing judgment," nor does having "two partners attend several depositions").

[46]  *See National Ass'n of Concerned Vets. v. Secretary of Defense*, 675 F.2d 1319, 1337 (D.C. Cir. 1982) (allowing recovery for time spent "conferring with colleagues, particularly subordinates, to ensure that a case is managed in an effective as well as efficient manner").

defendant's litigation tactics.[47]  I hasten to add that a vigorous defense is not necessarily a bad faith defense—even a vigorous good faith defense will drive up the prevailing plaintiff's fees.

51.     In this case, DGI vigorously contested virtually every issue, which has driven up the fees incurred by Plaintiff to meet and overcome each litigation hurdle thrown up in front of it: DGI's counterclaims were dismissed (Dkt. 19); its motion for a protective order regarding third-party subpoenas was denied (Dkt. 42); its motions to exclude Plaintiff's experts were denied (Dkt. 167); its motion for reconsideration of summary judgment was denied (Dkt. 207); and the Court held that the trial testimony of two of its principal witnesses was "not credible" (Dkt. 256).  Ultimately, DGI's contentions proved footless, yet it vigorously litigated the case from start to finish, forcing Plaintiff to incur increased fees.

52.     Mindful of the Court's skepticism of "big firm" litigation practices, however, but trying to balance that against the practical realities of litigating this "big case" on the Rocket Docket schedule—and especially during covid-19 restrictions—I have closely analyzed each firm's work during the active litigation phase.

### a.     McCandlish Lillard

53.     I am starting with an analysis of the McCandlish Lillard invoices for their work from June through October 2020, when they were sole counsel of record for Plaintiff.  During this period, these attorneys engaged in typical initial work in federal litigation, such as: legal and factual research; drafting pleadings and threshold motions; discovery planning; addressing the need for an ESI protocol, Rule 502 order, and Protective Order; and addressing settlement issues. The staffing was efficiently lean—just three lawyers supported by paralegals.  The work and fees

---

[47] *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 543 F. Supp. 126, 134 (E.D. Va. 1982); *accord Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (citation omitted) (defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response").

incurred appear proportionate the claims, defenses, and remedies at issue.  In my opinion, all this work should be included in the lodestar Step One, subject to certain percentage reductions for excessive or duplicative work by the lawyers or "clerical" work.  These analyses and proposed reductions are shown on **Attachment F**.

54.     In November 2020, the Hunton attorneys appeared as co-counsel for Plaintiff, and essentially became lead counsel, as is revealed by the nature and extent of the work they thereafter performed.  In contrast, the McCandlish Lillard time entries report that most of the work after November 2020 through the end of the trial involved reviewing case materials and monitoring the litigation.  True, there were exceptions when the McCandlish Lillard attorneys handled several important pretrial tasks, as noted on **Attachment F**, but I submit that much of their time and most of their fees after November 2020 should be excluded from the lodestar.

55.     This is not to say that these fees were excessive or unreasonable in an ethical sense—far from it.  McCandlish Lillard served as Plaintiff's regular trademark counsel and possessed the "institutional knowledge" of these issues.  By keeping abreast of the litigation, they could efficiently contribute valuable insights as new issues arose.  Nonetheless, under the federal statutory fee-shifting standard, a narrower view of "reasonableness" applies and does not shift fees for this sort of belt-and-suspenders approach of using two sets of lawyers.

### b.     *Hunton*

56.     Given that the Hunton lawyers essentially became the lead lawyers in November 2020, and that the litigation greatly intensified from then through the damages trial, I have analyzed the Hunton invoices, work, and fees one month at a time in the following paragraphs.

57.     ***October 2020:***    In late October 2020, five Hunton attorneys made intensive preparations to enter appearances as the lead lawyers for Plaintiff.  Anyone who has tried it will

agree: Preparing to step in as substitute lead counsel in the Alexandria Division is like trying to step onto a speeding train.  This instance was no exception.

58.     Over the course of five days, these five attorneys put in about 125 hours.  With deadlines upcoming, about 45 of those hours were spent by counsel and associate attorneys on document collection to respond to DGI's 52 document requests, as well as information to respond to DGI's 260 requests for admissions and 25 complex interrogatories, and to perform other discovery tasks.  About 75 of those hours were spent by two partners coming up to speed on the legal and factual issues and preparing to complete the various discovery tasks and learning the necessary factual and legal contours of the case to locate and hire necessary expert witnesses. The total unadjusted fee for this work totaled $110,097.50.

59.     In the exercise of "billing judgment" (*see* ¶¶ 116-120, *infra*), Hunton then reduced the October time and fees by 25% ($27,524.38), resulting in an adjusted fee of $82,573.12. Generally, the work was reasonably and necessarily done, and the 25% reduction accounted for any excessive or duplicative work.   However, for fee-shifting purposes, I submit that an additional reduction of 5% (about $4,000.00) be made due to the inefficiency caused by switching counsel midway in the case.  Thus, for October 2020, I would include **$78,500.00** in the lodestar.

60.     ***November 2020:***  The work in November 2020 was extensive but reasonably and necessarily done on various discovery tasks: discovery plan; protective order; initial disclosures; preparation of written discovery to serve on DGI; document collection; document review for production; ESI discovery; fact witness interviews; locating and retaining experts; preparation for expert discovery; interrogatory responses; and request for admission responses.  Focusing just on the ESI discovery illuminates the intensity of the firm's discovery work.  As described in

the *Declaration of Meghan Podolny* submitted herewith, who spearheaded this effort, the lawyers had to search the documentary and ESI records of numerous employees among Plaintiff's 50 offices, dating back to the 1960s because of Defendant's prior-use defense. Plaintiff ultimately collected (from over 20 custodians), reviewed, and processed thousands of documents for production.  As noted above, the other fact discovery also was voluminous: DGI propounded 52 Requests for Production of Documents, 25 complex Interrogatories, and 260 Requests for Admission.  The lawyers had to gather and review information from interviews, documents, ESI, and other sources to respond.  This work did not conclude in November— indeed, this intense and time-consuming discovery work continued over the next several months.

61.     The firm devoted about 600 hours of attorney time in November 2020, resulting in an unadjusted fee of $477,785.00.  The firm then exercised billing judgment and voluntarily reduced the amount by 25% ($119,446.25), for an adjusted fee of $358,338.75.

62.     Given the compressed schedule, numerous lawyers were required to perform these tasks on a hurry-up basis.  That, in turn, resulted in more supervisory time being reasonably incurred to ensure that tasks were accomplished properly and on-time.  I submit that the voluntary 25% reduction generally accounts for excessive, duplicative, and unnecessary time. Nonetheless, I would reduce the fee an additional 5% (about $18,000.00) because of multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, work performed on unpursued issues (*e.g*., joinder of an additional party), and "clerical work" (*see* ¶ 114, *infra*).  Thus, the amount I would include in the lodestar for November 2020 is **$340,425.00**.

63.     ***December 2020:***   The work in December 2020 again was extensive but reasonably and necessarily done on various discovery tasks: document collection; document

review for production; ESI discovery; expert discovery, including assisting expert witnesses in obtaining necessary information and documents for their analysis and reports; preparing supplemental interrogatory responses demanded by DGI; preparing and issuing a detailed 30(b)(6) deposition notice to DGI; drafting objections to DGI's 30(b)(6) notice to Plaintiff; propounding a second set of Interrogatories and third Request for Production to the DGI; analyzing DGI's discovery responses and deficiencies therein; and deposition preparation.

64.     The firm devoted about 850 hours of attorney time in December 2020, resulting in an unadjusted fee of $643,533.75.  The firm then exercised billing judgment and voluntarily reduced the amount by 25% ($160,883.44), for an adjusted fee of $482,650.31.

65.     I submit that the voluntary 25% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $48,000.00) because of multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, some document review being done at a higher rate than necessary ($565 vs. $375), and "clerical work."  Thus, the amount I would include in the lodestar for December 2020 is **$434,500.00**.

66.     *January 2021:*  The work in January 2021 again was extensive but reasonably and necessarily done on various discovery tasks: document collection; document review for production; review DGI documents; ESI discovery; privilege log; expert discovery; interrogatory responses; request for admission responses; analyzing DGI's discovery responses and deficiencies therein; discovery meet-and-confer session; third-party subpoenas; and deposition preparation.  In addition, the firm undertook and evaluation of the merits and damages in anticipation of settlement negotiations.

67.     The firm devoted about 700 hours of attorney time in January 2021, resulting in an unadjusted fee of $554,683.75.  The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($88,479.40), for an adjusted fee of $465,934.35.[48]

68.     I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $46,000.00) because of multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, some document review being done at a higher rate than necessary ($565 or $620 vs. $375), and "clerical work."  Thus, the amount I would include in the lodestar for January 2021 is **$420,000.00**.

69.     ***February 2021:***  The work in February 2021 again was extensive but reasonably and necessarily done on various discovery tasks: document collection; document review for production; review DGI production; ESI discovery; privilege log; expert discovery; draft requests for admission; drafting an extensive second set of 169 requests for admission, with nearly 100 exhibits aimed at document authentication and factual admissions necessary for summary judgment motions; analyzing DGI's discovery responses and deficiencies therein; discovery meet-and-confer communications; discovery motions; motion to extend the discovery schedule; third-party subpoenas and FOIA requests; and deposition preparation.  Two discovery events in February warrant special focus:  First, in February 2020, DGI made a "document dump" of over 288,000 documents that had to be quickly processed and reviewed prior to expert disclosures.  Second, opening expert reports were due on March 1, 2021, and a substantial amount of time was spent working with Plaintiff's five expert witnesses in four different

---

[48] This amount was later reduced by an additional $18,273.75.  Essentially, Hunton agreed not to raise its rates for this matter.  Initially, this invoice was erroneously calculated at the firm's new (as of January 2021) default rates, but then voluntarily reduced to the agreed rates.  That reduction appears on the invoice for fees incurred in March 2021 (*see* ¶ 74, *infra*).

disciplines—real estate development; confusion survey; profits/damages; and two in architectural practice.  Preliminary work also was done on dispositive motions.

70.     The firm devoted about 925 hours of attorney time in February 2021, resulting in an unadjusted fee of $683,336.25.  The firm then exercised billing judgment and voluntarily reduced the amount by 30% ($205,000.88), for an adjusted fee of $478,335.37.

71.     I submit that the voluntary 30% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $48,000.00) because of multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, duplicative document review, some document review being done at a higher rate than necessary ($565 or $620 vs. $375), and "clerical work."  Thus, the amount I would include in the lodestar for January 2021 is **$430,000.00**.

72.     ***March 2021:***  The intensity of litigation was sustained—even increased—in March 2021.  Most of the work was on discovery tasks: third-party subpoenas; document review and production; fact deposition preparation, taking, and defending; expert disclosures; discovery motions; and the privilege log.  Moreover, Hunton lawyers started preparing for dispositive motions, analyzing damages, and selecting trial exhibits.  These lawyers also prepared and filed an unsuccessful motion for leave to file a motion for partial summary judgment.

73.     Three aspects of the discovery work warrant further explanation at this point.  ***First***, this was a document-intensive case.  Hunton had to search for, process, analyze for relevance and privilege, and then produce Plaintiff's documents, as well as reviewing and analyzing both sides' documents from the prior litigation.  These lawyers also had to analyze the thousands of documents produced by Defendant in a rolling production *that had more than 20 tranches*, including the massive ESI dump in February 2021.  And these lawyers had to obtain

documents from numerous third parties through subpoenas and FOIA requests, which included identifying likely third-party custodians and governmental agencies, as well as drafting and serving the subpoenas and FOIA requests, tailoring of the requests through negotiations, and then analyzing the resulting productions. *Second*, this litigation work was conducted during the peak of the pandemic, requiring that depositions be taken remotely, which entailed careful deposition preparation for efficient questioning; identification, processing, and pre-marking of potential exhibits; and additional administrative time to schedule and conduct the depositions. In all, there were 19 fact-depositions taken by the parties. *Third*, expert discovery was extensive: Plaintiff disclosed five experts and Defendant disclosed four experts. All nine were deposed.

74.     The firm devoted about 1100 hours of attorney time in March 2021, resulting in an unadjusted fee of $902,811.25. The firm then exercised billing judgment and voluntarily reduced the amount by 32% ($288,899.60), for a fee of $613,911.65, which was then further reduced by $18,273.75 for inadvertent over-charges in January 2021,[49] for an adjusted fee of $595,637.90.

75.     I submit that the voluntary 32% reduction generally accounts for excessive, duplicative, and unnecessary time—including the failed motion for leave to file a motion for partial summary judgment. Nonetheless, I would reduce the fee an additional 5% (about $30,000.00) because of multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, and "clerical work." Thus, the amount I would include in the lodestar for March 2021 is **$565,000.00**.

76.     Again, I stress that the additional reductions I am proposing are not because of unethical or unreasonable billing *vis a vis* the client—far from it. A client may request or expect

---

[49] *See* n. 48 *supra*.

no-stone-unturned representation from his lawyers—which would be understandable in a case like this, where Plaintiff was rightfully concerned about the irreparable injury to its valuable brand and service marks caused by confusion with the Defendant's infringing marks, as this Court ultimately found.  However, in the federal fee-shifting analysis, the Court is calculating a hypothetical reasonable fee without considering any special litigation effort the client may have requested or approved.

77.     *April 2021:*  The litigation became more focused in April 2021.  Most of the work was on discovery tasks: review DGI document production; review productions from third-party subpoenas and FOIA requests; supplemental discovery responses; fact deposition preparation, taking, and defending; confidentiality designations for deposition testimony; and expert disclosures and depositions.  In addition, the lawyers began preparing witness and exhibit lists, prepared for the pretrial conference, and prepared a motion to modify the schedule.  Moreover, the lawyers continued preparing for dispositive motions and analyzing damages.

78.     The firm devoted about 700 attorney-hours in April 2021, resulting in an unadjusted fee of $569,013.75.  The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($91,042.20), for an adjusted fee of $477,971.55.

79.     I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $47,000.00) because of multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, and "clerical work."  Thus, the amount I would include in the lodestar for April 2021 is **$430,000.00**.

80.     *May 2021:*  The litigation became still more focused in May 2021.  Most of the work was on discovery tasks: fact deposition preparation, taking, and defending; deposition

errata sheets and confidentiality designations for deposition testimony; and multiple expert depositions.  In addition, the lawyers continued work on witness and exhibit lists, authenticated third-party documents, and prepared another motion to modify the schedule.  Moreover, the lawyers continued preparing for dispositive motions which were due to be filed the following month and analyzing damages.

81.    The firm devoted about 478 attorney-hours in May 2021, resulting in a fee of $392,697.50.  The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($62,831.60), for an adjusted fee of $329,865.90.

82.    Nonetheless, I submit that an additional reduction of 20% (about $65,000.00) is warranted to account for excessive, duplicative, and unnecessary time, such as multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, and "clerical work."   Thus, the amount I would include in the lodestar for May 2021 is **$264,000.00**.

83.    *June 2021:*   The litigation went into the intensive final pretrial stages in June 2021.  Most of the work was on the dispositive motions filed by each side, as well work to oppose the motions filed by DGI to exclude Plaintiff's experts.  Each side's summary judgment motion presented complex and detailed legal and factual issues.  Further, each side's motion was supported with numerous exhibits and factual contentions.  For example, Plaintiff's motion was supported by 184 documentary exhibits and eleven fact-witness declarations, many of which were extremely detailed.  Much of the evidence supporting these motions had to be file under seal, which added to the work necessary to prepare and make sealed filings, to draft and file sealing motions and responses, and to analyze whether materials should be unsealed.  Finally,

some work was on the remaining discovery tasks, including deposition errata sheets and confidentiality designations for deposition testimony.

84.     The firm devoted about 845 attorney-hours in June 2021, resulting in an unadjusted fee of $696,667.50.   The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($111,466.80), for an adjusted fee of $585,200.70.

85.     I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $58,000.00) because of the Court's concerns about "big firm" litigation—that is, the number of lawyers participating in the preparation of the dispositive motion papers—as well as multiple instances of lawyers reviewing other lawyer's work, multiple attorneys participating in tasks and meetings, and "clerical work."  Thus, the amount I would include in the lodestar for June 2021 is **$527,000.00**.

86.     At this point, I want to comment on the briefing of dispositive motions. Plaintiff's summary judgment brief covered a lot of ground, was intricately detailed, and supported by over one hundred exhibits (Dkt. 78-110).  It cannot be gainsaid that the lawyer's accomplished a Herculean task by distilling this complicated case into a coherent narrative and persuasive argument—and doing so within the agreed page limits.  Moreover, as Mr. Schmalz explains in his declaration, each of the principal lawyers on the Hunton team had a defined role and focus (*e.g.*, Mr. Demm on trademark-specific issues, Mr. Caulder on DGI's documents and discovery responses, Mr. Wright, on Plaintiff's documents and facts, and Mr. Schmalz as the supervising lawyer with the most detailed knowledge of the entire case and overall strategy).  In my opinion, however, the amount of time spent by Plaintiff's lawyers drafting, reviewing, and revising of the summary judgment brief appeared to be somewhat greater than absolutely

necessary—at least under the hypothetical lodestar analysis.     Thus, employing the Court's rationale, the additional 10% reduction I propose seems warranted.

87.     I hasten to add, however, that the work on the briefing was not excessive under the rules of ethics.  In the lawyers' judgment and with the client's informed consent, the detailed and exacting preparation of the briefs was justified.  Hundreds of exhibits needed to be analyzed and included to ensure that each link in the chain of DGI's liability was carefully formed and supported by undisputed factual evidence.  Having read these briefs, moreover, I found them to be exceptionally thorough, well written, and well-reasoned—especially given the factual complexity of the case, which had to be clearly and succinctly explained.   Furthermore, the results confirm their value: Plaintiff's summary judgment motion was granted, and Defendant's was denied.  Even so, as explained above, the objective lodestar analysis supports the downward adjustment I have applied here.

88.     *July 2021:*  During July 2021, the litigation focused on dispositive motions filed by each side.  The Hunton lawyers analyzed DGI's summary judgment motion and prepared an opposition.  DGI's summary judgment motion made complex arguments and was supported by nearly three-dozen exhibits, many under seal (Dkt. 70-77).  In addition, they analyzed DGI's opposition to Plaintiff's motion for summary judgment and prepared a reply brief.   These lawyers also prepared oppositions to the three motions filed by DGI to exclude Plaintiff's experts.  Much of the evidence supporting or opposing these motions had to be file under seal, which added to the work necessary to prepare and make sealed filings, to draft and file sealing motions and responses, and to analyze whether materials should be unsealed.  These lawyers also prepared for and presented oral argument on the parties' summary judgment motions and prepared Rule 26(a)(3) witness lists, exhibit lists, and deposition designations.

89.     The firm devoted about 730 attorney-hours in July 2021, resulting in an unadjusted fee of $617,472.50.   The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($98,795.60), for an adjusted fee of $518,676.90.

90.     I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.   Nonetheless, I would reduce the fee an additional 10% (about $52,000.00) because of the Court's concern about "big firm" litigation practices—that is, multiple instances of lawyers reviewing and revising one another's work, multiple attorneys and paralegals participating writing, reviewing, and revising briefs, and "clerical work."   Thus, the amount I would include in the lodestar for July 2021 is **$466,000.00**.

91.     At this point, I want to comment on the briefing of DGI's three motions to exclude Plaintiff's experts.   This is an instance of an aggressive defendant driving up the Plaintiff's legal fees (*see* ¶¶ 49-51, *supra*).   Although all three motions were denied, I do not suggest that DGI filed these motions in bad faith or that they were frivolous.   Rather, DGI's fight-for-every-inch tactics created more work for Plaintiff's lawyers, who devoted extensive attorney-time to analyze and oppose these three motions, which, concomitantly, increased the fees Plaintiff incurred.   DGI's filing of these three motions is symptomatic of its fight-for-every-inch tactics, which drove up the legal fees at other stages of the case, as well.

92.     ***August 2021:***   During August 2021, the litigation focused on final pretrial preparations.   On August 11, 2021, the Court entered an order granting Plaintiff's motion for summary judgment on liability, while denying DGI's cross-motion.   The Hunton lawyers then expended extensive time preparing Rule 26(a)(3) witness lists, exhibit lists, and deposition designations for the bench trial on damages.   The lawyers also prepared and filed papers to support entry of a permanent injunction.   They also addressed issues concerning the sealing or

unsealing of the judicial record concerning dispositive motions.  Further, the lawyers analyzed DGI's motion for partial reconsideration of the summary judgment order.  Finally, the lawyers began preparing Plaintiff's fee application.

93.     The firm devoted about 440 attorney-hours in August 2021, resulting in an unadjusted fee of $360,403.75.   The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($57,664.60), for an adjusted fee of $302,739.15.

94.     I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $30,000.00) because of the Court's concern about "big firm" litigation practices—that is, multiple instances of lawyers reviewing and revising one another's work, multiple attorneys and paralegals participating writing, reviewing, and revising briefs, and "clerical work."  I also would reduce this amount by $5,000.00 for fees expended on the fee application.  All fee-application time is combined and considered in ¶ 142, *infra*.   Thus, the amount I would include in the lodestar for August 2021 is **$265,000.00**.

95.     ***September 2021:***  During September 2021, the litigation focused on final pretrial preparations for the bench trial on damages, which was continued and rescheduled to begin on October 12, 2021.  The Hunton lawyers then expended extensive time revising Plaintiff's witness lists, exhibit lists, and deposition designations, as well as analyzing DGI's witness lists, exhibit lists, and deposition designations, and working through objections.  The lawyers also analyzed DGI's opposition and prepared and filed reply papers to support entry of a permanent injunction.  Further, the lawyers analyzed and responded to DGI's motion for partial reconsideration of the summary judgment order and analyzed DGI's reply.  The reconsideration motion was denied on

September 16, 2021.  In addition, some time was expended discussing settlement with DGI.
Finally, the lawyers continued preparing Plaintiff's fee application.

96.     The firm devoted about 600 attorney-hours in September 2021, resulting in an
unadjusted fee of $497,368.75.   The firm then exercised billing judgment and voluntarily
reduced the amount by 16% ($79,579.00), for an adjusted fee of $417,789.75.

97.     I submit that the voluntary 16% reduction generally accounts for excessive,
duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about
$42,000.00) because of the Court's concern about "big firm" litigation practices—that is,
multiple instances of lawyers reviewing and revising one another's work, multiple attorneys and
paralegals participating in conferences, and "clerical work."  I also would reduce this amount by
$17,000.00 for fees expended on the fee application.  All fee-application time is combined and
considered in ¶ 142, *infra*.  Thus, the amount I would include in the lodestar for September 2021
is **$359,000.00**.

98.     ***October 2021:***   During October 2021, the litigation focused on final pretrial
preparations for the bench trial on damages, which began on October 12, 2021.  The Hunton
lawyers then expended extensive time preparing to present Plaintiff's witnesses and to cross-
examine DGI's witnesses, as well as analyzing the exhibits each side had pre-marked for
submission.  They also prepared deposition summaries.  The lawyers then appeared for and
presented a three-day bench trial on damages, involving both fact and expert witnesses.  After
the trial was completed, the lawyers began work on post-trial briefs and proposed findings of fact
and conclusions of law, which included reviewing the trial transcripts and exhibits.  In addition,
some time was expended discussing settlement with DGI.

99.     The firm devoted about 466 attorney-hours in October 2021, resulting in an unadjusted fee of $386,886.25.   The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($61,901.80), for an adjusted fee of $324,984.45.

100.    I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.   Nonetheless, I would reduce the fee an additional 10% (about $32,000.00) because of the Court's concerns about "big firm" litigation practices—that is, multiple instances of lawyers reviewing and revising one another's work, multiple attorneys and paralegals participating writing, reviewing, and revising briefs, and "clerical work."   Although four lawyers and a paralegal appeared for the trial, I would not make any reduction for that time as "duplicative."   Each timekeeper had a discrete role, and, in my experience, the trial presentation of a complex case like this usually requires several attorneys.   However, I would reduce this amount by $9,000.00 for time billed for attorney travel, which I approximated by taking the number of travel hours and reducing them to $100 per hour, instead of the attorney's standard rate.[50]   Thus, the amount I would include in the lodestar for October 2021 is **$284,000.00**.

101.    ***November 2021:***   During November 2021, the litigation was in the post-trial phase, but still very active.   The Hunton lawyers expended extensive time preparing post-trial briefs and proposed findings of fact and conclusions of law, which included reviewing and analyzing the trial transcripts and exhibits.   In addition, some time was expended discussing settlement with DGI.

---

[50] *Harwood*, 2019 U.S. Dist. LEXIS 138844 at *12 ("It is inappropriate to recover full fees for travel time.  This Court has previously found that a $100 per hour rate for travel is reasonable.") (citations omitted).

102.    The firm devoted about 192 attorney-hours in November 2021, resulting in an unadjusted fee of $139,505.00.   The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($22,320.80), for an adjusted fee of $117,184.20.

103.    I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.   Nonetheless, I would reduce the fee an additional 10% (about $12,000.00) because of the Court's concern about "big firm" litigation practices—that is, multiple instances of lawyers reviewing and revising one another's work.   Thus, the amount I would include in the lodestar for November 2021 is **$105,000.00**.

104.    ***December 2021:***   During December 2021, the merits-adjudication stage of the litigation was nearly over except for post-trial briefing.   The Hunton lawyers expended extensive time preparing Plaintiff's proposed findings of fact and conclusions of law, including continued review and analysis of the trial transcripts and exhibits, which was filed on December 15, 2021. Plaintiff's 49-page highly detailed proposed findings of fact and conclusions of law carefully assembled the factual evidence of Defendant's aggravated conduct that the Court relied upon to support its sizeable disgorgement award and its "exceptional case" determination for fee-shifting. That submission also required extensive legal research and analysis to address complex issues relating to the disgorgement of profits award, such as the extent to which the award could be based upon profits on the books of DGI's affiliated entities that had been generated by DGI's use of the infringing marks at issue.   Although the briefing efforts consumed the vast majority of Hunton's efforts in December 2021, the firm's team also worked on sealing issues associated with the parties' various submissions.   After completing Plaintiff's proposed findings and conclusions, the Hunton team then had to spend extensive time and effort to begin their

opposition to DGI's post-trial proposed findings of fact and conclusions of law which would be due the following month.

105.    The firm devoted about 350 attorney-hours in December 2021, resulting in an unadjusted fee of $293,981.25.   The firm then exercised billing judgment and voluntarily reduced the amount by 16% ($47,037.00), for an adjusted fee of $247,002.75.

106.    I submit that the voluntary 16% reduction generally accounts for excessive, duplicative, and unnecessary time.  Nonetheless, I would reduce the fee an additional 10% (about $25,000.00) because of the Court's concerns about "big firm" litigation practices—that is, multiple instances of the lawyers reviewing and revising one another's work.  Thus, the amount I would include in the lodestar for December 2021 is **$222,000.00**.

107.    ***January 2022:***  During January 2022, the Hunton lawyers expended extensive time preparing and filing an opposition to DGI's post-trial briefs and proposed findings of fact and conclusions of law, which was filed on January 20, 2022.  Like Plaintiff's initial post-trial brief, this filing also required considerable focus and effort, particularly as the Hunton team had only 25 pages within which to respond to all the many factual and legal arguments in DGI's nearly 50-page proposed findings and conclusions.   The Hunton team also analyzed and discussed with their client a settlement proposal from DGI and addressed sealing issues.  They also had a relatively small number of hours preparing for the fee application.

108.    The firm devoted about 210 attorney-hours in January 2022, the vast majority of which were devoted to preparing the opposition to DGI's post-trial brief and analyzing and discussing with the client a settlement proposal from Defendant.   The work done to oppose DGI's proposed findings and conclusions was detailed and comprehensive—which was reasonable and necessary in the circumstances.   This resulted in an unadjusted fee of

$177,716.25.  The firm then applied a 16% discount ($28,434.60) as well as further voluntary reduction based on budgeting considerations ($9,265.00), resulting in an adjusted fee of $140,016.65.  Finally, on this invoice, the firm redacted certain time entries to protect attorney client privilege and attorney work product and work not directly pertinent to the merits-based litigation.[51]  These redacted entries are neither sufficiently documented, nor does the work appear to be necessary for the merits-litigation at issue here.  Thus, I would deduct theses fees (about $7,500 in total).

109.   Despite the firm's voluntary reductions and the deductions for redactions, I submit that an additional 10% reduction ($13,000.00) is warranted to account for unnecessary time, as well as the Court's concerns about "big firm" litigation practices—that is, multiple instances of the lawyers reviewing and revising one another's work, as well as work on the fee application (which is addressed in ¶ 142, *infra*).  Thus, the amount I would include in the lodestar for January 2021 is **$119,500.00**.

110.   ***March and April 2022:***  The Court issued its ruling on damages on March 2, 2021 (Dkt. 256 [sealed]).  As shown in the firm's records for work in March 2022, extensive and detailed work as devoted to addressing DGI's sealing motion, this totaled about $29,000.00 when adjusted for the 16% discount.  Although the firm reasonably spent considerably more time, and the work involved multiple timekeepers, the staffing on the sealing motion was a little "top heavy," with partner-level timekeepers doing a lot of the work.  Therefore, for the sealing

---

[51] *See* Schmalz Dec., ¶¶62, 66.  It has been recognized that privileged or protected information may be contained in attorney-generated documents like "correspondence, bills, ledgers, statements, and time records which reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the service provided, such as researching particular areas of law."  *Chaudry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999) (citation omitted). Thus, certain redactions may appear in fee applications in ongoing cases to protect privileges or work product.  *See, e.g., Hair Club for Men*, 2017 U.S. Dist. LEXIS 51370 at *23-24 (citing cases).

motion, I submit that adopting a blended hourly rate of $650 as applied to 30 hours of work for a total of **$19,500.00** represents a reasonable fee for responding to DGI's sealing motion. Furthermore, the work the lawyers did on Plaintiff's fee application in March and April 2022 is considered ¶ 142 below.

### 3.    *Other Considerations When Calculating the Lodestar*

111.    *Block Billing and Vague Time Entries:*   The Supreme Court has directed that "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly."[52]  When considering the adequacy of the documentation, the Court often looks for both "block billing" and "vague "time entries.

112.    The single most criticized billing practice in fee-shifting litigation is "block billing."   As the Court has observed: "Block billing is 'grouping, or lumping several tasks together under a single entry, without specifying the amount of time spent on a particular task.' It is appropriate to reduce the total fee award for block billing because block billing prevents a court from making 'an accurate determination of the reasonableness of the time expended in the case.'"[53]  Nonetheless, courts have observed that "while block billing might not provide the best possible description of hours sought, it is not a wholesale prohibited practice."[54]  In this matter, the McCandlish Lillard and Hunton timekeepers, for the most part, assigned time to each task individually.   Only a handful of timekeepers used block billing, but those instances are *de minimus* and the time entries describe compensable work and do not appear excessive. Therefore, I submit that no reduction for block billing is warranted.

---

[52]  *Hensley*, 461 U.S. at 434.

[53]  *S. Boston Energy*, 2019 U.S. Dist. LEXIS 138847 at *14 (citations omitted).

[54]   *United States ex rel. McKay v. Touchstone Research Labs., Ltd*., 2009 U.S. Dist. LEXIS 90779, *9-10 (S.D. Ohio Sept. 3, 2009).

113.    Likewise, deductions are sometimes made for "vague" time entries that fail to "describe specifically the tasks performed" and thereby prevent the Court from "weigh[ing] the hours claimed and exclud[ing] hours that were not reasonably expended."[55]   However, counsel for the prevailing party "is not required to record in great detail how each minute of his time was expended," but need only "identify the general subject matter of his time expenditures."[56]   Upon my close review of the invoices, I found that the litigation tasks were specifically described and not vague.   Therefore, I submit that no reduction for vague time entries is warranted.

114.    *Reduction for "Clerical Work":*   Law firms sometimes charge clients for work performed by librarians, administrative staff, and other sundry non-lawyer services as *à la carte* billing items, instead of treating them as overhead expenses subsumed in their attorneys' hourly rates.   Even if this is a customary practice and the client agrees to pay for those services, such work is not included in the lodestar.   The touchstone here whether the individual is performing "tasks traditionally performed by an attorney and for which the attorney would customarily charge the client;" if so, those fees many be included in the lodestar regardless of whether a paralegal or law clerk performed them instead of a licensed attorney.[57]   As this Court has explained, however, "an award of attorneys' fees may not include purely clerical or secretarial tasks.   This is because purely clerical tasks are part of a law office's overhead and are included in the hourly rate charged.   Some examples of clerical tasks are collating and filing documents with the court, issuing summonses, scanning and mailing documents, reviewing files for information, printing pleadings and preparing sets of orders, document organization, creating notebooks or files and updating attorneys' calendars, assembling binders, emailing documents, or logistical

---

[55]   *S. Boston Energy*, 2019 U.S. Dist. LEXIS 138847 at *14 (citations omitted).

[56]   *Hensley*, 461 U.S. at 437 n.12.

[57]   *See Priestley*, 651 F.3d at 416 (citations omitted).

telephone calls with the clerk's office or the judge's chambers."[58]  In the course of my analysis above, reductions from the lodestar I have proposed would eliminate fees for "clerical work."  To be sure, both firms' paralegals performed important tasks that otherwise would have had to be handled by lawyers, and those fees may be included in the lodestar.  At other times, their work fell within the definition of "clerical work" that must be excluded from the lodestar.  A line-item review, however, was not feasible.  Thus, in the reductions I propose, I included reductions I estimated were fees for "clerical work."

115.    *Law clerks or Summer Associates:*  Law firms sometimes charge clients for work performed by law clerks or summer associates, who usually are law students (*see* ¶ 31, *supra*).  Clients often decline to be charged for such work, which is seen as "training" for the firm's benefit as opposed to proficient work for the client's benefit.  To be sure, law clerks and summer associates may be capable of professional legal work and their output may have measurable value to the client.  In fact, Mr. Schmalz praised the work of the Hunton summer associates whose work contributed to the success in this case.  Nonetheless, in the exercise of billing judgment, Hunton voluntarily eliminated law clerk and summer associate time and fees.  I agree with that reduction and do not propose any further reductions.

116.    *Exercising Billing Judgment:*  Even if all hours worked by the lawyers were expended in a good faith effort to prevail, a critical self-analysis still must be undertaken to eliminate certain hours from the lodestar calculation.  The fee applicant "should exclude from this initial fee calculation hours that were not 'reasonably expended.'  Cases may be overstaffed, and the skill and experience of lawyers vary widely.  Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or

---

[58]  *Harwood*, 2019 U.S. Dist. LEXIS 138844 at *7-8 (citations and internal quotation marks omitted).

otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."[59]   This reduction or elimination of excessive hours is called "billing judgment."[60]   This critical self-analysis should be undertaken by the fee applicant and voluntary deductions should be made.[61]   Thus, when carrying the burden of proof, the party seeking fees must demonstrate that billing judgment has been exercised to ensure that the hours claimed are reasonable and not excessive.

117.    In my analysis, I specifically looked at whether billing judgment had been exercised, and although I determined that some additional percentage reductions from the firm's fees may be appropriate as explained above, it appeared that billing judgment was diligently exercised by both firms.   For example, Hunton made regular reductions of 16% and on certain invoices gave even higher reductions.   Moreover, with minor exceptions, both firms kept hourly rates the same from start to finish.   Thus, both firms exercised billing judgment.

118.    Furthermore, I understand that both firms analyzed their invoices for excessive work and fees prior to sending them to the client.   From my examination of the firms' declarations, it appears that both firms exercised billing judgment even prior to creating their invoices by eliminating fees for certain work and timekeepers.   I agree with those decisions and do not propose any further reductions on this this basis.

119.    I understand that, in a further exercise of billing judgment, McCandlish Lillard, with the consent of Plaintiff, is voluntarily reducing the fee application in accordance with my recommendations.   Accordingly, in my opinion, the amount of the fees incurred by the

---

[59] *Hensley*, 461 U.S. at 434.

[60] *Id.*

[61] *BMG*, 234 F. Supp. 3d at 773 (fee applicant voluntarily cut $1 million from the total).

McCandlish Lillard firm in this matter that should be included in the lodestar would be **$258,962.00** (**Attachment F**).

120.    I understand that, in a further exercise of billing judgment, Hunton, with the consent of Plaintiff, is voluntarily reducing the fee application in accordance with my recommendations.  Accordingly, in my opinion, the amount of the fees incurred by the Hunton firm in this matter that, should be included in the lodestar would be $**5,329,425.00** (**Attachment G**).

### C.    *The Lodestar Amount*

121.    In this case, my calculation of the lodestar amount is not the mere multiplication of a reasonable number of hours times reasonable hourly rates, but careful analysis of the overall fees incurred in real time in the context of this litigation.

122.    The total lodestar is **$5,588,387.00**.

123.    *Awards in Similar Cases:*  In the lodestar analysis, the Court may look at awards in comparable cases to determine if, in an order-of-magnitude sense, the lodestar amount is reasonable.  In *BMG*, another "big case" litigated between two "big firms," the Court awarded about $8.4 million in fees.  That case was litigated over a longer period and included a three-week jury trial, but in my opinion still is comparable for this analysis.  Similarly, in *Vienna Metro*, the Court awarded about $4.1 million in fees.  In that case, most issues were resolved by summary adjudication followed by a focused, 4-day bench trial, resulting in an order of specific performance, but no damages, which makes that case a meaningfully comparable for this analysis.  Thus, a fee award in this action of **$5,588,387.00** is in-line with the order-of-magnitude for other "big cases" litigated between "big firms."

124.    Therefore, in my opinion, the lodestar amount in this case is **$5,588,387.00.**

## II.   STEP TWO: DEDUCTING FOR WORK ON UNSUCCESSFUL CLAIMS UNRELATED TO THE SUCCESSFUL ONES

125.    In Step Two, the Fourth Circuit requires that the Court "subtract fees for hours spent on unsuccessful claims unrelated to successful ones."[62]   Here, Plaintiff succeeded on all five counts of the complaint—including the three state law claims—so there are no "unsuccessful claims."   Further, as shown next, the state law claims were "related" to the federal trademark claims for which fee-shifting is allowed.   Therefore, no Step Two reduction is required.

126.    Where, as here, the plaintiff's claims for relief "involve a common core of facts or will be based on related legal theories, [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims.   Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."[63]   This reasoning applies to this fee application because all claims arise from a "common core of facts," and so all work may be considered in the reasonableness determination.

127.    There can be no doubt that all five of Plaintiff's claims arise under a "common core of facts."   First, DGI's liability under the CSA was based on its use of the same confusingly similar marks at issue under the federal trademark and unfair competition counts.   Dkt. 174, *Order* at 4-10.   Second, it is well-settled that "the test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law."   *Id.* at 11 (citation omitted).   Thus, the Court found that the

---

[62] *McAfee*, 738 F.3d at 88 (citations omitted).

[63]  *Hensley*, 461 U.S. at 435; *accord Brodziak v. Runyon*, 145 F.3d 194, 197 (4th Cir. 1998) (same).

facts which supported DGI's liability under the federal also supported its liability under the state trademark and unfair competition claims.  *Id*. at 11-19.  Accordingly, all counts arose out of a "common core of facts," and fees for work on all these related claims may be considered for an award under § 1117(a).

128.    Therefore, a reduction under Step Two is not required.

### III.    STEP THREE:  ADJUSTING FOR DEGREE OF SUCCESS

129.    Generally, "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded," is the prevailing party.[64]   Unquestionably, Plaintiff is the prevailing party.  Nonetheless, in Step Three, the degree of success analysis, the Court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."[65]   To be sure, in most complex litigation, a party is not simply successful or unsuccessful; rather, the party may achieve only "partial or limited success," in which case, the party may be entitled to an award of some, but not all, of the attorney's fees requested.[66]   That, then, is the initial determination in Step Three.

130.    The Supreme Court has held that

> There is no precise rule or formula for making these determinations.  The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.  The court necessarily has discretion in making this equitable judgment.  This discretion, however, must be exercised in light of the considerations we have identified.[67]

---

[64]  *Grissom v. Mills Corp.*, 549 F.3d 313, 318 (4th Cir. 2008).

[65]  *Hensley*, 461 U.S. at 435.

[66]  *Id*. at 436.

[67]  *Id*. at 436-37.

131.   The Fourth Circuit considers the degree of success as "the most critical factor" in determining what fee is reasonable,[68] but acknowledges that "it can be challenging to put a number on success" given that "[t]here is no precise rule or formula to aid the court in determining just how successful a plaintiff may have been."[69]   When trying to determine the degree of success, the Court at least "must compare the amount of damages sought to the amount awarded."[70]   However, this is not just a math problem of comparing the plaintiff's *ad damnum* to the verdict.  Indeed, even nominal damages may support a fee award if "significant" legal rights have been vindicated.[71]

132.   Here, Plaintiff prevailed on liability for all five counts, and then won both a huge award of damages—disgorgement of $43 million of Dewberry Group's profits—and the award of an injunction to protect its valuable trademark and brand name rights.  Dkt. 174, 208, 229 & 256.

133.   Although all five counts were interrelated and largely depended on the same proof, they are separate rights of action and Plaintiff succeed on all of them.  Success on 100% of the claims warrants a fully compensatory fee.

134.   Plaintiff also was highly successful in seeking disgorgement of Defendant's profits.   For the "degree of success" analysis, I would not reduce the lodestar because the disgorgement damages awarded were "only" 80% of DGI's sales revenues.  Dkt. 256 at 22-27, 29.  That percentage, in and of itself, is an excellent recovery under the disgorgement provisions in § 1117(a).

---

[68]   *See Doe v. Chao*, 435 F.3d 492, 505 (4th Cir. 2006) (quoting *Hensley*, 461 U.S. at 440).

[69]    *Jones v. Southpeak Interactive Corp.*, 777 F.3d 658, 676 (4th Cir. 2015) (internal quotation marks omitted).

[70]   *Mercer v. Duke Univ.*, 401 F.3d 199, 204 (4th Cir. 2005).

[71]   *See Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 206-07 (4th Cir. 2007).

135.    Under the statute, "the plaintiff shall be entitled, … subject to the principles of equity, to recover [*inter alia*] defendant's profits. … The court shall assess such profits … or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."[72]  The purpose of this remedy is to make infringing unprofitable—literally.[73]

136.    When Plaintiff sued, it had no information regarding Defendant's revenues and profits—whether they were $1 dollar or $1 billion dollars—so no specific amount is demanded in the complaint's *ad damnum*.  During discovery, Plaintiff obtained relevant information regarding the sales revenues from DGI and its related entities, which Plaintiff then submitted to carry its burden of proof under § 1117(a).

137.    Thus, the recovery of "only" 80% of the amount sought is not the result of Plaintiff's failure to prove damages fully.  Rather, Plaintiff carried its burden under § 1117(a) to prove Defendant's sales revenues, which then shifted the burden of proof to DGI to prove its costs and other deductions—which DGI failed to do.  Dkt. 256 at 27 ("Dewberry Group failed to carry its twin burdens of proof on deductions (such as reasonable expenses) and non-infringement revenues.").  Thus, it is Defendant who faltered at this stage, being able to prove that only 20% of its revenues were not subject to disgorgement.

138.    Furthermore, under the degree of success analysis, the Court should weigh the value of any injunctive relief won by the plaintiff.[74]  The injunction awarded (Dkt. 208 & 229)

---

[72]  15 U.S.C. § 1117(a).

[73]  *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 855 (E.D. Va. 1998) (when awarding damages remedies under § 1117(a), "[t]he trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party").

[74]  *Berry v. Schulman*, 807 F.3d 600, 618 (4th Cir. 2015) (under degree of success factor, affirming the fee award because the injunction awarded to plaintiffs was an "excellent result in [a] large and complex action").

48

fully vindicates Plaintiff's trademark and brand name rights and protects its trademarks and brand name from the irreparable harm of future infringement.  Securing valuable intellectual property rights through an injunction also shows a high degree of success.

139.    This high degree of success—winning on all five counts and being awarded both damages and an injunction—warrants a "fully compensatory fee" award: "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.  In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit."[75]

140.    Therefore, I submit that no deduction should be made under the Step Three analysis of the degree of success.  The results obtained were excellent, and Dewberry Engineers should be awarded a fully compensatory fee.

141.    Accordingly, I submit that the Court should award **$5,588,387.00** to Plaintiff as a "reasonable" attorney's fee for the work performed to win the merits adjudication as well as the remedies of a permanent injunction and $43 million in disgorgement damages.

### The Reasonable Fee Award for the Fee Application

142.    Under federal fee-shifting statutes, fees-on-fees may be awarded to compensate the prevailing plaintiff for the reasonable fees incurred to pursue its fee application.  As the Court has cautioned, the amount awarded "may not unreasonable."[76]  I have reviewed the *Declaration of Arthur E. Schmalz*, which details the work and fees incurred on the fee petition

---

[75]  *Hensley*, 461 U.S. at 435.

[76]  *United Supreme Council v. United Supreme Council, etc.*, No. 1:16cv1103-LO-IDD, 2019 U.S. Dist. LEXIS 138846, *13-14; 2019 WL 3848784 (E.D. Va. Aug. 15, 2019) (citations omitted).

and bill of costs submission in March and April.  The work on the fee application involved about 80 hours of work by various timekeepers, which is understandable and justified under the circumstances and the amount at issue.  Although the firm reasonably spent considerably more time, and the work involved multiple timekeepers, I submit that adopting a blended hourly rate of $650 as applied to 60 hours of work for a total of **$39,000.00** represents a reasonable fee for the fee application.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT**.

Dated:  April 29, 2022.

_CCR_
_____
Craig C. Reilly