IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| DEWBERRY ENGINEERS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:20-cv-610-LO-IDD |
| ) | |
| DEWBERRY GROUP, INC. F/K/A ) | |
| DEWBERRY CAPITAL CORPORATION. ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DECLARATION OF MEGHAN A. PODOLNY IN SUPPORT OF PLAINTIFF DEWBERRY'S PETITION FOR ATTORNEYS' FEES AND BILL OF COSTS**

I, Meghan A. Podolny, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over 18 years of age and otherwise competent to make this declaration.

2. I have personal knowledge of all matters alleged herein.

3. I am counsel at the law firm Hunton Andrews Kurth LLP ("Hunton") on the litigation team. I received my J.D. from The College of William & Mary in 2007, and my B.A. from the University of Notre Dame in 2004. I am an attorney admitted to practice in all courts in the Commonwealth of Virginia, the United States District Court for the Eastern District of Virginia, and the United States District Court for the Western District of Virginia. I am an active member of the bars of Virginia and the District of Columbia.

4. I serve as head of Hunton's Information Governance & eDiscovery Group. My practice focuses on providing state-of-the-art data management and eDiscovery advice and services to corporate clients across multiple industries. My experience includes developing and implementing best practices for client eDiscovery challenges with innovative and cost-effective

technology solutions that promote efficient handling of complex data management projects. In this capacity, I frequently support the case teams of Hunton's larger litigation matters to devise and supervise the strategy for discovery efforts in complex litigations. As part of my responsibility, I regularly vet the proposed prices of eDiscovery service vendors for various activities in the fields of collection, processing, analytics, and production.

5. In this litigation, I managed the collection of electronic documents from Dewberry Engineers Inc. ("Dewberry") as well as the review, evaluation and production of documents responsive to Defendant's discovery requests. I conducted multiple witness interviews to ensure Dewberry reasonably and defensibly collected relevant documents and information, and I handled issues and disputes that arose from our responses to Defendant's requests for production. I also evaluated deficiencies in Defendant's discovery responses and aided the Dewberry team in identifying key documents for deposition, summary judgment briefing, and trial.

**A. Overview of Dewberry's Discovery Efforts and Particular Challenges**

6. When Hunton was engaged by Dewberry in late October 2020, I was asked by my partner, Arthur Schmalz, to plan for and manage the response to discovery in this action, in particular, the aspects of discovery related to electronically stored information ("ESI"). At that time, the expert witness and discovery deadlines set by the Scheduling Order were fast approaching (on November 4, 2020) and no significant efforts had yet been made in connection with document collection and production, in part because the Joint Discovery Plan, and the Consent Discovery Order, had been negotiated and submitted to the Court on October 14, 2020, and October 15, 2020, respectively.

7. The Consent Discovery Order, entered before Hunton's involvement in litigation, contained very specific and extensive requirements concerning the collection, processing and production of ESI. Among other things, it required the parties to disclose various pieces of information about their discovery response efforts, including custodians/sources, search terms, and other filtering methodologies, none of which had been prepared prior to my engagement in the litigation, but were necessary to define and disclose prior to responding to pending discovery requests.

8. The Consent Discovery Order also required the parties to collect and produce documents in a specific format in order to allow the discovery to be reasonably usable by the receiving party. The Order specified both electronic and hard copy documents were to be produced as TIF images, with separate files for the text contained within those documents, and a separate load file (cross reference file) containing an enumerated list of 35 metadata fields.

9. These metadata fields provided information about the nature of the documents (such as date, author, custodian, filename, originating location, etc.) and allowed them to be sortable according to those fields.

10. To comply with this requirement, Dewberry was required to collect documents in a manner that allowed for Dewberry to make a copy of the document for use in the litigation while capturing the metadata for delivery, as well as provide produced documents as TIF image copies. These various specific requirements under the Consent Discovery Order could not be satisfied by our law firm or the client, particularly under the extremely tight discovery deadlines imposed under the Scheduling Order at that time, as well as the huge volume of ESI to be collected and processed from a large company like Dewberry who employs over 2,000 people across more than 50 offices in 17 states. Rather, that is an effort that only a capable and

experienced eDiscovery services vendor could provide. Dewberry retained Driven (now InnovativeDriven) to assist with collection services, as well as for services related to processing, hosting, and producing documents in this litigation.

11. At the time of Hunton's engagement, Dewberry had been served two weeks earlier with 52 requests for production, 260 requests for admission, and 25 interrogatories. Despite having just onboarded the case and the vast knowledge to begin amassing to prosecute the litigation, Dewberry timely Answered those discovery requests on November 20, 2020 and November 25, 2020. This was no small feat, as many of the requests required Hunton to investigate and address issues involving facts and issues dating back a half century or more. Not surprisingly, Dewberry's Answers to the 260 requests for admission comprised 64 pages, and its Answers to the 25 Interrogatories spanned 44 pages, with an additional comprehensive, 11-page chart compiling extensive factual details requested by the Defendant about nearly 60 separate real estate development projects that Dewberry and its owners had pursued since the 1960s.

12. The immense nature of the discovery efforts in this litigation were in large part attributable to the need to prove Dewberry's legacy right to the marks at issue. Dewberry Group vigorously contested that point, claiming that the parties did not operate in the same industry and provided entirely different services to entirely different types of customers in dissimilar markets—arguments that Dewberry ultimately proved to be false during the summary judgment proceedings. In fact, in an effort to reduce the need for such exhaustive historical discovery and evidentiary exposition during summary judgment and trial, Dewberry also asked opposing counsel to agree to drop Dewberry Group's prior-use/senior user affirmative defense because Defendant had raised that very same defense and argument in the earlier 2007 litigation—

defenses and arguments that were conclusively settled and dismissed. Dewberry Group, however, refused to do so.

13. Because Dewberry Group's prior-use defense asserted prior uses of "Dewberry" dating back to the late 1980s, we had no choice but to diligently search for documents and witnesses to help prove Dewberry's specific uses of the Dewberry name and mark from over three decades earlier and involvement in real-estate development going back to the 1960s. This included a painstaking search for and documentation of evidence of the use of the Dewberry name and mark used for a wide array of services, in work provided for different client industries and in multiple geographic areas.

14. Many of these documents were found only in archived hard copy sources, which we had to scan to provide a copy for use in the litigation. Due to the age of these documents, the quality of the scan and associated indexing meant Dewberry could not rely on text-based searches to narrow what was reviewed.

15. Over the next several weeks, the Hunton team interviewed over 20 Dewberry employees to locate sources of responsive discovery, retrieved and scanned legacy hard copy documents pertinent to establishing Dewberry's historic use of its marks, and engaged Driven as a vendor to collect, process and host documents in the format required by the Consent Discovery Order.

16. Dewberry also faced challenges in connection with its email collection efforts. To collect email that predated April 2019, Dewberry could reliably only collect that information from a legacy archiving repository, referred to as Mimecast. The complexities of the way that archive was set up meant that Dewberry could not feasibly retrieve a custodian's entire mailbox in one export without it failing. The only feasible manner to make a copy of potentially

responsive emails maintained in Mimecast was to run a search, a custodian at a time, with a date range limitation, for specific keyword search terms. In this manner, the search conducted was not to identify what was responsive for production, but rather to collect a copy of the documents in a volume small enough to allow for export from the archive system. This copy was necessary, because the documents could not be reviewed within Dewberry's Mimecast system and needed to be provided in the format required by the Consent Discovery Order.

17. Given Dewberry's limited internal resources to conduct these searches, Dewberry leveraged the technical resources of Driven to access Dewberry's systems, and search and export documents from Mimecast to provide for processing in this litigation.

18. Driven also assisted with the collection of documents maintained on share drive locations within the company. The purpose of this collection was to make a copy of the documents for use in the litigation, as Dewberry's legal team needed to be able to provide such copies of those documents in the format required by the Consent Discovery Order.

19. Driven further aided in the copying of various internet pages and audio/visual content for use in the litigation. Due to fact that such content residing on the internet would need to be exchanged in static form, a copy was obtained through the use of Driven's PageVault service, which capture the originating location with authenticating date and time stamp in a manner that allowed Dewberry to provide responsive content to Defendant in the format required by the Consent Discovery Order.

20. Within approximately three weeks of Hunton's engagement, we were able to complete the initial response to Defendant's discovery requests, which included a production of 13,670 pages of documents. By the following week, on December 2, 2020, we made two additional ESI productions, which included nearly 6,000 more pages worth of documents. We

mad three additional productions in that month so that by the end of December 2020, two months after our retention in this litigation, we had produced more than 26,000 pages of documents.

21.     This was a document intensive case to defend Dewberry's position.  Throughout the discovery period, Dewberry (with the assistance of Driven) collected over 217,866 documents from 25 unique Dewberry employees, 2 law firms, and a myriad of shared resources that included network drives and hard copy archives.  Dewberry leveraged sophisticated technology and search terms to cull that volume to 26,130 documents for review.  From that volume, Dewberry produced 6,564 documents, comprising over 55,000 pages of material, and provided a privilege log. Additionally, Dewberry collected 1,798 documents from third parties through subpoenas or open records requests.

22.     Dewberry encountered other challenges that added to the ESI-related discovery burdens and efforts required in this case, including a very significant one caused by the Defendant. On February 2, 2021, a mere 10 days before opening expert reports were due, and less than two months before the close of all discovery, pursuant to the scheduling order in place at that time, Dewberry Group provided Dewberry a "document dump" of nearly 290,000 pages worth of emails and documents, many of which were responsive to document requests issued in June 2020.  Up to that time, Dewberry Group had only produced approximately 118 emails, as I noted in a previous declaration submitted in this case.  *See* Dkt. 59-1, ¶8.  Indeed, in a December 11, 2020 joint motion to modify the pretrial schedule, Dewberry Group acknowledged its failure to supplement its prior, November 2, 2020 production as promised, but claimed to be diligently working to do so and expressed its intention "to produce a significant number of documents responsive to Dewberry's Requests for Production" the following week, leading Dewberry to "agree not to file the motion to compel that it had anticipated filing." *See* Dkt. 032, ¶5.  Making a nearly 290,000 page ESI

7

dump nearly two months later, barely a week before the opening expert report deadline, was not the diligent, good faith discovery progress Dewberry anticipated from Defendant.

23. To make matters worse, when asked for consent to seek a 30-day extension of the opening expert report deadline and discovery cutoff in light of the massive ESI dump, Dewberry Group would only agree to a 15-day extension of the expert witness report deadline and discovery cutoff. See Dkt. 59-2, ¶¶ 5-6. Having no other option under the circumstances, the Hunton team quickly dove into the enormous quantity of ESI to (1) locate relevant documents that had been requested and supplied what we could find to our experts for use in their reports and disclosures that were due two weeks later, and (2) identify key information necessary for the large number of depositions to be taken starting about a week later. This was an incredibly intensive and time consuming effort.

24. An important part of this review was to identify the earliest time in which Defendant used the infringing mark in connection with each of the many commercial properties it managed or developed. Because Defendant's mark presented as an image, it was not something that could feasibly be searched for by use of search terms or analytic technology that is based upon textual similarities. Therefore, Dewberry's assessment of Defendant's documents required more effort than other litigation matters that could be supported with text-based information. Dewberry had to review a large percentage of Defendant's documents to identify the ones needed for depositions and expert reports.

**B. Retention of Discovery Vendor and Services Provided**

25. The Consent Discovery Order requires documents to be converted into copies that are reasonably usable by the receiving party. This includes obligations to image the document, brand the document with a Bates number and applicable confidentiality marking, provide the text

of the document in a separate file, and also provide a cross reference file (load file) with enumerated metadata fields.

26. The preparation of such copies require services that neither Dewberry nor Hunton have in-house. Hunton solicited, and retained on behalf of its client, the services of a professional discovery services vendor Driven (now InnovativeDriven).

27. Hunton had worked with Driven many times before for matters pending before courts in the Eastern District of Virginia and has first-hand experience of their competitive rates and quality of their work. Driven's physical presence in Northern Virginia was beneficial for ease of access in collection related activities.

28. Driven provided services in connection with collecting electronic information from Dewberry's share drives and email archives, rendering static images of website pages through the PageVault service, processing documents, hosting documents in a review platform, and converting documents to production images with the other format requirements mandated by the Consent Discovery Order and as was necessary for the exhibits to be used during the remote, video-conference depositions to be taken in the case.

29. These services were necessary to prepare copies of Dewberry documents for use in the litigation.

### C. Specific Discovery Fees Incurred

30. I have reviewed the Driven invoices Dewberry has received and paid covering services from October 2020 through January 2022. True and correct copies of all Driven invoices are attached as Bill of Costs Exhibit 8 (hereinafter "**BOC Ex. 8**") (Driven's payment information and Tax ID Number have been redacted). Spanning this date range, Dewberry has incurred, and has since paid Driven $169,329.34.

31. From this amount, Driven billed Dewberry (and Dewberry paid) $20,721.83 for services and materials in connection with the collection of electronic documents from Dewberry custodians, shared electronic document repositories, and public sources, as well as preparing electronic image copies of various documents, so that Dewberry could have a copy of these documents from their original source to respond to discovery requests propounded by Defendant in this litigation. Collection was conducted in a manner to preserve metadata associated with the source documents as required by the Court's Discovery Order. I have highlighted in **BOC Ex. 8** the specific charges for Driven's collection services tied to making copies of electronic material, incurring a cost of $20,721.83. I additionally prepared a chart, a true and correct copy of which is found at **BOC Ex. 8A** that extracts and sums those costs and provides my explanation for why such costs qualify as taxable costs relating to copying and exemplification of ESI.

32. Of the 217,866 documents collected in this litigation, over 95,000 documents were copied by Driven through use of forensic collection of custodian identified shared drives, as well as export of segments of email from the Mimecast and O365 archives. These charges include a combination of the cost for the hard drive to place the copy on, shipping costs, and labor time spent arranging for and performing the copy. This part of the copying effort incurred $13,532.50.

33. Of the 217,866 documents collected in this litigation, nearly 700 documents consisting of internet content were copied by Driven through use of the PageVault service. These charges are set based on the complexity of the site to be copied and the turnaround time of the request. The PageVault specific costs are included within the larger set of Driven invoices gathered at **BOC Ex. 8**, and also are separately notated in the chart at **BOC Ex. 8A**. This part of the copying effort incurred $5,011.25.

34. Dewberry also incurred separate charges from Driven for the imaging of documents from their native, manipulable form, to a static TIF image, as required by the Consent Discovery Order. Those charges are also identified in **BOC Exs. 8 & 8A**. This part of the copying effort incurred $2,178.18.

35. Dewberry would not have incurred these collection and imaging costs but for the need to obtain them for use in the litigation. The Order entered into by this Court required the discovery to be provided to the opposing party in a specific format, as opposed to inspection at the source. These services were not for mere efficiency. Furthermore, because the parties had agreed to take all depositions via videoconference (28 in total), and would use electronic copies of images of documents as opposed to paper copies for exhibits during the questioning, it was particularly important to have the documents collected and maintained by a discovery vendor with the capacity to provide the exhibits in whatever electronic format might ultimately be required by the court reporting/videoconferencing service conducting the depositions. This made the array of ESI-related services and tools provided by Driven not only useful, but necessary.

36. Based on my nearly 15 years of experience exclusively in the field of electronic discovery strategy and management, the charges invoiced by Driven for these services are reasonable and appropriate.

[Execution page to follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Meghan A. Podolny

Dated: April 26, 2022