UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| DEWBERRY ENGINEERS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:20-cv-610-LO-IDD |
| DEWBERRY GROUP, INC. F/K/A | ) | |
| DEWBERRY CAPITAL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR ATTORNEYS' FEES

After more than a year of intense litigation featuring 28 virtual depositions, reports from nine expert witnesses, extensive briefing on cross-motions for summary judgment, three concurrent *Daubert* motions, and a three-day bench trial for damages, Plaintiff Dewberry Engineers Inc. ("Dewberry") emerged completely victorious on all of its claims against Defendant Dewberry Group, Inc. ("Dewberry Group"), including all of its Lanham Act claims. After the Court's summary judgment ruling (and the Defendant's failed motion for partial reconsideration), Dewberry obtained a permanent injunction to stop Dewberry Group's continued infringement.  Then, after the bench trial, the Court awarded Dewberry nearly $43 million in disgorged profits.  *See* Dkt. No. 256 (unsealed on April 1, 2022 pursuant to Order at Dkt. No. 266).  In that Order, the Court held, among other things, that "Dewberry Group continuously disregarded Dewberry Engineers' trademark and contractual rights"; it "barreled ahead with its unlawful, all-encompassing rebranding" despite a parade of red flags warning that the rebrand would violate the parties' prior settlement agreement and the Lanham Act; that the trial testimony of two of its principal witnesses (its founder and CEO, John Dewberry, and its

former general counsel, David Groce) lacked credibility.  *See id*.  For these reasons and others, this Court correctly determined that this is an "exceptional case" warranting an additional award to Dewberry of its attorneys' fees incurred in this action.

Although the total fees paid by Dewberry to its outside counsel in prosecuting this challenging case and opposing Defendant's intense defensive efforts, are greater and fully justified, as reflected by the accompanying declarations of its outside counsel at Hunton Andrews Kurth LLP ("Hunton") and McCandlish Lillard, P.C. ("McCandlish"), Arthur E. Schmalz and Alan B. Croft, as explained below, for the purposes of this fee claim, Dewberry accepts the lodestar analysis of its attorneys' fee expert, Craig C. Reilly, Esq., in his accompanying declaration to arrive at the reduced amount of **$5,588,387.00**, plus an additional **$39,000.00** for fees associated with the preparation of the attorneys' fee application.   For the reasons set forth below, the Court should adopt that total amount (**$5,627,387.00**) as the appropriate fee award to Dewberry.

## **RELEVANT FACTUAL BACKGROUND**

Dewberry filed its Complaint in this action on May 29, 2020, during the first wave of the Covid-19 pandemic in the United States.  The Declarations of Arthur E. Schmalz and Alan B. Croft, filed concurrently herewith and incorporated by reference, together carefully describe the sequence of litigation through discovery (including depositions conducted completely virtually), motions practice, the damages trial, and post-trial briefing.  In addition, the Declaration of Meghan A. Podolny, also filed concurrently herewith and also incorporated by reference, describes particular challenges and costs relating to the discovery of electronically stored information ("ESI") in this case.  Highlights of this litigation's chronology follow below.

**McCandlish's Role as Lead Counsel through October 2020**:  For many years, McCandlish has been Dewberry's outside counsel for handling various trademark-related matters, including handling the filing and prosecution of Dewberry's service marks at issue with the USPTO, together with periodic maintenance filings thereafter.  *See* Croft Decl. ¶¶ 11, 19. From approximately late 2017 through the fall of 2019, McCandlish prepared cease and desist correspondence to Dewberry Group regarding its infringing "Dewberry" service mark applications at issue in this litigation, and also submitted letters of protest relating thereto to the USPTO.  *Id*.  Most of McCandlish's work up to this time was handled by McCandlish partner, Ralph M. Tener, who specializes in trademark-related matters. *Id*.  By late 2019, when litigation with Dewberry Group became inevitable, McCandlish began the necessary pre-filing investigation, drafted and filed the Complaint, moved for and obtained dismissal of Dewberry Group's counterclaims, and prepared and responded to discovery requests, the vast majority of which was done by Mr. Tener, Alan B Croft, a McCandlish partner, and Mark Abrajano, a McCandlish associate.  *Id.* ¶¶ 12–13 .

As the case began to move into discovery after issuance of the Scheduling Order in mid-October 2020, it became apparent that settlement was unlikely and that the litigation was going to be significantly more intensive than originally expected. *Id.* ¶ 14.  Among other things, it became apparent that a very large volume of electronically stored information ("ESI") and hard copy documents would have to be collected and produced by both sides in a compressed time frame, work that McCandlish was not well-equipped to handle at that time.  *Id.*; Schmalz Decl. ¶ 6.  After Hunton took over as lead counsel, McCandlish attorneys remained involved in the case in a valuable support role, including taking and defending depositions, and assisting with expert reports and motions practice.  Croft Decl. ¶ 16.

**Hunton's Engagement as Lead Counsel in October 2020 Through Trial:** Art Schmalz at Hunton entered his appearance in this action on November 2, 2020.  Schmalz Decl. ¶ 7.  Within about one month, he and his team at Hunton had interviewed over 20 witnesses; collected, reviewed, and produced over 22,000 pages worth of Dewberry's ESI responsive to the Defendant's document requests; began privilege log preparations; located and engaged three outside expert witnesses (on the subjects of real estate development, damages, and confusion); served initial disclosures; answered 52 requests for production, 260 requests for admissions, and 25 interrogatories (not counting subparts); and propounded a second set of interrogatories, a second and third request for production of documents, and a Rule 30(b)(6) deposition notice to Dewberry Group, among other things.  *Id.* ¶¶ 6, 13.

This was no small feat, as many of Dewberry Group's discovery requests required Hunton to investigate and address issues involving facts and issues dating back a half century or more.  Not surprisingly, Dewberry's Answers to the 260 requests for admission comprised 64 pages, and its Answers to the 25 Interrogatories spanned 44 pages, with an additional 11-page chart compiling extensive factual details requested by the Defendant about nearly 60 separate real estate development projects that Dewberry and its owners had pursued since the 1960s. Podolny Decl. ¶ 11.  One of the reasons that discovery was so demanding was Dewberry's need to prove its legacy right to the marks at issue.  *Id.*  ¶ 12.  Dewberry Group vigorously contested that point, claiming that the parties did not operate in the same industry and instead provided entirely different services to entirely different types of customers in dissimilar markets— arguments that Dewberry ultimately proved to be false during the summary judgment proceedings.  *Id.*  In fact, in an effort to reduce the need for such exhaustive historical discovery and evidentiary exposition during summary judgment and trial, Dewberry also asked opposing

counsel to agree to drop Dewberry Group's prior-use/senior user affirmative defense because Defendant had raised that very same defense and argument in the earlier 2007 litigation— defenses and arguments that were conclusively settled and dismissed.  *Id.*  Dewberry Group, however, refused to do so.  *Id.*; *see also* Schmalz Decl., ¶¶ 21(a), 36.

Because Dewberry Group's prior-use defense asserted prior uses of "Dewberry" dating back to the late 1980s, counsel for Dewberry had no choice but to diligently search for documents and witnesses to help prove Dewberry's specific uses of the Dewberry name and mark from decades earlier and involvement in real-estate development going back to the 1960s. *Id.* ¶ 13; *see also* Schmalz Decl., ¶¶ 21(a), 36.  This included a painstaking search for and documentation of evidence of the use of the Dewberry name and mark used for a wide array of services, in work provided for different client industries and in multiple geographic areas. Podolny Decl., ¶ 13.  Many of these documents were found only in archived hard copy sources, which Hunton had to scan to provide a copy for use in the litigation.  *Id.* ¶ 14.  Due to the age of these documents, the quality of the scan and associated indexing meant Dewberry could not rely on text-based searches to narrow what was reviewed.  *Id.* ¶ 14.

Then, on February 2, 2021, just 10 days before opening expert reports were due, and less than two months before the close of all discovery pursuant to the scheduling order in place at that time, Dewberry Group provided Dewberry a "document dump" of nearly 290,000 pages of emails and documents, many of which were responsive to document requests issued in June 2020.  *Id.* ¶ 22.  Up to that time, Dewberry Group had only produced approximately 118 emails, as Ms. Podolny noted in a previous declaration submitted in this case.  *Id.*; *see* Dkt. 59-1, ¶ 8. Indeed, in a December 11, 2020 joint motion to modify the pretrial schedule, Dewberry Group acknowledged its failure to supplement its prior, November 2, 2020 production as promised, but

claimed to be diligently working to do so and expressed its intention "to produce a significant number of documents responsive to Dewberry's Requests for Production" the following week, leading Dewberry to "agree not to file the motion to compel that it had anticipated filing." *Id.*; *see* Dkt. 032, ¶ 5.  A nearly 290,000 page ESI dump nearly two months later, barely a week before the opening expert report deadline, was not the diligent, good faith discovery progress Dewberry anticipated from Defendant. *Id.*

To make matters worse, when asked for its consent to a 30-day extension of the opening expert report deadline and discovery cutoff in light of the massive ESI dump, Dewberry Group would agree to only 15 days. *Id.* ¶ 23; *see* Dkt. 59-2, ¶¶ 5–6.  Having no other option under the circumstances, the Hunton team quickly dove into the enormous quantity of ESI to (1) locate relevant documents and supply them to Dewberry's experts for use in their reports and disclosures that were due two weeks later, and (2) identify key information necessary for the large number of depositions to be taken starting about a week later.  This was an incredibly intensive and time consuming effort. *Id.*

The deposition schedule was also unrelenting, with 28 depositions, 18 of which were taken in less than four weeks during March and April 2021.  Schmalz Decl ¶ 21(d).  More than half of those deponents were Dewberry's fact and expert witnesses, all of whom required intense preparation—some including multiple sessions. *Id.* ¶ 21.  Dewberry served four initial expert reports and another four rebuttal reports to Dewberry Group's experts. *Id.*  Summary judgment briefing totaled 105 pages for each side (40-page opening briefs and oppositions and 25-page replies) and—because Dewberry Group wrongly contended that these parties do not operate in the same industry—painstakingly detailed Dewberry's use of its marks and its diverse array of services, including real-estate development, going back to the 1960s. *Id.* ¶¶ 36–37.  Dewberry

Group also moved to exclude the opinions set forth in three of Dewberry's expert disclosures (Bosco, Berger, and Hasson and Beight), which required massive additional resources to oppose those motions *concurrently with summary judgment briefing*.  *Id.* ¶ 21(e).

In addition, Dewberry Group fought tooth-and-nail for every possible litigation advantage.  Examples include Dewberry Group's filing a meritless counterclaim, which the Court dismissed, its refusal to drop its unfounded prior-use defense, its filing multiple, unsuccessful *Daubert* motions to exclude Dewberry's expert witnesses, its filing an unfounded motion for partial reconsideration of the Court's summary judgment ruling, and its filing a motion asking for the unprecedented relief of sealing the amount of the Court's damages award and other key aspects of its ruling.  Schmalz Decl. ¶ 65.

Despite all of these challenges, and at great expense, Dewberry prevailed on all of its claims against Dewberry Group in this action for breach of contract and violation of state and federal trademark infringement and unfair competition—achieving total victory in the form of a permanent injunction, a profits disgorgement, and attorneys' fees.

## ARGUMENT

### I.      Dewberry is the prevailing party in this exceptional case.

The Lanham Act, at 15 U.S.C. § 1117(a) provides that, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  There can be no question either that that Dewberry is the prevailing party or that this is an exceptional case.  Dewberry prevailed on all five of its claims, including those arising under the Lanham Act, at the summary judgment stage.  *See* Dkt. No. 174.  It obtained a permanent injunction (Dkt. No. 229) and a monetary award disgorging $42.9 million in profits from Dewberry Group (Dkt. No. 256).  And the Court held that this is an "exceptional case" for purposes of fee-shifting, specifically finding "beyond a

preponderance of the evidence that Dewberry Group engaged in bad faith, intentional misconduct." Dkt. No. 256, at 27–28. Specifically, "Dewberry Group pervasively breached the CSA over Dewberry Engineers' objection, in contravention of its General Counsel's false assurance, and in the face of multiple red flags, which were cited by the Court on summary judgment . . . and bolstered at trial." *Id.* The Court continued, explaining that a profits disgorgement, plus fee-shifting, were, "necessary to deter Dewberry Group from continuing its wrongdoing, and ensure that it doesn't unjustly benefit from four years' use of the Infringing Marks." *Id.* The only remaining question, therefore, is the amount of attorneys' fees to award to Dewberry.

## II.     The lodestar calculation supports Dewberry's request.

Once it became clear that Dewberry Group would not cease its infringement of Dewberry's federally registered trademark rights—and indeed that Dewberry Group would even take the position that *it* was the senior user of the marks in question—Dewberry met Dewberry Group's bluster with strength. Dewberry filed suit, prosecuted its claims relentlessly, won quick dismissal of Dewberry Group's ill-founded counterclaims, and achieved total victory on the merits of its claims. But Dewberry Group did not give up easily, and Dewberry's victory did not come cheaply: Dewberry spent hefty sums to defend its sterling reputation, protect its federally registered trademarks, and restore the goodwill it earned through decades of excellent work.

Because the Court already determined that Dewberry is entitled to its reasonable attorneys' fees, the only question now is the amount of the fee award. "The Fourth Circuit employs a three-step methodology in calculating the appropriate fee award." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 234 F. Supp. 3d 760, 766 (E.D. Va. 2017), *vacated on other grounds*, 881 F.3d 293 (4th Cir. 2018). **<u>Step one</u>** is to determine the lodestar figure. *Id.* (citing

*McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013)).  That involves simply "multiplying the hours spent on a case by a reasonable hourly rate of compensation for each attorney involved." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 563 (1986), *supplemented*, 483 U.S. 711 (1987).  "The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence" and is entitled to a "strong presumption" of reasonableness.  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (citation omitted).  **Step two** is to "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *BMG*, 234 F. Supp. 3d at 766 (quoting *McAfee*, 738 F.3d at 88).  And **step three** is for the court to "award[] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.* (quoting *McAfee*, 738 F.3d at 88) (alteration in original).

In this case, the three-step inquiry essentially collapses into one: the lodestar calculation of hours spent on the case by each attorney multiplied by their reasonable hourly rates.  None of Dewberry's claims were unsuccessful, so there is no reduction in step two, and Dewberry achieved total success on the merits, so the percentage of fees awarded in step three should be nothing short of 100%.  The singular question here, then, is what is the appropriate lodestar figure?

When deciding "what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013), *as amended* (Jan. 23, 2014).  The Fourth Circuit has interpreted the *Johnson* factors as encompassing the following:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the

litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009). This Court has observed, however, that "in the wake of the Supreme Court's decision in *Perdue*, at least eight of the *Johnson* factors have been subsumed in the initial lodestar analysis." *Page v. Va. State Bd. of Elections*, No. 3:13-CV-678, 2015 WL 11256614, at *2 (E.D. Va. Mar. 11, 2015) (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010)).

Specifically, Factors (3), (4), (5), (6), (9), and (12) all bear on the reasonableness of the rates, while Factors (1), (2), and (7) bear on the number of hours reasonably expended. *Page*, 2015 WL 11256614, at *3 (citation omitted). The remaining factors are Factor (8), the results obtained, which is discussed in Part II.C, *infra* and favors an award of 100% of the lodestar; Factor (10), the undesirability of the case, which is not relevant here; and Factor (11), the nature and length of the relationship between Dewberry and counsel, which has been long and mutually productive, *see* Croft Decl. ¶¶ 11, 19 (Dewberry and McCandlish); Schmalz Decl. ¶ 15 (Dewberry and Hunton), and also supports the conclusion that the rates charged and paid were reasonable. As explained below, the lodestar analysis supports the requested attorneys' fee award to Dewberry.

**A.    Dewberry's counsel's hourly rates were reasonable for this type of work in this community.**

It is the fee applicant's duty to "submit evidence supporting the hours worked and rates claimed." *BMG*, 234 F. Supp. 3d at 770 (quoting *Hensley v. Eckerhart*, 461 U.S. at 424, 433 (1983)). Such evidence typically includes attorney affidavits from counsel who worked on the case, plus "affidavits of other local lawyers who are familiar both with the skills of the fee

applicants and more generally with the type of work in the relevant community." *Id.* (quoting *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009) (other citations omitted). The "relevant market" in this inquiry is "ordinarily the community in which the court where the action is prosecuted sits." *Id.* (quoting *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175) (4th Cir. 1994)). In other words, the hourly rate inquiry is "best guided by what attorneys earn from paying clients for similar services in similar circumstances." *Rum Creek*, 31 F.3d 169 at 175. For at least three reasons, the Court should find that the hourly rates that Dewberry's counsel charged are reasonable and appropriate here under the circumstances.

**First**, Dewberry engaged counsel at Hunton and McCandlish at the rates described below and in the accompanying Declaration of Craig Reilly and in the invoices attached hereto as Exhibits A (Hunton) and C (McCandlish).[1] *See* Reilly Decl. ¶¶ 28–34 & Attachs. C (Hunton attorney rate table), D (Hunton other timekeepers rate table), E (McCandlish rate table). Dewberry then paid its bills timely and reliably throughout this litigation. *See* Schmalz Decl. ¶ 11; Croft Decl. ¶ 17. Such engagement and payment by itself goes a long way toward establishing the reasonableness of the rates established and paid. As explained by the Fourth Circuit, "market rates may be provided by the rate which clients normally and willingly pay the petitioning attorneys." *Rum Creek*, 31 F.3d at 175; *see also Page*, 2015 WL 11256614, at *4 ("[T]he prevailing party should be 'compensated at the rate that the attorney would receive in cases not governed by the federal fee-shifting statutes.'") (quoting *Perdue*, 559 U.S. at 554–55).

---

[1] The two firms' invoices attached as Exhibits A and C hereto are authenticated in the Declarations of Messrs. Schmalz and Croft (Schmalz Decl., ¶ 11; Croft Decl., ¶ 7). Exhibit B, attached, is a chart summarizing Hunton's invoices at issue, including pre-bill write-offs (that do not appear on the invoices) and discounts reflected on the invoices. Schmalz Decl., ¶ 11.

Here, the rates for attorneys and hourly professionals at Hunton and McCandlish are not only the rates agreed to and paid by Dewberry, but they are also the rates normally charged by those firms for their respective attorneys and staff in the ordinary course of business, and in Hunton's case, less applicable negotiated discounts relating to the sheer volume of work undertaken here.  *See* Schmalz Decl. ¶ 11; Croft Decl. ¶ 10.  In other words, this is not a case where the prevailing party never actually paid the hourly rates being claimed in the lodestar, as in the case of a civil rights case involving fee-shifting.  Here, counsel charged, and Dewberry paid, the rates associated with the fees it now seeks to recover.

**Second**, as explained in the Declaration of Craig Reilly, the rates charged by Dewberry's counsel in this dispute are within the current prevailing market rates in Northern Virginia for complex litigation.  *See* Reilly Decl. ¶¶ 23–34.  Mr. Reilly is an eminently qualified and experienced local practitioner with knowledge of the legal market whose opinions on attorneys' fees have been accepted many times by this Court and by Virginia state courts.  *See id.* ¶¶ 8–10.  Indeed, more than ten years ago, this Court in *Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10-cv-00502, 2011 WL 13369780, at *6 (E.D. Va. Aug. 24, 2011) found Mr. Reilly's declaration "satisfactory in establishing the reasonableness of the market rate in the relevant community of Northern Virginia because [it] demonstrates his knowledge and experience with attorney fee rates for similar services in Northern Virginia."  According to Mr. Reilly, the ranges of hourly rates for complex litigation in Northern Virginia in 2011, based on the years of experience of the timekeepers, were as follows:

| *Vienna Metro* Rates | | | | | |
|---|---|---|---|---|---|
| Paralegal | 1-3 years of experience | 4-7 years of experience | 8-10 years of experience | 11-19 years of experience | 20+ years of experience |
| $130-350 | $250-435 | $350-600 | $465-640 | $520-770 | $505-820 |

*Id.* As mentioned, this Court has relied on Mr. Reilly's *Vienna Metro* matrix in subsequent cases. *See* Reilly Decl. ¶ 8 (citing *E.g.*, *Tech Systems, Inc. v. Pyles*, No. 1:12cv374 (GBL/JFA), 2013 U.S. Dist. LEXIS 110636, *19–20 & n.4 (E.D. Va. Aug. 6, 2013); *Taylor v. Republic Services, Inc.*, No. 1:12cv523 (GBL/IDD), 2014 U.S. Dist. LEXIS 11086, *14–15 (E.D. Va. Jan. 29, 2014); *Zoroastrian Ctr. and Darb-E-Mehr Metro. Wash., D.C. v. Rustam Guiv Found.*, No. 1:13cv980 (LO/TRJ), 2017 U.S. Dist. LEXIS 43754, *32–33 (E.D. Va. Mar. 24, 2017); *BMG*, 234 F. Supp. 3d at 770–73). Mr. Reilly additionally has testified or presented his written expert opinions on the reasonableness (or not) of attorneys' fees in Northern Virginia in numerous cases over the years. Reilly Decl. ¶ 11 & Attach. B.

The rates described in *Vienna Metro* are now more than ten years old, and local legal billing rates have risen since 2011—particularly since 2015. Reilly Decl. ¶ 27. Yet as set forth in Craig Reilly's declaration and the accompanying tables, the billing rates of the Hunton attorneys—even before considering applicable discounts that Hunton applied to its invoices—are still within or close to their respective *Vienna Metro* ranges (the only exceptions being the three Hunton partners' rates, which modestly exceed the *Vienna Metro* maximum, and Hunton staff attorney Natalie Harris's rate, which falls below where *Vienna Metro* would predict it to be based on her years of experience). *See* Reilly Decl. ¶ 28 & Attach. C (Hunton attorney rates are reasonable). Importantly, according to Mr. Reilly, the three partners' rates listed above that exceed *Vienna Metro* "are consistent with ***current*** market rates for similarly skilled attorneys with similar skills and experience." *Id* ¶ 29. These rates are reasonable for the Northern Virginia legal market and should be used in the Court's lodestar analysis. *Id.* ¶ 29.

Counsel at Hunton received valuable assistance from non-attorney timekeepers throughout the case. Although Hunton's non-attorney timekeeper chart contains many names,

the vast majority of that work at Hunton was conducted by just two paralegals: Stephanie Meharg and Meredith Malcolm.  *See* Schmalz Decl. ¶ 55.  Other timekeepers were involved in discrete and limited roles from time to time for necessary or specialized support, including librarians obtaining certain research materials, such as trademark-law treatises, and on-line records and materials, among other things.  *Id.* ¶ 56.  In any event, Mr. Reilly also explains that the rates charged by Hunton's non-attorney timekeepers are reasonable for the local Northern Virginia market, which now supports higher rates than it did at the time of *Vienna Metro* ten years ago.  Reilly Decl., ¶¶ 30–33 & Attach. D.  Furthermore, Hunton exercised billing judgment and did not charge Dewberry for any fees for certain of these non-attorney timekeepers, for whom Dewberry does not seek to recover fees.  *Id*. ¶ 116.

Art Schmalz is a partner in Hunton's Washington, D.C. office with 29 years of litigation experience who confirms his view, in agreement with Mr. Reilly's, that Hunton's attorney and non-attorney rates are reasonable and consistent with the rates prevailing in the market today, and that the hours expended in this litigation were also reasonable.  Schmalz Decl. ¶¶ 17, 63, 65.

Mr. Reilly also confirms that McCandlish's rates, while generally lower than Hunton's, are reasonable based on the respective timekeepers' seniority levels, as shown below in comparison to *Vienna Metro* rates.  *See* Reilly Decl. ¶ 34 & Attach. E.  Further, Alan Croft is senior counsel at McCandlish with more than forty years of experience who confirms his view, also in agreement with Mr. Reilly's, that McCandlish's rates shown in the table below are reasonable and consistent with the rates prevailing in the market today.  Croft Decl. ¶¶ 4, 17.

**Third**, the complexity of this trademark litigation, coupled with its taking place in this Court's "Rocket Docket," demanded premium rates commanded by an international firm like Hunton that was capable of performing excellent legal work in a short timeframe.  Reilly Decl. ¶

14

26.  Indeed, as recognized in the McCarthy treatise, courts have observed that "[t]rademark litigation is a particularly difficult field of specialization and is recognized as meriting greater than average rate of pay."  5 McCarthy on Trademarks and Unfair Competition § 30:102 (citations omitted).  The workload in this case for Dewberry's counsel was simply massive, as explained above, and required Hunton's lead counsel, Mr. Schmalz, and the core members of the Hunton team to be "all in" from the outset of the case and most of the remaining litigation.  *See* Schmalz Decl. ¶¶ 6, 12–13, 63, 65; Podolny Decl. ¶¶ 6–24.  For all of these reasons, the rates for Hunton and McCandlish are reasonable and appropriate here and should not be subject to any additional discounts in the lodestar analysis.

**B.      The number of hours expended were reasonable, given the complexity and intensity of the litigation, yet Dewberry accepts the lodestar determination of its fee expert, Craig Reilly.**

Although Dewberry prevailed over Dewberry Group at every stage of this litigation, this case was no cakewalk.  Dewberry Group refused to acknowledge its wrongdoing at every turn, requiring Dewberry to aggressively and relentlessly prosecute its federal trademark rights and its contract rights obtained in the CSA to overcome Defendant's fusillade of legal and factual arguments, many of which the Court ultimately found to be baseless on summary judgment and at trial.  Among other things, right out of the box, Dewberry Group even asserted a meritless counterclaim seeking cancellation of Dewberry's trademark rights that the Court dismissed as plainly barred by the CSA.  *See* Dkt. No. 14.  Thereafter, among other things, Defendant launched a huge blitz of voluminous discovery and document/ESI production requests, sought to quash all of Dewberry's third-party subpoenas (a move which completely backfired on it), delayed producing all but a tiny handful of emails until its massive ESI dump 10 days before the scheduled expert deadline, launched three unfounded *Daubert* motions concurrently with its summary judgment motion, unsuccessfully sought partial reconsideration of the Court's

15

summary judgment rulings, presented key fact witnesses at trial who offered testimony the Court found to be utterly lacking in credibility, and then took the unheard of step of asking the Court to permanently seal not only key portions of the Court's damages award, but also the very amount of the award.  Schmalz Decl., ¶ 65.  Given Dewberry Group's fervent, no-holds-barred defense, Dewberry's experienced litigators at Hunton and McCandlish necessarily had to expend huge efforts to fend off those attacks, as well as investigate, develop, and win this case.  And even though Dewberry's summary judgment victory limited the trial to the issue of damages, the trial was not just a quick discussion of Dewberry Group's finances.  Rather, to justify a disgorgement-of-profits remedy, Dewberry had to establish at trial, among other things, that Dewberry Group infringed willfully and intentionally and that the permanent injunction would not sufficiently deter Dewberry Group from continuing to infringe.  *See* Order, Dkt. No. 256 (citing *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006)).  On top of that, Dewberry had to penetrate, both legally and factually, the complicated skein of non-arms' length financial maneuverings of Defendant, together with its affiliated "ownership entities" and president/owner John Dewberry, in order to establish the appropriateness of a large profits disgorgement award of the magnitude that the Court ultimately awarded.  Dkt. 256.  After three days and six witnesses, plus two rounds of post-trial briefing, Dewberry had done exactly that.  Nevertheless, in an effort to keep costs to manageable levels, lead counsel at Hunton (Art Schmalz) exercised billing judgment throughout this case, as described below, and Dewberry further accepts the additional lodestar adjustments of its expert, Mr. Reilly, which should militate against any further reductions by the Court.

First, Dewberry does not even begin its hours tabulation, at Mr. Reilly's recommendation, until October 2019 when McCandlish began conducting pre-litigation work in

earnest.  *See* Reilly Decl. ¶ 40 & Attach. F.  Pre-litigation fees like those incurred by counsel

when researching and drafting of a complaint are recoverable.  *E.g.*, *Ray Haluch Gravel Co. v.*

*Central Pension Fund of Op. Engrs.*, 571 U.S. 177, 189–90 (2014); *Mary Kay Inc. v. Ayres*, 827

F. Supp. 2d 584, 593 (D.S.C. 2011) (acknowledging "the considerable work required to

investigate a trademark matter prior to filing suit" and awarding fees in connection with such

work).  So despite McCandlish incurring substantial fees from late 2017 until the fall of 2019, in

the leadup to the litigation, Mr. Reilly concludes that only the work performed by McCandlish

between October 2019 and the filing date of May 29, 2020 should be included in the lodestar

analysis.  *See* Reilly Decl. ¶ 40 & Attach. G.  Similarly, although Mr. Demm at Hunton assisted

with some of the 2017 and 2018 cease and desist letters and subsequent letters of protest filed

with the PTO, none of the fees associated with those efforts are included in Dewberry's fee

application.  Rather, consistent with Mr. Reilly's analysis, Dewberry's fee claim does not include

any of Hunton's fees in the lodestar calculation until the firm took over as lead counsel in late

October of 2020.  *Id.* at ¶ 41 & Attach. F.

When it comes to Hunton's hours, Mr. Schmalz exercised billing judgment throughout

this litigation.  These include performing substantial pre-bill write-offs of time (over

$163,000.00 in all) which do not appear on the invoices, to adjust for time spent by associate

Brian Wright learning the case after joining the litigation team to replace the senior associate,

Ms. Peters, who had to leave the case for health reasons, and for any duplication of efforts

resulting from more than one associate assisting with the preparation and taking of certain

depositions, among other things.  *See* Schmalz Decl. ¶¶ 9 n.1, 11, 22, 40.  Hunton also wrote off

or provided at not charge on the invoices more than 40 hours of valuable research and other work

performed by its summer associates, *id.* ¶ 11, certain time from its non-attorney timekeepers, *id.*

¶ 56, and over $28,000.00 in total legal research costs from its invoices to Dewberry. Schmalz

Decl. ¶ 64. Notably, courts including this one have allowed prevailing parties to recover their

legal research costs, either as a component of non-taxable expenses included in their attorneys'

fee applications (*see, e.g.*, *Mulugeta v. Ademachew*, No. 1:17-cv-649, 2019 WL 7945712, at *7

(E.D. Va. Nov. 6, 2019); *Taylor v. Republic Servs., Inc.*, No. 1:12-CV-00523-GBL, 2014 WL

325169, at *13 (E.D. Va. Jan. 29, 2014); *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 43 (1st Cir.

2006) or as a taxable cost under 28 U.S.C. § 1920 (*e.g.*, *Lamonaca v. Tread Corp.*, 157 F. Supp.

3d 507, 522 (W.D. Va. 2016)). Counsel's billing discretion, however, preemptively removes

those costs from consideration here and serves as further reason for the Court not to impose any

additional reductions in counsel's rates or hours expended beyond those recommended by Mr.

Reilly.

Then, on top of the discretionary pre-bill write-offs, Hunton exercised billing judgment

by providing at least a 16% discount on the total fees billed on every invoice, with much greater

discounts on several of them (e.g., 25% for Oct.-Dec. 2020; 30% (Feb. 2021), and 32% (March

2021). Schmalz Decl., ¶ 11. All told, billing judgment during the litigation, including the pre-

bill write-offs and discounts reflected on the invoices reduced Hunton's total fees by more than

$1.7 million. *Id.*, ¶ 64. *See BMG*, 234 F. Supp. 3d at 773 ("[T]he reasonableness of these hours

is enhanced by the fact that [counsel] has used his billing judgment to eliminate almost $1

million in fees from the total tally [of $10.479 million].").

In addition, for the purposes of its fee claim here, Dewberry has removed more than

$62,000 of fees associated with redacted entries in Hunton's January and March 2022 invoices

because they do not relate directly to the merits-stage litigation of this case. *See* Schmalz Decl.,

¶ 66. With that adjustment, the total Hunton fees submitted for this fee claim amount to

$**5,990,335.00**. *Id*., ¶ 67; *see also* Ex. B (Chart).  As noted below however, Hunton and Dewberry agree to accept Mr. Reilly's reduced lodestar amount of $**5,329,425.00** for the purposes of the Hunton fees at issue in this fee application.  That amount, however, does not include any fees associated with the preparation of Dewberry's fee application prepared by Hunton.  *See* Schmalz Decl., ¶ 69; Reilly Decl., ¶¶ 110, 142.  Given the breadth and scope of the facts and circumstances of the litigation among other things, the firm had to spend considerably more time and effort than the 60 hours deemed appropriate by Mr. Reilly in his declaration.  Schmalz Decl., ¶ 68; Reilly Decl., ¶ 141.  Dewberry, nonetheless defers to Mr. Reilly's judgment and accepts the $**39,000.00** amount that he deems reasonable for preparation of the fee application.  *Id*.

McCandlish likewise exercised billing discretion in the course of its billings to Dewberry.  Croft Decl., ¶22.  Although its actual fees from October 2019 through January 2022 were substantially greater (over $413,000.00), McCandlish and Dewberry concur with the adjustments that Mr. Reilly has made in his lodestar analysis of those fees to arrive at $**258,962.00**.  *Id*., ¶ 23.

Finally, as noted, while both Hunton and McCandlish firmly believe that all of the work and fees reflected in their firms' respective invoices was fair and reasonable under the very challenging demands and circumstances of this case, solely for purposes of this fee application, they and Dewberry have adopted the conclusions of its fee expert Craig Reilly, who carefully scrutinized the invoices and work performed in this case and applied the hypothetical lodestar analysis used in this Court to arrive at the lower fee total for both firms' work of $**5,588,387.00**.  *See* Schmalz Decl., ¶ 69; Croft Decl., ¶ 23; Reilly Decl. ¶¶ 42–52 & 57–120 (explaining Mr. Reilly's adjustments to every monthly Hunton invoice and agreed adjustments to McCandlish's fees).  And as previously noted, Dewberry also accepts Mr. Reilly's determination that an

additional $**39,000.00** is an appropriate fee award for Hunton's time spent preparing the fee application and supporting materials.  Mr. Reilly's monthly lodestar amounts are tabulated in Attachments F and G to his declaration.  Mr. Schmalz has reviewed all of Mr. Reilly's proposed reductions and Mr. Schmalz, Mr. Croft, and Dewberry all concur in Mr. Reilly's analysis, which has the effect of reducing the total lodestar amount by over $**800,000.00** to account for things like potentially overlapping work performed by multiple attorneys at certain stages of the litigation.  *See id.*  The final lodestar figure of $**5,588,387.00**, plus an additional $**39,000.00** for the fee application, as calculated by Mr. Reilly, is more than reasonable considering the frantic pace, broad scope, and intensity of this litigation as already described.

The Court noted correctly in its *BMG* opinion concerning fees that "large law firms are often hired to cinch every belt, tighten every suspender, and scrutinize every Bluebook citation." 234 F. Supp. 3d at 773 (citing *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 152 F. Supp. 3d 503, 527 (E.D. Va. 2015).  The Court further explained that doing so "may be expected in the context of large law firms," but it is not always "'reasonable' in the legal sense" because "oftentimes a more focused expenditure of hours from fewer attorneys could have achieved the same task with the same results." *Id.* (reducing the total claimed fee by 10%). Nevertheless, given Dewberry's total adoption of Mr. Reilly's recommendations with respect to reducing the lodestar, an additional reduction like the one in *BMG* is neither necessary nor appropriate here merely because multiple lawyers worked on behalf of Dewberry in this intense fight.  As the Court explained in *Page*,

> "[t]here is no per se rule preventing more than one attorney from participating in court, at depositions, or at conferences."  In additional to being "not at all uncommon," conferences between attorneys "often result in greater efficiency and less duplication of effort, thus requiring fewer hours overall."  The mere fact that many attorneys worked on the case therefore does not justify a reduction in Plaintiffs' claimed hours.

*Page*, 2015 WL 11256614, at *9 (internal citations omitted).

Additionally, it bears repeating that Dewberry initially hired McCandlish, a relatively small northern Virginia firm with lower rates than Hunton's, to handle this litigation.  Croft Decl. ¶ 6.  It was only after it became clear that the demands of the case would be too taxing for McCandlish alone that Dewberry engaged Hunton, with its deeper bench of attorneys and broader array of litigation skill sets and resources, to keep pace with Dewberry Group's big-firm counsel.  Schmalz Decl. ¶¶ 6–7.  Indeed, no doubt part of the reason that the litigation threatened to overwhelm McCandlish is that Dewberry Group was represented by Arnall Golden Gregory LLP, a large firm that ranked #189 in the AmLaw200 for the year 2021.  *See* Law.com profile, *available at* https://www.law.com/law-firm-profile/?id=14&name=Arnall-Golden-Gregory (last visited April 14, 2022); Reilly Decl. ¶ 46 (describing Arnall Golden Gregory as a firm with nearly 200 lawyers and about 50 litigators).  It would be inequitable to penalize Dewberry now, after prevailing on its infringement claims against an intentional infringer, by reducing its fee award in part because the infringer had hired large-firm defense counsel, which led to Dewberry's eventually deciding also to hire a large firm in Hunton.  Reilly Decl. ¶ 47.

Finally, Dewberry Group cannot be heard to complain that the number of hours were unreasonable when its litigation tactics forced Dewberry's counsel to incur many of those hours.  *See Va. Academy of Clinical Psychologists v. Blue Shield of Va.*, 543 F. Supp. 126, 134 (E.D. Va. 1982); *accord Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) (citation omitted) (instructing that a litigant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [other party] in response").  To recap, Dewberry Group filed completely meritless counterclaims that, although clearly precluded by the CSA, nevertheless required full briefing.  *See* Dkt. Nos. 15, 17, 18 (briefing), and 19 (dismissal order).  Dewberry

Group also produced a 290,000 page ESI dump just 10 days before the expert witness report deadline in February 2021, and barely a month before depositions were to begin. Schmalz Decl. ¶ 31. Throughout summary judgment proceedings, Dewberry Group argued that the CSA meant the complete opposite of what it said. *See* Order, Dkt. No. 174, at 15 ("Defendant argues that Plaintiff consented to Dewberry Group's use of DEWBERRY CAPITAL, and then attempts to extrapolate this limited grant of consent to a wider grant of consent to the term 'Dewberry' in general. ***The CSA, in fact, says the opposite:*** not only is the consent of Defendant's use of 'Dewberry' (with regards to real estate development and related services) limited to just the use of 'Dewberry Capital,' even this was impermissible within Virginia.") (emphasis added). Then, after losing on summary judgment, Dewberry Group argued in a motion for reconsideration that the Court had "mistakenly granted summary judgment on a claim that Plaintiff did not allege or articulate in its Complaint." Dkt. 185. The Court shut that argument down too, but only after Dewberry again had to expend significant resources to oppose the motion. Observing that "[a] motion for reconsideration is an extraordinary remedy which should be used sparingly," the Court denied the motion, ruling that Defendant "was undoubtedly on notice from the Complaint" of the purportedly unasserted claim. Dkt. 207 at 2, 4. Dewberry correctly noted that Defendant's reply brief even altered an image of its letterhead, cropping out six other Infringing Marks from the top and bottom of the letter to suggest, incorrectly, that Defendant used its "Stylized D" logo "standing alone." Dkt. 205 at 4, n.1 (citing Dkt. 202 at 3). Accordingly, if Dewberry Group thinks Dewberry's fee request is high, Dewberry Group is a primary reason for it, and that is no basis to adjust the lodestar downward.

      **C.**    **There are no unsuccessful claims unrelated to successful ones.**

      Once the lodestar figure is established, it can be reduced to account for any unsuccessful claims, but "in order to qualify for a reduction" on the basis of unsuccessful claims, "the party

must lose its 'prevailing party' status as to a distinct portion of the case." *BMG*, 234 F. Supp. 3d at 776.  That isn't so here.  Dewberry not only prevailed on every one of its claims, but it also prevailed in defeating Dewberry Group's counterclaim.  Dewberry additionally won the permanent injunctive and monetary relief it sought, plus attorneys' fees in an amount to be determined.

That Dewberry's Complaint included three counts based on state law causes of action (which do not involve fee-shifting) in addition to its two Lanham Act counts (which do) has no effect on the lodestar calculation.  When claims "involve a common core of facts or will be based on related legal theories," it is inevitable that "[m]uch of counsel's time will be devoted generally to the litigation as a whole," which makes it difficult, if not impossible, to attribute counsel's hours to any specific claim or defense.  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).  Accordingly, this lawsuit "cannot be viewed as a series of discrete claims."  *Id.*  Rather, the Court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  *Id.*

As already mentioned, the overall result obtained by Dewberry is nothing short of an unqualified success.  The only arguable setback to Dewberry during this litigation is when the Court denied Dewberry's request for leave to file a motion for partial summary judgment last spring (*see* Dkt. Nos. 51–55 (motion and brief), 58 (opposition), 59 (reply), and 60 (order)), but that comes nowhere close to meeting the standard to discount the fee petition by the amount of the fees incurred to prepare and file that unsuccessful motion.  Dewberry's motion for partial summary judgment was, simply put, not an "unsuccessful claim[] unrelated to successful ones," *BMG*, 234 F. Supp. 3d at 775 (quoting *McAfee*, 738 F.3d at 88), that would "justify treating [that motion] as a 'separate lawsuit[],'" *id.* (quoting *Plyler v. Evatt*, 902 F.2d 273, 280 (4th Cir. 1990)

23

(alteration in *BMG*).  Dewberry filed that motion to combat Dewberry Group's Eighth

Affirmative Defense (i.e., that *Dewberry Group* was actually the "senior user" of the marks in

question), *see* Dkt. No. 54—which is a defense that Dewberry ultimately overcame later in the

case anyway.  The motion therefore is not fairly considered "unrelated" to Dewberry's successful

claims, or a distinct portion of the case.  Accordingly, there should be no downward adjustment

to the lodestar to account for any unsuccessful, unrelated claims.

### D.    Dewberry's claims were completely successful.

In the final step of the lodestar analysis, the Court "award[s] some percentage of the

remaining amount, depending on the degree of success enjoyed by the plaintiff."  *BMG*, 234 F.

Supp. 3d at 776 (quoting *McAfee*, 738 F.3d at 88) (alteration in original).  "There is no precise

rule of formula for making these determinations."  *Hensley*, 461 U.S. at 436.  But where, as here,

"a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee,"

*BMG*, 234 F. Supp. 3d at 776 (quoting *Hensley*, 461 U.S. at 435).  As already noted, Dewberry

achieved total victory at every meaningful stage of litigation, ultimately winning dismissal of

Dewberry Group's counterclaims, obtaining a permanent injunction against Dewberry Group's

continued infringement, and earning a $42.9 million award of disgorged profits, plus attorneys'

fees.  That deserves 100% of the lodestar calculation.

### CONCLUSION

Dewberry Group's intentional infringement forced Dewberry either to (1) stand aside and

allow its goodwill to be damaged by an entity run by "Atlanta's Emperor of Empty Lots"[2] hell-

bent on infringing Dewberry's federally registered marks or (2) stand and fight for the reputation

---

[2] *See* Bloomberg Businessweek, "Atlanta's Emperor of Empty Lots," *available at* *https://www.bloomberg.com/news/features/2017-09-12/atlanta-s-emperor-of-empty-lots* (last visited April 14, 2022).

that Dewberry had built over more than a half century.  Dewberry chose to fight.  The fight was

neither easy nor cheap, but it was overwhelmingly successful.  In circumstances like these, the

Lanham Act contemplates that a bad-faith, intentional infringer like Dewberry Group will pay

the full attorneys' fees of the trademark owner.  The Court should apply the lodestar

methodology as recommended by Craig Reilly and adopted by Dewberry herein and conclude

that Dewberry is entitled to attorneys' fees in the total amount of **$5,627,387.00**, consisting of

attorneys' fees incurred during the merits litigation of $**5,588,387.00**, together with an additional

award of **$39,000.00** for fees associated with the preparation of Dewberry's attorneys' fee

application and supporting papers.

Dated:  April 29, 2022

Respectfully submitted,

DEWBERRY ENGINEERS INC.

**By Counsel**

By:   /s/ Arthur E. Schmalz

| | |
|---|---|
| Stephen P. Demm (VSB # 30534) | Arthur E. Schmalz (VSB # 36014) |
| Brian A. Wright (VSB # 82827) | HUNTON ANDREWS KURTH LLP |
| HUNTON ANDREWS KURTH LLP | 2200 Pennsylvania Ave. N.W. |
| 951 East Byrd Street | Washington, D.C. 20037 |
| Richmond, VA 23219 | Tel: (703) 714-7467 |
| Tel: (804) 788-8331 | Fax: (202) 778-2201 |
| Fax: (804) 343-4513 | aschmalz@huntonak.com |
| sdemm@huntonak.com | |
| wrightb@huntonak.com | Alan B. Croft (VSB # 9209) |
| | MCCANDLISH LILLARD, P.C. |
| | 11350 Random Hills Road, Suite 500 |
| | Fairfax, VA 22030 |
| | Tel: (703) 273-2288 |
| | Fax: (703) 273-4592 |
| | acroft@mccandlaw.com |

*Counsel for Plaintiff Dewberry Engineers Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2022, I caused a copy of the foregoing to be electronically filed using the CM/ECF system, which will send notification to counsel of record of such filing by operation of the Court's electronic system.  Parties may access this filing via the Court's electronic system.

By     /s/  Arthur E. Schmalz

26